UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| ISMAEL MARRERO ROLON, ANNE CATESBY JONES, JORGE VALDES LLAUGER, PUERTO RICO BATHROOM REMODELING, INC., PERFORMANCE CHEMICALS COMPANY, INC. | Civ. No. 15-01167 (JAG) |
| | CLASS ACTION COMPLAINT |
| Plaintiffs, | JURY DEMAND |
| v. | |
| AUTORIDAD DE ENERGIA ELECTRICA A/K/A PUERTO RICO ELECTRIC POWER AUTHORITY; WILLIAM RODNEY CLARK; EDWIN RODRIGUEZ; CESAR TORRES MARRERO; INSPECTORATE AMERICA CORPORATION; BUREAU VERITAS HOLDING, INC.; CORE LABORATORIES N.V. D/B/A SAYBOLT; ALTOL CHEMICAL ENVIRONMENTAL LABORATORY INC. D/B/A ALCHEM LABORATORY; ALTOL ENVIROMENTAL SERVICES, INC. D/B/A ALTOL ENTERPRISES; PETROBRAS AMERICA, INC.; PETROLEO BRASILEIRO S.A.; CARLOS R. MENDEZ & ASSOCIATES; SHELL TRADING (US) COMPANY; PUMA ENERGY CARIBE LLC; PUMA ENERGY INTERNATIONAL, B.V. TRAFIGURA A.G., TRAFIGURA BEHEER, B.V.; PETROWEST, INC.; VITOL, S.A., INC.; VITOL, INC.; JOHN DOES 1-100 | |
| Defendants | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AS TO SAYBOLT LP A DELAWARE LIMITED PARTNERSHIP [HEREINAFTER SAYBOLT] ERRONEOUSLY DENOMINATED CORE LABORATORIES, N.V. D/B/A SAYBOLT FOR FAILURE TO STATE A CLAIM [UNDER RULE 12(b)(6) OF F.R.C.P. AND RULE 9(b) OF F.R.C.P.]**

# TABLE OF CONTENTS

I.     PREFACE ................................................................................... 1

II.    THE STANDARDS APPLICABLE TO A MOTION TO DISMISS UNDER
       RULE 12(b)(6) AND RULE 9(b) ............................................. 2

III.   THE FACTUAL ALLEGATIONS ............................................. 5

       A. Plaintiffs' Class ............................................................... 5

       B. Defendants ...................................................................... 5

       C. Class Period .................................................................... 6

       D. The Alleged Fraudulent Scheme .................................... 6

       E. Use of the Mails ............................................................. 10

       F. Fraudulent Concealment ................................................. 11

IV.    DISCUSSION OF THE GROUNDS TO DISMISS THE COMPLAINT

       A. THE INJURY ALLEGEDLY CAUSED TO PLAINTIFFS' PUTATIVE CLASS
          OCCURRED SINCE 2002 AND NO NEW AND INDEPENDENT INJURY IS
          ALLEGED TO HAVE OCCURRED AFTER 2006. THEREFORE THE COMPLAINT
          BROUGHT IN 2015 IS BARRED BY THE FOUR YEAR APPLICABLE STATUTE
          OF LIMITATIONS ................................................................. 11

          1.  The Accrual Period in RICO Action ........................... 12

          2.  The Accrual of Plaintiffs' Cause of Actions.............. 13

       B. EVEN ASSUMING THAT EVERY SHIPMENT OF NON-COMPLIANT OIL
          WHICH WAS SOLD TO PREPA AS COMPLIANT BASED ON THE
          RICO SCHEME TRIGGERED A NEW CAUSE OF ACTION, THERE IS NO
          PLAUSIBLE ALLEGATION THAT CO-DEFENDANT SAYBOLT ENGAGED
          IN ANY FRAUDULENT CONDUCT AS PART OF THE ALLEGED RICO
          SCHEME DURING THE FOUR YEAR PERIOD PRIOR TO FEBRUARY 24, 2015,
          THAT IS FROM FEBRUARY 24, 2011 TO FEBRUARY 24, 2015 .................. 14

       C. THE ALLEGATIONS OF THE COMPLAINT DO NOT WARRANT THE
          APPLICATION OF THE DOCTRINE OF FRAUDULENT CONCEALMENT .......... 17

D. THE PLAINTIFFS HAVE FAILED TO ALLEGE A SUBSTANTIVE RICO VIOLATION AS REQUIRED BY SECTION 1962(C)OR A CONSPIRACY UNDER SECTION 1962(d) OF THE RICO STATUTE. THEREFORE THEY LACK  STANDING TO BRING THE PRESENT ACTION ................................. 19

E. THE COMPLAINT FAILS TO STATE A CAUSE OF ACTION UNDER THE ANALOGOUS DOCTRINE OF THE FILED RATE .......................................... 20

F. THE COMPLAINT FAILS TO STATE THE REQUIREMENTS OF USE OF THE MAILS WITH THE SUFFICIENT PARTICULARITY ......................................... 21

G. IF THE PRINCIPAL CAUSE OF ACTION IS DISMISSED ON THE ABOVE GROUNDS THIS HONORABLE COURT SHOULD DECLINE TO ENTERTAIN THE LOCAL ACTION OF UNJUST ENRICHMENT UNDER THE CIVIL CODE OF PUERTO RICO ................................................................................... 22

V.      CONCLUSION  ..................................................................... 22

## TABLE OF AUTHORITIES

**Federal Statutes and Cases**

Rule 12(b)(6) of F.R.C.P............................................................... 2, 3

Rule 9(b) of F.R.C.P ................................................. 2,3,15,17,19,21

**Federal Cases**

*Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 456 (1991) ..................... 20

*Armstrong v. McAlpin,* 699 F.2d 79, 90 (2nd Cir. 1983) ............................. 18

*Agency HoldingCorp. V. Malley-Duff & Associates, Inc.,* 483 U.S. 143 (1987)........................................................... 4

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................... 3

*Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1102 (2nd Cir. 1988) ....... 4

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559 (2007) ........................ 4

*Bingham v. Zolt,* 66 F.3d 553, 559 (2nd Cir. 1995) ..................................... 4,12

*Callahan v. U.S.*, 426 F.3d 444, 454 (2005) ................................................. 5

*Craighead v.* E.F. Button & Co., 899 F.2d 485, 495 (6th Cir. 1990) ........... 17

*De Sole v.Knoedler Gallery, L.L.C.,* 974 F.Supp.2d 274, 318 (2013)........ 18

*Educadores Puertorriqueños v. Rey Hernández,* 508 F.Supp.2d
    164, 175 (D.P.R. 2007) ........................................................ 22

*González v. United States,* 284 F.3d 281 (1st Cir. 2002)............................ 5

*In Re: Celexa and Lexapro Marketing and Sales Practices Litigation,*
    2014 WL 7009339.............................................................. 4

*In Re: Lupron Marketing and sales Practices Litigation,*
    295 F.Supp.2d 148,169 (D. Mass. 2003) ........................................... 21

*In Re: Processed Egg Products Antitrust Litigation,* 2013 WL
    4504768 ............................................................ 19

*In Re: Trilegiant Corp.,* 11 F.Supp.3d, 82 (2014)....................................... 13

*In Re: Elec. Carbon Prod. Antitrust Litigation,* 333 F.Supp.2d
    303, 317 (2004)................................................................ 18

*Klehr v. A.O. Smith Corp.,* 521 U.S. 179 (1997)......................................... 5

*Lancaster Community Hospital v. Antelope Valley Hospital District,*
    940 F.2d 937, 405 (9th Cir. 1991) ....................................... 21

*Lares Group, II v. Tobin,* 221 F.3d 41, 44 (1stCir. 2000) ........................... 4

*Liberty Mut. Ins. Co. v. Excel Imaging P.C.,* 879 F.Supp.2d
    243 (2012)....................................................... 22

*Maiov. Aetna, Inc.,* 221 F.3d 472, 484, 486 (3rd Cir. 2000)........................ 20

*Medina & Medina v. Country Pride Foods Ltd.,*631 F.Supp. 293
    (D.P.R. 1986) ................................................. 22

*National Group for Communication and Computers v. Lucent
    Technologies, Inc.,* 420 F.Supp.2d 253, 266 (2006) ...................... 13

*Pharr v. Evergreen Gardens, Inc.,* 2004 WL 42262 ................................. 4,12

*Puerto Rico American Ins. Co. v. Burgos,* 283 F.Supp.2d 546, 549
    (D.P.R. 2003) ................................................. 17

*Rotella v. Woods,* 528 U.S. 549, 553 (2000)................................................. 12

*Santana-Castro v. Toledo Dávila*, 579 F.3d 109, 114 (1st. Cir. 2009........ 3

*Taffet v.Southern Co.,* 967 F.2d 1483 (1992)............................................. 20

**United Food and Commercial Workers Local 1776 v. Teikoku**
**Pharma USA, Inc.,** 2014 WL 6465235.............................................. 22

**Washtenau County Employees Retirement System v. AVID Technology,**
**Inc.,** 28 F.Supp.3d 93 (2014) ............................................................ 3

*WegolandLtd.v.* NYNEX Corp., 27 F.3d 17 (2nd Cir. 1994) ........................ 21

**Puerto Rico Statutes**

**Section 196 Tit. 22 L.P.R.A** .......................................................................... 21

**Law 57 of May 27, 2014** ............................................................................... 21

**Other Authorities**

**Gregory P. Joseph, Civil Rico; A Definitive Guide;**
**Chapter 7, 207, 216** ......................................................................... 15

**TO THE HONORABLE COURT:**

COMES now codefendant Saybolt LP, a Delaware limited partnership, erroneously denominated CORE Laboratories N.V. d/b/a SAYBOLT, hereinafter "Saybolt", and respectfully presents its Memorandum to move the Honorable Court to dismiss the complaint on the basis of Rules 12(b)(6)  and 9(b) of F.R.C.P.

I.    PREFACE

RICO civil actions serve a societal purpose. But, as any enabling legislation, can be used to file unwarranted claims. The courts at the initial stage of the litigation discharge their duty to sift the good from the bad by an intelligent and wise exercise of its analytical tools.

The 292 paragraphs complaint attempts to portrait and allegedly perfect[1] and perennial scheme devised by the Fuel Oil Suppliers of the Puerto Rico Electric Utility (hereinafter PREPA) to sell PREPA inferior fuel oil for the production of electricity at a superior price thus injuring PREPA economically and consequently the electricity consumers of Puerto Rico and by contaminating the environment with dirty fuel oil residues.  To accomplish said scheme the stated tale proceeds to describe how the Fuel Oil Suppliers, guided by greed, corrupted selected officers and employees of PREPA by giving them "lavish gifts", trips and commissions. They also enlisted the testing laboratories who acquiesced to the fraud by allegedly falsely issuing laboratory tests in exchange of continued business.

---

[1] Paragraph 106 of the Complaint alleges that PREPA has always accepted deliveries of non-compliant oil and has never rejected a complete shipment of oil.

Because Puerto Rico barely produces any renewable energy and most of it is generated by burning imported fuel oil in order to keep energy costs within bounds, the most common fuel oil burned is Fuel Oil No. 6, which is an oil residue containing various contaminants, specially Sulphur.  The Environmental Protection Agency, the federal regulatory agency, limited in 2004 the contents of Sulphur in such oil to a maximum of .50 per weight.  The alleged scheme, so says the complaint, endeavored successfully to sell PREPA oil containing an excess of Sulphur amount for oil that complies with the EPA standards.

The complaint traces the alleged scheme back to the prior century.  It came to light in the period of 2000 to 2002 and generated certain litigation in which a prior testing laboratory named Caleb Brett was sued by PREPA in this Honorable Court and in which PREPA obtained from Caleb an undisclosed amount of damages around 2002. Notwithstanding, the alleged scheme continued as business "as usual" to the present time.(Complaint ¶ 101)

The factual allegations of this alleged long fraudulent scheme are anecdotal, sparse and sprinkled with gossip, non sequiturs, innuendos, hearsay and conclusory statements.  But in a motion to dismiss generosity is the norm and said allegations must be taken as true together with their reasonable inferences in order to test whether a plausible cause of action and right of remedy exists.

II.    THE STANDARDS APPLICABLE TO A MOTION TO DISMISS UNDER
       RULE 12(b)(6) AND RULE 9(b)

The present motion is filed under Rule 12(b)(6) of F.R.C.P. and Rule 9(b) of F.R.C.P. to obtain dismissal of the present action as to "Saybolt".  We will discuss the

standards applicable to said motion and the applicable law regarding the statute of limitations applicable to RICO actions to determine whether the facts alleged in the complaint warrant that the complaint should be dismissed as barred by the applicable statute of limitations.  We will also argue Plaintiffs' failure to allege plausible acts of fraud, failure to plead any substantive RICO violation or a conspiracy nor a RICO injury, as well as lack of standing and lack of causation and cause of action under the doctrine of unjust enrichment.

Rule 12(b)(6) of F.R.C.P. allows a defendant to raise the defense of failure to state a claim upon which  relief can be granted. The affirmative defense of the statute of limitations is one that may be raised by motion to dismiss under rule 12(b)(6). See, *Santana-Castro v. Toledo-Dávila*, **579 F.3d 109, 114 (1st. Cir. 2009)**.  In the same manner the defense that Plaintiffs' fraud allegations have not been pleaded with the particularity of the circumstances required by Rule 9(b) of F.R.C.P. can be brought in a motion to dismiss.  See, *Washtenau County Employees Retirement System v. AVID Technology, Inc.*, **28 F.Supp.3d 93 (2014).**

Nevertheless, when a defendant submits a motion to dismiss a complaint for failure to state a claim he accepts for the purpose of the motion the truth of the well pleaded plausible factual allegations of the claim.  The court is allowed to make all inferences favorable from said facts in favor of Plaintiffs but does not have to accept legal conclusions as true.  *Ashcroft v. Iqbal*, **556 U.S. 662 (2009)**. The motion to dismiss will be granted if the defense appears clear on the face of Plaintiffs' pleadings. In short, in order to survive a motion to dismiss under Rule 12(b)(6) the complaint's well pleaded factual allegations taken as true must show that there is a right to a remedy

3

that is not defeated by any substantive applicable law. ***Bell Atlantic Corp. v. Twombly***, **550 U.S. 544, 559 (2007)**

In the present case Plaintiffs have based their claim under the civil provisions of RICO Act, 18 U.S.C. §1962(c). The Supreme Court of the United States has held that an action under the RICO provisions has a limitation period of four years since the accrual of the claim. ***Agency Holding Corp. v. Malley-Duff & Associates, Inc.,*** **483 U.S. 143 (1987)**.

In ***Lares Group, II v. Tobin***, **221 F.3d 41, 44 (1st Cir. 2000)** our First Circuit of Appeals adopted the majority view in the different circuits that the action accrues when the Plaintiffs knew or should have known of his injury.  The First Circuit accepted the Second Circuit's principles to the effect that each time that the Plaintiffs suffer a new and independent injury caused by a violation of 18 U.S.C. § 1962 a cause of action to recover damages for the injury based on that injury accrues to Plaintiffs at the time he discovered or should have discovered the injury (citing ***Bankers Trust Co. v. Rhoades***, **859 F.2d 1096, 1102 (2d Cir.1988)**. See, ***In Re:Celexa and Lexapro Marketing and Sales Practices Litigation***, **2014 WL 7009339**.

Each new and independent injury caused by the pattern of racketeering gives rise to a new cause of action that must be brought within the four year period since the discovery of such new injury.  But non-independent injuries will not cause a new limitations period to accrue. ***Bingham v. Zolt***, **66 F.3d 553, 559 (2d Cir.1995); Pharr v. Evergreen Gardens Inc., 2004 WL 42262**.

As an exception, the four year period of limitations can be tolled by the fraudulent concealment of the fraudulent action. *Klehr v. A. O. Smith Corp.*, **521 U.S. 179 (1997)** But it must be shown that Plaintiffs could not have found in the exercise of reasonable diligence the information necessary to file the suit. *Gonzalez v. United States*, **284 F.3d 281 (1st Cir. 2002).** As stated in *Callahan v. U.S.*, **426 F.3d 444, 454 (2005):**

> Like the discovery rule, the doctrine of fraudulent concealment is a means available to plaintiffs seeking to toll the statute of limitations. In order for a plaintiff to prevail on a fraudulent concealment claim, the defendant "must have engaged in fraud or deliberate concealment of material facts relating to his wrongdoing and the plaintiff must have failed to discover these facts within the normal limitations period despite his exercise of due diligence." [Citations omitted.]

III.    THE FACTUAL ALLEGATIONS

A. Plaintiffs' Class

Plaintiffs' putative class action complaint alleges that the Defendants, a substantial number of natural and juridical persons schemed to sell PREPA from 2002 on to the present Non-Compliant Fuel Oil to produce electricity be accepted by PREPA at a price in excess of its true value.  The class comprising all electricity consumers in Puerto Rico from 2002 to the present claims that it has suffered economic damage by paying PREPA electricity produced by an inferior product paid at a higher price.

B.  Defendants

The Defendants comprise certain employees and ex-employees of PREPA (alleged beneficiaries of the bribes, kickbacks, gifts and lavish entertainment), the Fuel Suppliers and their employers (the ones providing the bribes, kickbacks, gifts and lavish entertainment), the laboratories who tested the fuel oil supplied to determine whether it

5

complied with the specifications required who falsely altered the labs results. It also includes certain other named and undetermined persons and PREPA itself. The motive of the testing laboratories as alleged in the complaint is to continue receiving work from the fuel suppliers and from PREPA.

Saybolt is included as one of such laboratories that is alleged tested non-compliant as compliant allegedly in exchange for continued work.  (Complaint ¶ 2)

C. Class Period

The class period alleged in the complaint begins January 1st, 2002 to the present. The class of Plaintiffs includes all persons in Puerto Rico who consumed electricity within the period which paid for electricity based on Non-Compliant Fuel Oil.  (Complaint ¶ 4)  It is alleged that each of the plaintiffs in the putative class suffered money damages during the class period. (Complaint ¶¶ 7 to 11)

D.  The Alleged Fraudulent Scheme

The alleged continuing plot is detailed in this Section.  All these allegations are denied by Saybolt:  Under the direction and/or knowledge of PREPA Participants and Fuel Oil Suppliers, Laboratories routinely falsify the results throughout the class period. The laboratories falsify the results to secure more work and presumably in consideration that PREPA would abstain from using its own laboratory. (Complaint ¶ 73)

The PREPA Participants agreed to the Suppliers wishes in exchange of kickbacks and lavish trips and parties. (Complaint ¶ 75)

The alleged fraudulent scheme existed even prior to 2000.  As a result of an audit of the Comptroller in 2002 it came to public scrutiny (Complaint ¶¶ 83 to 95).  As a result PREPA filed a case based on the RICO Act against Caleb Brett, a testing laboratory,

6

based on Caleb Brett illegal actions in falsifying fuel results to make them compliant with the specifications.  PREPA settled the case with Caleb Brett for an undisclosed amount. Nevertheless, despite said litigation and the Comptroller findings, the scheme continued as business as usual, i.e., PREPA acquiring from the Suppliers Non-Compliant Fuel Oil and paying as it were Compliant Fuel Oil.  Said business as usual has extended from 2002 to the present.

Every shipment of fuel oil delivered by the Fuel Participants to PREPA since 2002 to the present has been noncompliant in at least five areas of the approximate 13 parameters that Fuel Oil is supposed to meet. (Complaint ¶ 103) PREPA has always accepted the deliveries of Non-Compliant Fuel Oil and has never rejected a complete shipment of Fuel Oil. (Complaint ¶ 106)  From 2010 to 2013 a hundred percent of the shipments from Fuel Oil Supplier Participants were out of specifications on viscosity. Therefore, confirming that all shipments were Non-Compliant Fuel Oil.  (Complaint ¶ 107)  As an example of the Non-Compliant Fuel Oil, on October 22, 2010 the tank of fuel oil was transferred to PREPA's tanks, and a test made by Alchem Laboratory that showed it was not Non-Compliant.  Officers from Petrobras, the shipper, had another laboratory (Inspectorate) resampled the fuel oil which showed that it was compliant. The fuel was accepted by PREPA's Officers based on Inspectorate results despite the results from Alchem. (Complaint ¶¶ 109 –112)

In early 2008 the testing of fuel oil made by Laboratory Alchem found that a sample was Non-Compliant. The sample was retested by Saybolt who found that it was compliant and PREPA accepted the fuel oil.  Then, members of PREPA Evaluating Committee of Suppliers (Audit Team) visited Saybolt on April 9, 2008 to assess the

7

conflicting results, but did not render any report.   (Complaint ¶¶ 109-115)   Other example occurred in December 24, 2008 when a chemist from PREPA documented in writing that the fuel oil in a reserve tank was Not-Compliant in asphaltenes. (Complaint ¶ 116)

On June 2009, an internal auditing in PREPA revealed deficiencies in the internal laboratory. (Complaint ¶¶117 - 121).   Around that time the Laboratory Participants had told the audit team that they had received instructions directly from the Fuel Oil Office to always certify Non-Compliant Fuel Oil as compliant regardless of the test result. (Complaint ¶ 124)  As a result, the Office of Internal Audit prepared a draft report to be submitted for review on November 2010.  The report included an "egregious example" occurred in May 19, 2010, PREPA Office of Fuel Oil bought 67,015.69 No. 6 barrels of fuel oil from Defendant STUSCO at a cost of $4,799,638. That tests were made and Alchem reported that the fuel was outside specifications regarding Sulphur, with a result of 0.51% instead of the limit imposed in the Consent Agreement with EPA of 0.50%. The shipment was retested by Alchem and at the request of STUSCO by Saybolt. In the retesting, Alchem reported results exceeding the specification of 0.51% and Saybolt reported exactly the maximum limit of 0.50% as alleged in the Complaint, PREPA accepted the fuel despite the fact that it was tested by Saybolt who was hired by STUSCO.

It is alleged that the Office of Internal Audit determined that Saybolt results were fraudulent because Saybolt reported the compliant sulfur results at 8:14 p.m. via electronic mail when in fact Saybolt analyzed the sample fuel until 8:49 p.m. That is that

Saybolt reported the results thirty five minutes before it conducted the analysis of the sample. (Complaint ¶ 132)

The Audit Report was to be presented by the Chairman of the Board of PREPA, Eng. Luis García Passalacqua on November 2010. (Complaint ¶135) Garcia Passalacqua insisted that the Report would be presented to the Board before the end 2010. (Complaint ¶ 143)   The report was finally presented to Vice-President of the Chairman of the Board, José Pérez Canabal.  (Complaint ¶ 146)  And the allegations of the report leaked to the media October 2011. (Caribbean Business Newspaper) (Complaint ¶ 149)

The Complaint continues to allege that Mr. Ivan Clark, an Auditor, hired by PREPA reported that for the period of December 2008 to December 2011, from 699 fuel quality samples only six turned up non-complaint (Complaint ¶ 152), something that was not considered legitimate by the Internal Auditors. (Complaint ¶ 153)

According to Alchem, every shipment of fuel oil by Vitol and PetroWest starting in 2012, contained more than the maximum allowed of one percent (1%) volume in water and sediment combined. (Complaint ¶¶ 154 – 157) And there was Non-Compliant Fuel Oil as to BTU during the class period.

An involvement of Saybolt refers to 2007 in an undetermined day at 8 a.m. When Alchem reported that the sulfur levels to be at .75 (being the maximum .70), Saybolt reported results at .70. To reach its result Saybolt was using Non-Compliant Fuel Oil to calibrate its instruments. (Complaint ¶ 165)   This is an example of what was typical during the whole class period. (Complaint ¶ 171).

9

As to Inspectorate, another Laboratory Participant, the allegations contained in Paragraph 172 to 205, make similar allegations pertaining to year 2010. (Complaint ¶¶ 207–216)

It is alleged that Saybolt received most of the business because Saybolt ensured that all tests for the fuel oil delivered by the fuel suppliers would reflect that the fuel was compliant.  (Complaint ¶¶ 217, 218)

In September 30, 2014 PREPA and Petrobras signed a contract for $680,000.00 agreeing to have the fuel tested by a mutually agreed laboratory.

On December 2014, Petrobras auditors stated that Alchem was the only one calibrating the instruments which was interpreted as an admission that Saybolt and Inspectorate were submitting false tests results. (Complaint ¶ 236)

A Petrobras auditor told Mr. Morales, then Alchem President, that the other laboratories (presumably including Saybolt) would always report .20 under the actual sulphur content and such was an admission by Petrobras that demonstrates that Saybolt and Inspectorate were submitting false reports. Further, that Petrobras would give the work to Saybolt and Inspectorate because they would give a passing grade to the oil.  Petrobras and PREPA were doing acts to insure the purchase of Non-Compliant Fuel Oil by accepting "irregularities" by laboratory participants Saybolt and Inspectorate.

E.  Use of the Mails

As to the use of mail and wires, it is alleged that the defendants used thousands of mails and interstate communications to further the fraudulent scheme of RICO. (Complaint ¶ 249)  And that they communicated by mail and telephone to consume their actions. (Complaint ¶ 250).

10

F.  Fraudulent Concealment

Defendants, it is alleged, concealed their actions. They hid their financial connections between PREPA participants and Fuel Oil Supplier Participants and used the Laboratory Participants to cover up the fraud with falsified reports. (Complaint ¶ 263)   Plaintiffs could not have discovered the scheme earlier.   Despite falsified laboratory results, the defendants did not disclose the kickbacks.  PREPA prevented internal auditors from conducting audits to discover the fraud and "buried auditors reports of fraudulent activity." That PREPA paid a purported independent auditor to cover up the scheme so that Plaintiffs could not have discovered the fraudulent nature of defendants' conduct.

It is averted that the scheme was discovered in 2014 after a television program which caused the launching of an investigation by the Puerto Rico Justice Department.


IV.    DISCUSSION OF THE GROUNDS TO DISMISS THE COMPLAINT

A. THE INJURY ALLEGEDLY CAUSED TO PLAINTIFFS' PUTATIVE CLASS OCCURRED SINCE 2002 AND NO NEW AND INDEPENDENT INJURY OCCURRED AFTER 2006. THEREFORE THE COMPLAINT BROUGHT IN 2015 IS BARRED BY THE FOUR YEAR APPLICABLE STATUTE OF LIMITATIONS.

The complaint traces the alleged pattern of racketeering and injuries to the consumers to a period prior to 2002 (Complaint ¶¶ 95 to 101) It is alleged, that the pattern of racketeering and injuries continued after 2002 despite the Comptroller's findings in 2002, the 2004 consent decree and PREPA's lawsuit against Caleb Brett "as business as usual." The business as usual allegations consisted in the continuing practice of shipping to PREPA "dirty" Oil 6 containing more than .50 Sulphur but obtaining a false Compliant Test Reports from the participating laboratories and lastly

11

by PREPA accepting such Non-Compliant Oil despite its knowledge that it was Non-Compliant.

The "dirty" Oil was burned into electricity and sold to the consumers which constitute the putative class and who were charged monthly an amount in excess of the real price of the oil. As it is alleged, PREPA never rejected any shipment from 2002 to the present. (Complaint ¶106)

Granting the truth of the above facts, as we must in a motion to dismiss, the injury to the consumers occurred in 2002 or before when the predicate acts of agreeing to test and testing falsely the oil and selling such inferior oil to PREPA which PREPA burned into electricity and sold it to the consumers occurred.

1. The Accrual Period in RICO Actions

The applicable rule as to the accrual of the four years statute of limitations in RICO actions is after the occurrence of the injury when the Plaintiffs knew or should have known that they had been suffered a RICO injury.  See, **Rotella v. Woods, 528 U.S. 549, 553 (2000)**.

Under said rule every time that the Plaintiffs suffer a new and independent injury, such injury starts the four year statute of limitations with regard to such specific injury. Such doctrine is known as the separate accrual rule.  **Bingham v. Zolt, supra**.  But as the rule makes clear, for the new injury to generate the accrual of a new cause of action it has to be independent.  Identical injuries will not trigger a new accrual period.  As held in **Pharr v. Evergreen Gardens, Inc., supra.**

12

("[F]or an injury to trigger the accrual of a new RICO claim, the injury must be new and independent.").  It is beyond peradventure that the plaintiffs' injury from the rent checks mailed within the past four years is not "a new and independent injury."  The injury the plaintiffs allegedly suffered due to the rent bills mailed within the four-year statute of limitations is identical to the injury they suffered when the defendants allegedly unlawfully increased the room count.  Thus, the fact that defendants continued to mail allegedly unlawful rent bills does not make plaintiffs' claim timely, as they knew or should have known about the illegal room count more than four years prior the commencement of this lawsuit.

Again in **National Group for Communication and Computers v. Lucent Technologies, Inc., 420 F.Supp.2d 253, 266 (2006)**, it was decided:

In this case, plaintiff's own allegations confirm that the kickback payments were clearly outlined to NGC several months before the first kickback payment was made. See SAC at ¶¶ 158, 164-77. The injuries caused by the Saudi kickback scheme were not speculative because NGC understood in 1995 that it would be making six percent kickback payments on all revenue earned from ASB subcontracts. Under these circumstances, we conclude that the statute of limitations began to run on all NGC's extortion claims when the first kickback payment was made in August 1995. Since plaintiff waited until 2003 to file this lawsuit, the RICO claims related to the alleged kickback payments are now time-barred.

Likewise in **In re Trilegiant Corp., 11 F.Supp.3d, 382 (2014)** the Plaintiffs argued that each monthly fee illegally charged triggered a new cause of action that accrued with each monthly charge.  The court disagreed and held that the action accrued at the time of the initial membership enrollment.

2.  The Accrual of Plaintiffs' Cause of Action

The alleged cause of action of the consumers in the present action accrued when since around 2002 they were billed every month for electricity generated by an inferior fuel when they knew or should had known that they were paying their electricity produced by an inferior fuel.  As stated in the complaint, in 2002 the Comptroller had

13

blown the cover to the scheme and even PREPA had sued an offending laboratory for engaging in said fraudulent practices.  The red flags of these two events were so glaring that gave Plaintiffs notice of the alleged continued scheme. The repeated electricity monthly bills were not a new independent injury. Therefore the complaint should have been brought not later than 2006 or 2007. In consequence the action is barred by the four years statute of limitations.

    B. EVEN ASSUMING THAT EVERY SHIPMENT OF NON-COMPLIANT OIL WHICH WAS SOLD TO PREPA AS COMPLIANT BASED ON THE RICO SCHEME TRIGGERED A NEW CAUSE OF ACTION, THERE IS NO PLAUSIBLE ALLEGATION THAT CO-DEFENDANT SAYBOLT ENGAGED IN ANY FRAUDULENT CONDUCT AS PART OF THE ALLEGED RICO SCHEME DURING THE FOUR YEAR PERIOD PRIOR TO FEBRUARY 24, 2015, THAT IS FROM FEBRUARY 24, 2011 TO FEBRUARY 24, 2015.

Under the accrual rule of RICO actions each new independent injury would trigger a new cause action.  Assuming that each shipment of Non-Compliant Oil sold as Compliant due to the RICO scheme triggered a new independent cause of action the putative class action would be limited to the last four years (in absence of fraudulent concealment which will discuss hereinafter).

Therefore, the Plaintiffs must allege as to Saybolt RICO predicate acts for each and every shipment during said period.

The required particularity of said allegations is missing as to Saybolt.  True that some paragraphs involving alleged fraudulent conduct of Saybolt are mentioned for the period before 2010.  (See, Complaint ¶132)  But with regard to the period 2011-2015 the few allegations against Saybolt as will appear fail to state Saybolt's fraudulent conduct with any particularity at all.

As it has been stated in the treatise ***Civil RICO: A Definitive Guide*, by Gregory**

**P. Joseph, Chapter 7, page 207**:

> The complexity of the RICO statute demands precision in pleading. *See, e.g., Connecticut Nat'l Bank v. Rytman*, 241 Conn. 24, 694 A.2d 1246, 1255 (1997) (quoting Treatise).  RICO complaints are strictly scrutinized because "[t]he mere assertion of a RICO claim … has an almost inevitable stigmatizing effect on those named as defendants.  In fairness to innocent parties, courts should strive to flush out frivolous RICO allegations at an early state of the litigation." *Figueroa Ruis v. Alegria,* 896 F.2d 645, 650 (1st Cir. 1990).

Because of this legitimate concern, the particularity requirements of Rule 9(b) of

F.R.C.P. have to be enforced.   These particular requirements have been clearly

expressed in the above cited treatise, at page 216.

> To the extent that any predicate acts sound in fraud—as, in practice, most do—the pleading of those acts must satisfy the particularity requirements of rule 9(b) of the Federal Rules of Civil Procedure. *See, e.g., Farlow v. Peat, Marwick, Mitchell & Co,* 956 F.2d 982 (10th Cir. 1992) ("Under Rule 9(b), plaintiffs must sufficiently allege each element of a RICO violation and its predicate acts of racketeering with particularity, a requirement justified by the 'threat of treble damages and injury to reputation'"); *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016 (7th Cir. 1992) ("the complaint must, at minimum, describe the predicate acts with some specificity and 'state the time, place, and content of the alleged communications perpetrating the fraud'"); *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.,* 940 F.Supp. 1101 (W.D. Mich. 1996) ("[A] complaint may not lump all the defendants together, but must specify who was involved in each activity"); *Lubin v. Sybendon Corp.,* 688 F.Supp. 1425 (S.D.Cal. 1988) excoriating "plaintiff's dragnet' tactic of indiscriminately grouping all of the individual defendants into one wrongdoing monolith"); *Craighead v. E.F. Hutton & Co., Inc.,* 899 F.2d 485 (6th Cir. 1990)(dismissing RICO claim for failure to plead predicate acts with particularity: "the plaintiffs' collection of conclusions and unrelated, unexplained events fails to set forth any instance of mail fraud, securities fraud, or any other fraud, with *any* particularity."

The few allegations against Saybolt during these last four years period fall short

of this test.  They are vague, generalized and full of unwarranted conclusions.

15

It is alleged for instance that from 2010 to 2013 a hundred percent of the shipments from the Fuel Oil Participants were out of specifications for viscosity. (Complaint ¶107)   Therefore, confirming that all shipments were Non-Compliant Oil. (Complaint ¶107)

Later, it is alleged, that from December 2008 to December 2011 from 699 fuel quality samples only 6 turned up Non-Compliant.  Something that was not considered legitimate by the internal auditors. (Complaint  ¶¶ 152-153).

It is also alleged that in 2012 every shipment of oil by Vital and PetroWest contained more than the maximum 1% allowable water and that there was Non-Compliant Oil as to BTU during the class period.  (Complaint ¶155)

The allegations against Saybolt during the pertinent period 2011-2015 are limited to the following:

On September 30, 2014 PREPA and Petrobras signed a contract for delivery of compliant oil agreeing to have the fuel tested by a mutually agreed laboratory.

On December 2014, Petrobras auditors stated that Alchem was the only one calibrating the instruments which was interpreted as an admission that Saybolt and Inspectorate were submitting false tests results. (Complaint ¶ 236)

That Petrobras auditor told Mr. Morales, then Alchem President, that the other laboratories (presumably including Saybolt) would always report .20 under the actual Sulphur content and such was an admission by Petrobras that demonstrates that Saybolt and Inspectorate were submitting false reports. Further, that Petrobras would

16

give the work to Saybolt and Inspectorate because they would give a passing grade to the oil.  Petrobras and PREPA were doing acts to insure the purchase of Non-Compliant Fuel Oil by accepting "irregularities" by Laboratory Participants Saybolt and Inspectorate.

Certainly such generalized conclusory and vague allegations fall short of the requirements of Rule 9(b) which demand that the complaint at a minimum describe the predicate acts with specificity and state the time, place, and content of the alleged communications perpetrating the fraud.  As in the case of **Craighead v. E.F. Button & Co., 899 F.2d 485, 495 (6th Cir. 1990)** the allegations of Plaintiffs are just a collection of conclusions and unrelated, unexplained events which fail to pinpoint fraud with any particularity. The Plaintiffs have failed to plead who, what, when and where Saybolt made the alleged fraudulent misrepresentations consisting of false reports so that of inferior oil could be accepted as compliant. **Puerto Rico American Ins. Co. v. Burgos, 283 F.Supp.2d 546, 549 (D.P.R. 2003)**. The few references to Saybolt involvement are generalized, conclusory and based on impermissible inferences.

C. THE ALLEGATIONS OF THE COMPLAINT DO NOT WARRANT THE APPLICATION OF THE DOCTRINE OF FRAUDULENT CONCEALMENT

In part VII of the complaint (Paragraph 263 on) the plaintiffs seek to preemptively defeat the argument that the complaint is barred by the four year statute of limitations. They allege that the Defendants involvement was hidden because the "Defendants hid their financial connections between the PREPA Participants and Fuel Oil Supplier Participants and used the Laboratory Participants to cover up the fraud with falsified lab reports."(Complaint ¶ 263)  They allege by way of example that "Defendants falsified lab

17

testing reports, and did not disclose the kickbacks paid and received in connection with fuel oil contracts and purchases."   Moreover, it is alleged that PREPA prevented its internal auditors from conducting audits that would have discovered the fraud and report material compliance with the EPA Consent Decrees, and that "Plaintiffs have been kept in ignorance of vital information essential to the pursuit of these clams [sic], without any fault or lack of diligence on their part."(Complaint ¶ 264)

The allegations of fraudulent concealment form part of the alleged fraudulent scheme and therefore the requirements of the particularity necessary to allege fraud are applicable. *In Re: Elec. Carbon Prod. Antitrust Litigation*, **333 F.Supp.2d 303, 317 (2004)** The Plaintiffs allege that the scheme came in to light when a former internal auditor from PREPA decided to report the scheme in a TV program.  His disclosures about PREPA participation in the scheme exposed the racketeering scheme.  The facts as alleged by the Plaintiffs present the question as to whether these generalized allegations of fraudulent concealment meet the need of particularized allegations required for the application of the doctrine of fraudulent concealment.  The law is that conclusory allegations of fraudulent concealment are not sufficient to toll the statute of limitations. ***Armstrong v. McAlpin***, **699 F.2d 79, 90 (2d Cir.1983)** As held in ***De Sole v. Knoedler Gallery***, **L.L.C., 974 F. Supp. 2d 274, 318 (2013)**:

> For equitable tolling to apply, a plaintiff may not rely on the same act that forms the basis for the claim — the later fraudulent misrepresentation must be for the purpose of concealing the former tort. See Zumpano v. Quinn, 6 N.Y.3d 666, 674, 816 N.Y.S.2d 703, 849 N.E.2d 926 (2006). Equitable tolling "`is triggered by some conduct on the part of the defendant after the initial wrongdoing; mere silence or failure to disclose the wrongdoing is insufficient.'" (Citations omitted.)

The allegations of fraudulent concealment must also show with particularity the efforts that Plaintiffs made to uncover their claim.  ***In Re: Processed Egg Products Antitrust Litigation*, 2013 WL 4504768**. As explained there:

> "Other courts also have held that a plaintiff must specifically plead how she exercised due diligence in order to rely on fraudulent concealment. See Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir.1975); Commonwealth of Pa. v. Lake Asphalt & Petroleum Co. of Pa., 610 F. Supp. 885, 890(M.D. Pa. 1985) (holding that the plaintiff failed to adequately plead due diligence because it did not allege "what [it] did itself to uncover its claim"); see also Hinds Cnty. v. Wachovia BankN.A., 620 F. Supp. 2d 499, 522 (S.D.N.Y. 2009) ("[T]he Court cannot find that a brief reference to 'reasonable diligence,' coupled with general allegations of secrecy and deception . . . satisfies the Named Plaintiffs' burden under Rule 9(b) to plead the third prong of fraudulent concealment with particularity."). P.3

These requirements of diligent inquiry acquire special significance when Plaintiffs knew that around 2002 of prior acts of RICO conduct had been committed and had been disclosed with the filing of the Caleb Brett litigation.  In the light of the above, their complaint is not saved by the doctrine of fraudulent concealment and should be dismissed as barred by the applicable statute of limitations.

D. THE PLAINTIFFS HAVE FAILED TO ALLEGE A SUBSTANTIVE RICO VIOLATION AS REQUIRED BY SECTION 1962(C) OR A CONSPIRACY UNDER SECTION 1962(D) OF THE RICO STATUTE. THEREFORE THEY LACK STANDING TO BRING THE PRESENT ACTION.

In an action for violation of section 1962(c) of the RICO Act the Plaintiff must show that the Defendant engaged in a pattern of racketeering activity that injured his business or property.  A claim under section 1962(d) requires facts showing a conspiracy to violate any substantive provision of the RICO act.  If Plaintiffs fail to allege violation of the substantive provisions of 1962, the conspiracy allegations also fail.

The Supreme Court of the United States has held that the Plaintiffs must show that the defendant's violation was not only a "but for" cause but also that the defendant's violation was the proximate cause as well.  See, ***Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 456 (1991).**   This standard requires a direct injury, not merely an indirect injury.  As in ***Anza***, the action of Plaintiffs as customers of PREPA is an indirect injury. The real party injured is PREPA who received a more contaminated oil which it would have been rejected if PREPA employees had known or had not been corrupted by the fuel suppliers.  By buying such oil PREPA was not meeting the EPA standards and was contributing to further environmental contamination. PREPA's right was not to pay a lower price for oil containing more than .50 Sulphur but to reject said shipment under the consent decreed that limited content to .50. PREPA could not accept said oil and charge less to the consumers. PREPA charged its customers the same rate. Therefore, consumers suffered no economic damages.   Any alleged damages resulting from greater contamination is not a tangible economic harm to the Plaintiffs' class that must be remedied by a RICO action. ***Maio v. Aetna, Inc.*, 221 F.3d 472, 484, 486 (3d Cir. 2000)** If there is no RICO injury, the Plaintiffs have no standing to bring an action under violation of section 1962(c) or 1962(d).

E. The Complaint Fails to State a Cause of action under the Analogous Doctrine of the Filed Rate

In the filed rate context, it has been held that a consumer does not have a cause of action under RICO based on the rates charged by the utility on the grounds that such a rate is based on illegal or fraudulent circumstances. Any remedy should be obtained within the regulatory frame work established by the legislature applicable to the agency. Allegations based on fraud are no exceptions.  ***Taffet v. Southern Co.*, 967 F.2d 1483**

**(1992)**;***Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d Cir. 1994)** The filing of this complaint in which PREPA is included as a defendant upsets the stability of rates established. ***Taffet v. Southern Co.*, supra at 1492.**

As the injury (if any) was suffered by PREPA the direct buyer of the fuel oil and what the putative class seeks is to obtain for itself the damages suffered by PREPA, the action is an attempt to upset the rates established by PREPA.   The latter has a regulatory process to fix its rates.   See Section 196 Tit. 22 L.P.R.A.   Recent legislation approved in 2014 (Law 57 of May 27 of 2014) has widened the regulatory process and has given exclusive primary jurisdiction to the Energy Commission created to regulate rates.

### F.  THE COMPLAINT FAILS TO STATE THE REQUIREMENTS OF USE OF THE MAILS WITH THE SUFFICIENT PARTICULARITY

Rule 9(b) particularity requirements apply to Plaintiffs' allegations of the use of mails in furtherance of the RICO scheme.   Plaintiff's allegations are generalized and in no way pinpoint any specific mailing by Saybolt.   See, ***Lancaster Community Hospital v. Antelope Valley Hospital District*, 940 F.2d 937, 405 (9th Cir. 1991)** (finding that the contentions regarding the use of mail were too generalized to satisfy Rule 9(b) where no specific mailings are mentioned.) ***In Re: Lupron Marketing and Sales Practices Litigation,* 295 F.Supp.2d 148, 169 (D. Mass. 2003)**  With regard to Saybolt there are no specific and particular allegations that in the period 2009-2014 mail communications were sent by Saybolt in furtherance of the scheme.   Therefore, the complaint fails to state a cause of action under RICO.

G. IF THE PRINCIPAL CAUSE OF ACTION IS DISMISSED ON THE ABOVE GROUNDS THIS HONORABLE COURT SHOULD DECLINE TO ENTERTAIN THE LOCAL ACTION OF UNJUST ENRICHMENT UNDER THE CIVIL CODE OF PUERTO RICO.

The doctrine of unjust enrichment is completely inapplicable to the present facts. Assuming that the defendants have been unjustly enriched, for the reasons previously discussed, it cannot be said that the Plaintiffs have suffered an unjust impoverishment. The doctrine of unjust enrichment is an equitable doctrine that comprises two prongs: first an unjust enrichment by one party and second, the corresponding loss on the other party.  *Medina & Medina v. Country Pride Foods Ltd.*, 631 F. Supp. 293 (D.P.R. 1986); *Liberty Mut. Ins. Co. v. Excel Imaging P.C.*, 879 F.Supp.2d 243 (2012)

The fact is that Plaintiffs did not suffer any economic loss. There are no decisions that allow an indirect purchaser such as Plaintiffs' class to bring an unjust enrichment claim when the same claim would be barred under state antitrust law.  *United Food and Commercial Workers Local 1776 v. Teikoku Pharma USA, Inc.,* 2014 WL 6465235.  In the alternative, this Honorable Court should decline to entertain the unjust enrichment claim if the Honorable Court dismisses the claims upon which it had original jurisdiction. If the court dismisses the federal claims it should decline to exercise supplemental jurisdiction over the only remaining cause of action, that is, unjust enrichment. *Educadores Puertorriqueños v. Rey Hernández*, 508 F. Supp. 2d 164, 175 (D.P.R. 2007)

## CONCLUSION

For the above reasons and arguments Co-defendant Saybolt requests the dismissal of the complaint as barred by the applicable statute of limitations and lack of cause of action and standing.

22

**RESPECTFULLY SUBMITTED**.

I CERTIFY that on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to attorneys of record.

In San Juan, Puerto Rico, this 29 day of April 2015.

S/Antonio J. Amadeo-Murga
Antonio J. Amadeo-Murga
USDC No. 110103

**ANTONIO J. AMADEO-MURGA**
**BUFETE A.J. AMADEO-MURGA**
420 Muñoz Rivera Avenue
Midtown Building, Suite 910
San Juan, PR 00918
Tel. (787) 765-2731
Fax. (787) 641-1845
E-mail. ajamadeo@gmail.com

S/Jose O. Ramos-Gonzalez
José O. Ramos-Gonzalez
USDC No. 201304
E-mail. rgtolaw@gmail.com

S/Yolanda V. Toyos-Olascoaga
Yolanda V. Toyos Olascoaga
USDC No. 201302
E-mail. ytoyos@ramostoyoslaw.com

**RAMOS GONZÁLEZ &**
**TOYOS OLASCOAGA, CSP**
PO Box 193317
San Juan, PR 00919-3317
Tel. (787) 765-2731
Fax. (787) 641-1845