## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **ISMAEL MARRERO ROLON**, *et. al.*, | |
| Plaintiff, | **CIVIL NO.:  15-cv-1167 (JAG)** |
| **V.** | |
| **AUTORIDAD DE ENERGIA ELECTRICA A/K/A PUERTO RICO ELECTRIC POWER AUTHORITY; et. al.** | **CLASS ACTION COMPLAIT** |
| | **TRIAL BY JURY DEMANDED** |
| Defendants. | |

### MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

**TO THE HONORABLE JAY GARCIA-GREGORY**

    **COME NOW** Defendants, Altol Chemical Environmental Laboratory, Inc. and Altol

Environmental Services, Inc., and respectfully state and request as follows:

**s/Rolando Emmanuelli Jiménez**
Rolando Emmanuelli-Jiménez
USDC – PR No. 214105
**Bufete Emmanuelli, C.S.P.**
P.O. Box 10779
Ponce, Puerto Rico 00732-0779
TEL. (787) 843-8406; Fax (787) 848-6586
E-mail: remmanuelli@me.com

**s/Thomas Trebilcock Horan**
Thomas Trebilcock-Horan
USDC - PR No. 220514
**Trebilcock & Rovira, LLC**
Ochoa Building
Suite 201, Tanca Street
San Juan, PR 00901
Phone No.  (787) 723-0439
E-mail: ttrebilcock@trebilcockrovira.com

# TABLE OF CONTENTS

I. Introduction ...................................................................................................... 4 - 9

    A. The Complaint and its allegations.............................................................4

    B. Alchem's arguments in support of dismissal................................................8

    C. Frivolous RICO suits such as this one should not be allowed. ....................9

II. Standard of Review: the "well pleaded complaint" and pleading fraud with particularity under Fed. R. Civ. P.9(b) ......................................................................... 10 - 13

III. Facts Plead in the Complaint relevant to Alchem ....................................... 13 - 28

    A. The alleged scheme ...............................................................................13

    B. The Fuel Oil Cartel identified ..................................................................14

    C. PREPA needs to purchase Fuel Oil ..........................................................15

    D. The Contract Between PREPA and the Fuel Oil Supplies............................15

    E. Laboratories test of the Fuel Oil prior to delivery .......................................16

    F. The Fuel Oil Cartel Enterprises' Conduct..................................................18

    G. The Enterprise ......................................................................................21

    H. Predicate Acts of Wire and/or Mail Fraud ................................................22

    I. Pleading Conspiracy ...............................................................................23

    J. Alchem's Conduct as Alleged in the Complaint...........................................23

    K. Laboratory Participants Testing Methodologies .........................................26

    L. Source of the Information.........................................................................27

    M. Injury to the Plaintiffs as Plead ...............................................................28

IV. Arguments in Support of Dismissal............................................................ 29 - 49

    (1) The Complaint simply fails to state a RICO Claim under § 1962(c) or (d)........... 29 - 30

    (2) Alchem did not participate in the alleged RICO Enterprise................................... 30 - 35

(a) Alchem was not part of an "Association in Fact"........................................................31

(b) Alchem's conduct and the alleged Pattern of Racketeering Activity ..........................33

(c) Plaintiffs allege that Alchem and "enterprise" participants are the same...................34

(3) Alchem's alleged Rackettering Activity ................................................................. 35 - 39

   a. Plaintiffs state no fact suggesting that Alchem committed "predicate acts"................35

   b. The "mail" and "wire" fraud allegations fail to meet Rule 9(b) standards ..................36

   c. The Complaint Fails to plead "intent" to deceive as to Alchem ...................................38

(4) The Complaint does not plead "conspiracy" to violate RICO ............................... 39 - 40

(5) The RICO claim is based upon mere assertions and "Information and Belief" ...... 40 - 42

(6) Plaintiffs failed to conduct a pre-suit investigation as required by Rule 11 .......... 42 - 44

(7) Plaintiffs lack Article III Standing and lack an "injury-in-fact" ........................... 44 - 47

(8) Any injuries sustained prior to February 24, 2011 are time-barred ....................... 47 - 48

(9) The Filed Rate Doctrine Bars Plaintiffs Damages Claim ...................................... 48 - 49

(10) Plaintiffs' Unjust Enrichment Claim Fails Too ................................................... 49 - 50

V.  Conclusion ...............................................................................................................50

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **ISMAEL MARRERO ROLON**, *et. al.*, | |
| Plaintiff, | **CIVIL NO.:  15-cv-1167 (JAG)** |
| **V.** | |
| **AUTORIDAD DE ENERGIA ELECTRICA A/K/A PUERTO RICO ELECTRIC POWER AUTHORITY; et. al.** | **CLASS ACTION COMPLAIT** |
| | **TRIAL BY JURY DEMANDED** |
| Defendants. | |

### MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

**TO THE HONORABLE JAY GARCIA-GREGORY**

> **COME NOW** Defendants, Altol Chemical Environmental Laboratory, Inc. ("Altol Chemical") and Altol Environmental Services, Inc. ("Altol Environmental") (hereinafter collectively referred to as "Alchem"), through the undersigned attorneys, respectfully state and request as follows:

**I.      INTRODUCTION**

**A.      The Complaint and its allegations**

> On February 24, 2015, Plaintiffs and the Class (collectively "Plaintiffs") filed the Complaint (D.E. # 1), comprised of three (3) counts, alleging that this Court has jurisdiction to entertain this case pursuant to 18 U.S.C. § 1964 (the "Complaint").  Counts I and II claim that Alchem and approximately eighteen (18) co-defendants engaged in a racketeering scheme to defraud Plaintiffs, through an enterprise, in violation of 18 U.S.C. §§ 1962(c) (RICO substantive) and (d) (RICO conspiracy), causing them economic damages.  Regarding the scheme, it

allegedly entailed the Puerto Rico Electric Power Authority ("PREPA") paying full price for fuel oil, used to produce electricity, which it knew was non-compliant with contractual and/or Environmental Protection Agency ("EPA") decree.   Count III of the Complaint, apparently pursued under state law, alleges the co-defendants unjustly enriched themselves though that scheme because Plaintiffs, as consumers of the public utilities' electricity, were the ones who ultimately paid "full price" in their monthly electric bills for that non-compliant fuel oil.

Notwithstanding Plaintiffs' bold allegations, Alchem **did not engage in any misconduct** and has always conducted its affairs correctly and ethically.

The Defendants are classified in three (3) groups: (a) PREPA, its employees and agents, who procure and buy the fuel oil used to produce electricity; (b) the "Fuel Oil Suppliers," who sell and deliver fuel oil to PREPA; and (c) the three (3) laboratories, which test the properties and quality of the fuel oil being delivered to PREPA for purchase.   Alchem is one of those laboratories, which Plaintiffs identify as "Participant Laboratories."

The Plaintiffs allege that the "racketeering scheme" has been perpetuated by the co-defendants over the span of thirteen (13) years, that is, from January 1, 2002 to the present. However, **solely regarding Alchem**, the Complaint states that "[u]ntil 2010, **Alchem did not participate in the Fuel Oil Cartel**, generally followed proper methodologies, and submitted actual test results to PREPA. (*See*, Plaintiffs' Statement, D.E. # 35 at pg. 11¶ ¶2; and, Complaint, D.E. # 1 at ¶ 206.) (Emphasis supplied.)

In sum, Plaintiffs generally allege that the three (3) Laboratory Participants facilitated the scheme to defraud by testing fuel oil arriving for delivery and then always issuing false "Certificates of Analysis" reports to show that Non-compliant Fuel Oil was compliant.[1]

---

[1]   The Complaint describes two (2) types of fuel oil: "Compliant Fuel Oil," which meets **unspecified** requirements of a 1999 EPA Consent Decree and contractual specifications; and, "Non-compliant Fuel Oil", which does not meet

However, besides its general allegations about the Participant Laboratories' conduct, the Complaint **does not contain a single fact statement** saying or suggesting that Alchem issued false reports or participated in the alleged scheme. The Plaintiffs' allegations are limited to general assertions simply making reference to the term "Laboratory Participants", without specifically identifying Alchem.

In fact, while the Plaintiffs claims against the laboratories are based on the latter issuing false Certificates of Analysis, a review of the Complaint shows that Alchem **consistently reported Non-compliant Fuel Oil.** Further, that Plaintiffs used Alchem to set the standard of how testing should be conducted and reported. Thus, the real question is: Why is Alchem a defendant in this case?

Also, while all three (3) laboratories were sued together, their alleged conduct or involvement in the alleged scheme is completely different. Alchem brings this to the Court's attention because the Complaint **is completely devoid** of any statement suggesting that Alchem was falsifying reports. It also states that the Fuel Oil Supplier Participants **excluded** Alchem from performing both Sample Analysis Tests (chemical composition test) and Inspection Tests (volume test) on their behalf. The Complaint also fails to suggest what authority if any Alchem had to decide which fuel oil was accepted or rejected by PREPA. Thus, What did it do wrong?

Additionally, regarding the framing of Plaintiffs claims, even if the Plaintiffs' basic arguments regarding the quality of the fuel oil were true, which Alchem denies, this case is nothing more than a contractual dispute between PREPA and the Fuel Oil Supplier Participants. The Racketeer Influenced and Corrupt Organizations Act ("RICO") provides no cause of action to individuals injured by acts other than by criminal RICO violations. As the Complaint states,

---

such specifications. The Complaint at time makes cursory reference to "sulfer" parameters, but is completely devoid of any explanation or reference to the alleged EPA standards or contractual specifications.

in the event that Non-Compliant Fuel Oil (with regards to BTUs) was delivered, PREPA had a contractual right to require a price discount for that fuel oil.  (*Id*. at ¶ 158.)  Choosing not to exercise that right was a PREPA business decision, not Alchem's prerogative.  Regarding environmental failures, the Complaint does not even address what remedies, if any, existed. Furthermore, it is noteworthy that Plaintiffs are not seeking declaratory or injunctive relief in order to invalidate those contracts or transactions under Puerto Rico law.

That is because the filing of this RICO case is merely an attempt by the Plaintiffs to secure Federal Jurisdiction and expand the available universe of compensation.  They are also trying to intimidate the co-defendants, including Alchem, who they perceive as "deep pockets." But, once the Complaint is carefully read, it becomes apparent that this law suit was filed without having conducted even a minimum investigation and is supported merely by a public report issued by the Puerto Rico Comptroller in 2002, newspaper articles and a television interview with Puerto Rico Senator Eduardo Bhatia.  Undoubtedly, PREPA is one of the most politicized government corporations in the Commonwealth of Puerto Rico, therefore it is always under the limelight and the object of the general public and media's speculation.

 Besides the information used from those skewed and baseless sources, the Complaint is merely composed of bold assertions based on "information and belief."  In sum, this case is a text book example of when Plaintiffs make unsupported assertions using boiler plate language to attempt to meet the F. R. Civ. P. 12(b)(6) standards and try to pursue a "big pay day."

Plaintiffs basically assert frivolous allegations of criminal conduct and racketeering activity against Alchem, which fail to establish the specific instances in which RICO would apply and fail to meet the plausibility criteria articulated in *Twombly* and *Iqbal*, and/or

heightened pleading standard for fraud allegations required by Fed. R. Civ. P. 9(b). In light of the foregoing, **dismissal is not only warranted, but necessary.**

      **B.**     **<u>Alchem's arguments in support of dismissal</u>**

Here, where such frivolous and false allegations have been raised against Alchem, it respectfully seeks refuge in the Court and requests the following arguments in support of dismissal be considered:

(1) The RICO Claims are insufficiently plead.

(2) Alchem did not participate in the alleged RICO "Enterprise":

      (a) Alchem is not part of an Association-in-Fact;

      (b) Alchem's conduct and the alleged Pattern of Racketeering Activity;

      (c) Plaintiffs allege that Alchem and the "Enterprise" are the same.

(3) Alchem's alleged Racketeering Activity:

      (a) Plaintiffs state no fact suggesting that Alchem committed "predicate acts";

      (b) The "mail" and "wire" fraud allegations fail to meet Rule 9(b) standards;

      (c) The Complaint fails to plead "intent" to deceive as to Alchem Labs.

(4) The Complaint does not plead "conspiracy" to violate RICO.

(5) The RICO claim is based upon mere assertions and "Information and Belief".

(6) Plaintiffs failed to conduct the pre-suit investigation required by Fed. R. Civ. P. 11.

(7) Plaintiffs' lack Article III Standing and there is "injury-in-fact" (it's speculative).

(8) Any injuries caused prior to February 24, 2011 are time barred.

(9) The Filed Rate Doctrine Bars Plaintiffs' Damages Claim.

(10) Plaintiffs' Unjust Enrichment Claim Fails Too.

C.     **Frivolous RICO suits such as this one should not be allowed**

RICO complaints such as this one need to be carefully scrutinized because the mere assertion of a RICO claim has an inevitable stigmatizing effect on the named defendants. Congress enacted RICO to combat organized crime, not to provide a federal cause of action and treble damages to Plaintiffs on fishing expeditions, which is what is occurring in this case. The First Circuit has stated:

> A civil RICO suit is in effect quasi-criminal in nature. *Page v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*, 806 F.2d 291, 298 (1st Cir. 1986). The mere assertion of a RICO claim consequently has an almost inevitable stigmatizing effect on those named as defendants. **In fairness to innocent parties, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.** [Emphasis provided]

*Ruiz v. Algeria*, 896 F.2d 645, 650 (1st Cir. 1990) (citation omitted). Alchem is such an innocent party and is clearly being affected by Plaintiffs false claims.

Some courts have compared a RICO claim to a potent weapon, the equivalent of a thermonuclear device. Furthermore, 18 U.S.C. § 1964(a), clearly states that the court which presides over a RICO claim, should "make [] due provisions for the rights of innocent persons." *Id*. That is because courts have recognized, as did the Eastern District of New York recently in *Sky Med. Supply Inc. v. SCS Support Claims Servs.*, 17 F. Supp. 3d 207, 220-221 (E.D.N.Y 2014),

> [That], although civil RICO may be a "potent weapon," plaintiffs wielding RICO almost always miss the mark. *See Gross v. Waywell*, 628 F. Supp. 2d 475, 479-83 (S.D.N.Y. 2009) [] Accordingly, courts have expressed skepticism toward civil RICO claims. *See*, e.g., DLJ Mortg. Capital, 726 F. Supp. 2d at 236 ("[P]laintiffs have often been overzealous in pursuing RICO claims, flooding federal courts by dressing up run-of-the-mill fraud claims as RICO violations.").

(*Id.*) Considering the above, Alchem reiterates its request for refuge and proceed to argue.

II.    **Standard of Review: the "well pleaded complaint" and pleading fraud with particularity under Fed. R. Civ. P. 9(b).**

"A district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."  *Twombly*, 550 U.S. 544 (2007). That said, in *Iqbal*, the Supreme Court held that

> [t]wo working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. [*Twombly*] at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)).

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Basically, the Supreme Court suggested that in considering a motion to dismiss, a court should adopt a "two-pronged approach" in applying these principals: "(1) eliminate any allegations in the complaint that are mere legal conclusions; and (2) where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement of relief."  *ADA v. Cigna Corp.*, 606 F.3d 1283, 1290 (11th Cir. 2010).

Further and importantly, the "[Supreme] Court held in *Iqbal*, as it had in *Twombly*, that courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s], which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.'" *ADA v. Cigna Corp., Supra* at 1290 (citing *Iqbal* at 1951-52).  Finally, the "[Supreme] Court in *Iqbal* explicitly held that the *Twombly* plausibility standard applies to all civil actions, not merely antitrust actions, because it is an interpretation of Rule 8. *Id.* (citing *Iqbal* at 1953).

When considering a motion to dismiss for failure to state a claim, the Court must "accept as true all well-pleaded allegations in the complaint and draw all reasonable inferences therefrom

in the pleader's favor." *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013) (citing *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011)).   Further, the Court "may augment these facts and inferences with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *Id*. (citing *Haley v. City of Boston*, 657 F.3d 39 46 (1st Cir. 2011)).

That analysis starts with the rule that "a complaint must be 'a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  As a general rule, "detailed factual allegations are not necessary to survive a motion to dismiss for failure to state a claim, [although] a complaint nonetheless must contain more than a rote recital of the elements of a cause of action." *Rodriguez-Reyes, Supra* at 53.  (citing *Ashcroft v. Iqbal*, 556 U.S. 622, 678-79 (2009)).  That means that it "must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Id*.  (citing *Grajales v. P.R. Ports Authority*, 682 F.3d 40, 44 (1st Cir. 2012)).

Basically, when examining the sufficiency of a complaint, the Court is guided by the Supreme Court's instructions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Iqbal, Supra*.  As the First Circuit Court of Appeals recognized, the "Supreme Court effected a sea change in the law of federal pleading in *Iqbal* and *Twombly*.  *Rodriguez-Reyes, Supra* at 53. Those decisions require that complaints in civil actions be alleged with greater specificity than previously was required.

A "plausibility inquiry is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id*.  (citing *Iqbal, Supra* at 679).  "The plausibility standard is not akin to a 'probability requirement,' but it asks more than a sheer possibility that a defendant has acted unlawfully."  *Id*. (citing *Iqbal, Supra* at 678).

That "inquiry into plausibility" requires a two-step test.  *Id.*  "First, the court must sift through the averments in the complaint, sparing conclusory legal allegations (which may be disregarded) from allegations of fact (which may be credited)."  *Id.*  "Second, the court must consider whether the [removed] residue of factual allegations gives rise to a plausible claim to relief."  *Id.*  If after conducting that inquiry, "the factual allegations in the complaint are too meager, vague or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal."  *Rodríguez-Reyes, Supra at* 53. (citing *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2012) (en banc).

 In sum, "the complaint must include 'factual allegations that allow the court to draw reasonable inferences that the defendant is liable for the misconduct alleged.'" *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2012) (citing *Iqbal, Supra*) (en banc).   And, "[i]f the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal."  *Id.*

As explained in *Penalbert-Rosa v. Fortuño-Burset*, 631 F.3d 592 (1st Cir. 2011), "some allegations, while not stating legal conclusions, are nevertheless so threadbare or speculative that they fail to cross 'the line between conclusory and the factual."  *Id*. at 595.  Note that the "general allegations found inadequate in *Iqbal* were themselves 'factual' assertions but highly general and made without offering any detail."  *Pruell v. Caritas Christi*, 678 F.3d 10, 13 (1st Cir. 2012).

Further, "[b]ecause the complaint in this case contains allegations of fraud, **an additional hurdle must be surmounted**:  the pleader must "state with particularity the circumstances constituting the fraud."  *SEC v. Tambone*, *Supra* at 442 (citing Fed. R. Civ. P. 9(b) (Emphasis provided).  That means that "'to satisfy the particularity requirement, the pleader must set out the

time, place and content of the alleged misrepresentation with specificity.'" *Id.* (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999)).  Pursuant to Rule 9(b), "a party alleging fraud – 'and for this purposes, misrepresentation is considered a species of fraud,' [] must 'state with particularity the circumstances constituting fraud.'" *McKenna v. Wells Fargo Bank, N.A.*, 693 F.3d 207, 218 (1st Cir. 2012)(quoting Fed. R. Civ. P. 9(b))(internal citation omitted).

### III.    Facts Plead in the Complaint relevant to Alchem

Considering the length of the Complaint, seventy six (76) pages and two hundred ninety two (292) paragraphs (some are compound paragraphs), Alchem herein provides the Court with the following summary **of all the facts** in the Complaint relevant to the claims against Alchem. Every statement was taken from the Complaint and is supported by its citation.

### A.    The alleged scheme.

1.      Plaintiffs complain of a scheme perpetrated by all co-defendants to procure and provide PREPA with millions of barrels of Non-compliant Fuel Oil to be used to generate electricity, under the guise that the fuel oil met the following requirements: (1) the contractual specifications agreed upon between PREPA and certain Fuel Oil Suppliers; and (2) the EPA's 1999 Consent Decree.  (D.E. # 1, Complaint, ¶ 1.)

2.      At times, defendant Fuel Oil Supplier Participants supplied PREPA with fuel oil that did not meet PREPA's contractual requirements and/or EPA specifications ("Non-compliant Fuel Oil").  (*Id.* at ¶ 1.)

3.      PREPA accepted the Non-compliant Fuel Oil "in exchanged for, **on information and belief**, undisclosed kickbacks or commissions to PREPA Participants."  (*Id.* at ¶ 1.)(Emphasis added).

4.      As a result of the scheme, PREPA overpaid its fuel suppliers for Non-compliant Fuel Oil and then passed the entire cost on to the Plaintiffs in their monthly electric bills. (*Id.* at ¶ 1.)

5.      PREPA pays billions of dollars per year for fuel oil.  (*Id.* at ¶ 3.)

6.      Plaintiffs seek compensation for their losses, caused by that alleged scheme, between the period of January 1, 2002 and the present.  (*Id.* at ¶ 4.)

**B.  The Fuel Oil Cartel identified**

7.      That scheme was perpetuated by a Fuel Oil Cartel Enterprise (the "Cartel Enterprise").  (*Id.* at ¶ 2.)

8.      The Complaint state that the Cartel Enterprise "constitutes an association-in-fact enterprise."  (*Id.* at ¶ 70.)

9.      The Cartel Enterprise, according to Plaintiffs, is defined and comprised **of the following Defendants**:  (1) Defendant PREPA Participants[2] (PREPA and its agents and employees), (2) Defendant Fuel Oil Supplier Participants[3], and (3) Inspectorate, Saybolt and Alchem, the three (3) Defendant laboratories, which tested the fuel oil's quality on behalf of PREPA and/or the Fuel Oil Suppliers.[4]  (*Id.* at ¶ 2.)

10.      Plaintiffs allege that Defendant laboratories, Inspectorate, Saybolt and Alchem, "falsified laboratory test reports to show that Non-Compliant Fuel Oil delivered by the Fuel Oil

---

[2] PREPA Participants:  PREPA and other former and current agents and employees of PREPA "who were or are responsible for all of the activities associated with fuel procurement and purchase for PREPA."  (Id. at ¶ 2.)

[3] The Fuel Oil Supplier Participants: (1) Petrobras America Inc. and Peroleo Brasilerio S.A. ("Petrobras"); (2) Shell Trading (US) Company ("STUSCO"); (3) Carlos R. Mendez & Associates ("Mendez"); Puma Energy Caribe LLC and Puma Energy International, B.V. ("Puma"); (4) Trafigura A.G. and Trafigura Beheer, B.V. ("Trafigura"); (5) PeroWest, Inc. ("PetroWest"); (6) Vitol S.A., Inc. and Vitol, Inc. ("Vitol"), and other John Does, who also contracted with PREPA to provide compliant fuel oil, but actually supplied cheaper Non-Compliant Fuel Oil at the more expensive price. (Id. at ¶ 2.)

[4] Inspectorate, Saybolt and Alchem, the laboratories: (1) Inspectorate America Corporation, Bureau Veritas Holding, Inc. ("Inspectorate"); Core Laboratories N.V. d/b/a Saybolt Laboratory, Inc. ("Saybolt"); and (3) Altol Chemical Environmental Laboratory, Inc. d/b/a Alchem Laboratory, Altol Environmental Services, Inc. d/b/a Altol Enterprises ("Alchem"), and other John Does.  (Id. at ¶ 2.)

Supplier Participants was compliant when it was not, **in exchange for continued business** of the Fuel Oil Suppliers and/or the PREPA Participants." (*Id.* at ¶ 2.)(Emphasis added).

11.    The Complaint **initially does not** identify Defendant laboratories Inspectorate, Saybolt and Alchem collectively as "Laboratory Participants."   (*Id.* at ¶ 2.)  To the contrary, it identified the laboratories individually.  (*Id.*)  However, commencing at pg. 14, it begins using the undefined term of "Laboratory Participants."  (*Id.* at ¶ 37.)

### C.  PREPA needs to purchase of Fuel Oil

12.    Puerto Rico gets two-thirds of its electricity from petroleum or fuel oil.  (*Id.* at ¶¶ 46 and 49.)  High world petroleum prices have driven typical Puerto Rico prices to two (2) to three (3) times the U.S. average.  (*Id.* at ¶ 48.)

13.    In 2012, sixty five percent (65%) of Puerto Rico's electricity came from petroleum, eighteen percent (18%) from natural gas, sixteen percent (16%) from coal, and one percent (1%) from renewable energy.  (*Id.* at ¶ 52.)   PREPA's Fuel Oil Office sent out requests for fuel oil ("RFPs") to the "world's oil companies."  (*Id.* at ¶ 60.)   The RFPs included specifications for quality of fuel oil.  (*Id.*)  Contracts for fuel oil were awarded to the lowest bidders who could provide the quality of fuel oil specified.  (*Id.*)

### D.  The Contract between PREPA and the Fuel Oil Suppliers

14.    PREPA and the Fuel Oil Suppler participants drafted their contracts to provide that PREPA would automatically take a discount on the price of fuel oil for each shipment that did not meet the correct BTU requirement as reflected in the laboratory results.  (*Id.* at ¶ 158.)

15.    Plaintiffs allege that PREPA would latter refund any "automatic" discount taken, when the Fuel Oil Supplier Participants provided evidence that the fuel oil had reflected the correct BTUs.  Thus, paying full price for Non-Compliant Fuel Oil.  (*Id.* at ¶ 159.)

### E.  Laboratories test the Fuel Oil prior to delivery

16.     The fuel suppliers hired private laboratories (via telephone call or e-mail) when the cargo arrived to perform tests as to the chemical composition and quantity (volume) of the fuel oil before it was delivered to PREPA.  (*Id.* at ¶ 62.)

17.     In sum, the private laboratories performed "tests as to the chemical composition of the fuel [oil] ("Sample Analysis"), and then issued their results in a certificate called a **Certificate of Analysis**, which was delivered to PREPA together with the fuel oil.  (*Id.* at ¶¶ 62 and 64.)(Emphasis added.)

18.     However, the Fuel Oil Suppliers have used Laboratory Participants Saybolt and Inspectorate, **but not Alchem**, to provide the Certificates of Analysis for the Sample Analysis testing (chemical composition test) for their deliveries.  (*Id.* at ¶ 62.)(Emphasis added)

19.     PREPA authorized Alchem and Saybolt to provide Sample Analysis testing (chemical composition test) for it, and by default issue Certificates of Analysis, until the year 2014.  (*Id.* at ¶ 64.)  In late 2014, PREPA also authorized Inspectorate.  (*Id.*)

20.     "PREPA and the fuel oil suppliers also **jointly hire** and pay for a second laboratory to perform Inspection Tests as to the volume of the delivery."  (*Id.* at ¶ 63.) (Emphasis added).

21.     PREPA authorized Inspectorate, Saybolt and Alchem to conduct Inspection Tests, until the year 2014.  (*Id.* at ¶ 63.)  However, the Fuel Oil Suppliers only authorized Inspectorate and Saybolt to perform such testing, and **excluded Alchem** from performing such tests.  (*Id.* at ¶ 63.)

22.     Thus, according to the Complaint, the Fuel Oil Suppliers **excluded** Alchem from both the Sample Analysis testing (chemical composition test) and Inspection Testing (volume). (*Id.* at ¶ ¶ 62 and 63.)

23.     PREPA on the other hand, until the year 2014, authorized Alchem to perform both Sample Analysis Testing (chemical composition test) and Inspection Testing (volume). (*Id.* at ¶¶ 63 and 64.)

24.     Based on the Sample Analysis Tests and the Inspection Tests, PREPA "is supposed to determine if the fuel oil complies with the specifications contained in the purchase contracts and [EPA] Consent Decree – and is supposed to accept or reject the fuel oil based on the test." (*Id.* at ¶ 65.)

25.     In the year 1994, PREPA closed its internal laboratory, allegedly pursuant to an agreement with the Fuel Cartel Enterprise. (*Id.* at ¶ 65.)  Prior to that laboratory closing, PREPA regularly rejected Non-compliant Fuel Oil. (*Id.*)  Once the laboratory was closed, PREPA no longer rejected Non-compliant Fuel Oil. (*Id.*)

26.     On or about November 12, 2014, PREPA's auditors found Alchem's procedures and protocols to be acceptable and recommended that Alchem be qualified to provide fuel oil testing. (*Id.* at ¶ 231.)  Subsequently, Petrobras conducted an inspection of the Participating Laboratories and concluded that Alchem was the only laboratory that calibrated its instruments. (*Id.* at ¶¶ 232-242.)  Further, it got perfect marks on its BTUs test results. (*Id.* at ¶ 241.) However, "[d]espite the fact that [in 2014] Alchem was the only laboratory audited that conducted the tests [] that correctly reflected whether fuel oil was compliant or not, Petrobras headquarters in Brazil, sent an e-mail to Alchem one (1) week later, declining to certify it. (*Id.* at ¶ 242.)

27.     On September 30, 2014, Petrobras consolidated its control of the Cartel Enterprise. (*Id.* at ¶ 228.)

### F.  The Fuel Oil Cartel Enterprises' Conduct

28.     As stated above, the Cartel Enterprise is comprised **of the following Defendants:** (1) PREPA Participants, (2) the Fuel Oil Supplier Participant, and (3) the Laboratory Participants (Inspectorate, Saybolt and Alchem).  (*Id.* at ¶ 2.)

29.     From the period of 2002 to the present, the Fuel Oil Suppliers purposefully sent Non-compliant Fuel Oil to Puerto Rico and PREPA accepted that fuel oil.  (*Id.* at ¶ 102.) Furthermore, PREPA paid the more-expensive Compliant Fuel Oil prices.  (*Id.* at ¶ 106.)

30.     Plaintiffs allege that **every** shipment of fuel oil delivered by the Fuel Oil Participants to PREPA since 2002 did not comply with PREPA's specifications in at least five (5) areas and thus non-compliant.  (*Id.* at ¶ 103.)

31.     From 2002 to the present, the Fuel Oil Supplier Participants consistently delivered fuel oil that was out of specifications with respect to BTUs.  (*Id.* at ¶ 158.)

32.     PREPA has never rejected a **complete** shipment of fuel oil.  (*Id.* at ¶ 106.)

33.     PREPA and/or the Fuel Oil Supplier Participants **hired** the Laboratory Participants **thousands of times** (every time a delivery of fuel oil arrived), via phone calls or e-mails, to provide "fuel testing services for millions of barrels of fuel oil purchased by PREPA annually from the Fuel Oil Supplier Participants."  (*Id.* at ¶ 71.)

34.     The Laboratory Participants provided testing services to both PREPA and the Fuel Oil Supplier Participants for fuel oil to be delivered to PREPA.  (*Id.* at ¶ 72.)

35.     The tests were performed to verify "the quality of fuel oil delivered and the minimum and maximum allowable levels of certain compounds, including, but not limited to, sulfur, vanadium, asphaltenes, and BTU content." (*Id.* at ¶ 72.)

36.     Those tests were supposed to enable PREPA to determine whether fuel oil to be delivered met (1) contractual specifications and (2) the EPA's Consent Decree, *in sum*, whether it was Compliant Fuel Oil. (*Id.* at ¶ 72.)

37.     The Laboratory Participants, under the direction and/or knowledge of PREPA Participants and the Fuel Oil Suppliers, **routinely and consistently falsified the results of thousands of fuel test reports** on fuel oil, which was to be delivered to PREPA. (*Id.* at ¶ 73.) Such falsifications occurred thought the Class Period, which comprises the period between January 1, 2002 and the present. (*Id.* at ¶¶ 4 and 73.)

38.     The Laboratory Participants, under the direction and/or knowledge of PREPA Participants and the Fuel Oil Suppliers, falsified the fuel test reports to ensure that PREPA would pay full price for the fuel oil despite the fact that the Fuel Oil Participants were delivering cheaper Non-Complaint Fuel Oil. (*Id.* at ¶ 74.)

39.     At ¶ 82 of the Complaint, Plaintiffs provide a "figure [which] reflects how the Fuel Oil Cartel Enterprise scheme" was conducted. (*Id.* at ¶ 82.) That "figure" contains nine (9) statements. (*Id.*) One of its "figures" state that when the Laboratory Participant that is hired by PREPA, not by the Fuel Oil Suppliers or jointly, does not agree to falsify reports, "PREPA shifts tests to another lab which will falsify the reports to show Compliant Fuel Oil even when non-compliant." (*Id.*)

40.     At ¶ 82 of the Complaint, Plaintiffs provide a "figure [which] reflects how the Fuel Oil Cartel Enterprise scheme" was conducted. (*Id.* at ¶ 82.) A second group of "figures"

states that "[i]n the event of a 'dispute' between two Certificates of Quality, PREPA accepts the falsified test or has a **third lab which will falsify results**…" (*Id.*)(Emphasis added.)

41.     One hundred percent (100%) of the shipments contained Non-compliant Fuel Oil, but PREPA and the Fuel Oil Suppliers "took steps to ensure that the Laboratory Participants issued Certificates of Analysis showing the fuel oil was compliant." (*Id.* at ¶ 108.)  PREPA and the Fuel Oil Suppliers were able to get compliant results by "just mov[ing] the testing of Non-Compliant Fuel Oil between Laboratory Participants until one Laboratory Participant issued a Certificate of Analysis showing the fuel oil was compliant." (*Id.*)

42.     Even when Alchem reported Non-compliant Fuel Oil, PREPA, through the Class Period, pursuant to the scheme to defraud, [] required repetitive analysis until the test results show[ed] Compliant Fuel Oil.  (*Id.* at ¶¶ 160-161, 168-171.)

43.     In 2009, over the course of two (2) to three (3) months, a **PREPA' internal auditing team** sampled approximately ten (10) fuel oil deliveries, all but one (1) was sent by Defendant STUSCO.  (*Id.* at ¶ 123.)  "For each and every delivery […], PREPA kept passing the testing responsibilities to different Laboratory Participants to test until the fuel oil finally got passing results." (*Id.*)  The auditors concluded that a scheme to defraud was active.  (*Id.*)

44.     The Laboratory Participants were incentivized to participate in the scheme to defraud in order to secure future work from PREPA and the Fuel Oil Supplier Participants.  (*Id.* at ¶ 74.)  As well, upon information and belief, because PREPA had agreed not to use its internal laboratory and instead use the services of the Laboratory Participants to conduct testing. (*Id.*)

45.     The Complaint states that during the course of the year 2009 audit, **each and every one** of the Laboratory Participants, **to wit**, Saybolt, Inspectorate, and Alchem, stated to the

auditors that they had received direct instructions from PREPA's Fuel Oil Office to "always certify Non-Compliant Fuel Oil as compliant, regardless of test results." (*Id.* at ¶ 124.)

46.     The PREPA Participants directed and participated in the scheme, agreeing to accept and pay full price for Non-Compliant Fuel Oil because the Fuel Oil Participants agreed to pay them "undisclosed kickbacks." (*Id.* at ¶ 75.)

47.     The Fuel Oil Participants participated in the scheme to defraud and paid kickbacks in order to ensure their contracts to supply fuel oil to PREPA at prices higher than required for the Non-Compliant Fuel Oil delivered to PREPA. (*Id.* at ¶ 75.)

48.     On September 30, 2014, Petrobras consolidated its control of the Fuel Oil Cartel Enterprise. (*Id.* at ¶ 228.)  And, it "had no intention of letting Alchem test its fuel oil because it would show the fuel was non-compliant.  (*Id.* at ¶ 243.)  Petrobras did certify Laboratory Participants Inspectorate and Saybolt, because their tests would always give a passing grade to Non-Compliant Fuel.  (*Id.* at ¶ 243) (See also, for entire context ¶¶ 231-242.)

**G.  The Enterprise**

49.     Upon information and belief, in 2014, PREPA agreed to allow Petrobras control over all aspects of the Fuel Oil Enterprise. (*Id.* at ¶ 227.)  Petrobras was able to gain that control due to PREPA's severe financial restraints.

50.     In order to maintain its line of credit with Petrobras, PREPA agreed to "allow Petrobras to select the laboratories to be used by both the supplier and PREPA to verify oil content, rather than to have competing Certificates of Analysis from Sample Analyses.  (*Id.* at ¶ 227.)

51.     On September 30, 2014, PREPA and Petrobras signed a contract for delivery of fuel oil.  (*Id.* at ¶ 228.)  That contract solidified Petrobras' control of the Fuel Oil Enterprise and the choice of the Laboratory Participants.  (*Id.* at ¶ 228.)

### H.  Predicate Acts of Wire and/or Mail Fraud

52.     The fuel suppliers hire private laboratories (via telephone call or e-mail) when cargo arrives to perform tests as to the chemical composition and quality of the fuel oil before it is delivered to purchasers, in the case PREPA.  (*Id.* at ¶ 62)

53.     PREPA and/or the Fuel Oil Supply Participants hired the Laboratory Participants thousands of times (every time a delivery of fuel oil arrived) via phone call or e-mails pursuant to which the Defendant Laboratory Participants provided fuel testing services for millions of barrels of fuel oil purchased by PREPA annually from the Fuel Oil Supplier Participants.  (*Id.* at ¶ 71.)

54.     On October 22, 2010, Jose Banchs from Inspectorate sent an email to Juan Giorgetti from Trafigura and Carlos Méndez of Carlos R. Mendez & Associates with an attached Certificate of Analysis which showed that fuel oil delivered on-or-about October 22nd, by Petrobras and/or Trafigura, was compliant.  (*Id.* at ¶¶ 109 and 110.)  **Alchem had tested that fuel oil and reported that it was non-compliant.** (*Id.* at ¶ 110)(Emphasis added.)  Banchs forwarded that e-mail to PREPA's Fuel Oil Office.  (*Id.* at ¶ 111.)

55.     Defendants used thousands of mail and interstate wire communications to create and manage the fraudulent scheme and RICO enterprise. (*Id.* at ¶ 248.)  They used e-mails and wires to (1) make fuel orders and contracts, (2) request laboratory testing and falsified laboratory results (facsimile, e-mail and mail), (3) communicate, (4) make financial payments, (5) secure the sale and/or procurement of fuel oil, and (6) receive proceeds from the scheme.  (*Id.* at ¶ 249.)

56.     Defendants' corporate headquarters have communicated by United States mail, telephone and facsimile with various local and regional district managers and employees in furtherance of Defendants' scheme. (*Id.* at ¶ 250.)

**I.  Pleading Conspiracy**

57.     According to the Complaint, despite Alchem's reports that fuel oil was non-compliant, "PREPA never stopped delivery of the Non-Compliant Fuel Oil shipments pursuant to its conspiracy with STUSCO and Petrobras."  (*Id.* at ¶ 207.)

58.     Alchem's management admitted that it had hired employees to resolve the differences between the Non-Compliant Fuel results Alchem traditionally obtained (because the fuel oil delivered by the Fuel Oil Suppliers was non-compliant) with the Compliant Fuel Oil test results obtained by Saybolt and Inspectorate (because they had agreed to participate in the Cartel Enterprise).

**J.  Alchem's Conduct as Alleged in the Complaint**

59.     Until 2010, Alchem tried to avoid participating in the Fuel Oil Enterprise.  (*Id.* at ¶ 206.)

60.     PREPA gave Alchem very little work because Alchem's tests would show that the fuel oil delivered by the Fuel Oil Suppliers was non-compliant.  (*Id.* at ¶ 206.)  As soon as Alchem provided a report showing that the fuel oil was out of specifications, PREPA would move the remainder of the testing to another Laboratory Participant.  (*Id.*)

61.     Plaintiffs state that between fifteen (15) to thirty (30) fuel oil ships or barges arrived per month in Puerto Rico to deliver fuel oil.  Of those, Alchem was asked to test several per month.  If Alchem reported non-compliant fuel due to sulfur content or another critical

parameter, PREPA would shift testing to Laboratory Participant Saybolt, which would falsify the results to that the fuel oil could be compliant. (*Id.* at ¶ 104.)

62.     Plaintiffs allege that an unidentified Alchem employee stated that every shipment of fuel oil Alchem has tested over the last twenty (20) years contains Non-Compliant Fuel Oil. Of the approximate thirteen (13) parameters the fuel oil is supposed to meet, every shipment is always out of specifications in at least five (5) areas.  (*Id.* at ¶ 105.)

63.     In 2007, PREPA asked Alchem to test a delivery of fuel Oil from Petrobras. Alchem reported that the fuel oil's sulfur levels were non-compliant and reiterated that position. (*Id.* at ¶¶ 160-161 and 168.)

64.     In early 2008, Alchem reported that a fuel oil delivery was out of specifications for sulfur.  However, Saybolt reported that it was within specifications, so PREPA accepted the fuel oil.  (*Id.* at ¶ 113.)

65.     In 2009, the PREPA internal auditing team "**documented at that time, the only Laboratory Participant correctly performing Sample Analysis was Alchem…**"  (*Id.* at ¶¶ 118 and 134.) (Emphasis added)

66.     On October 22, 2010, Alchem tested fuel oil being delivered to PREPA by Petrobras and/or Trafigura.  (*Id.* at ¶ 109.)  **Alchem reported that the fuel oil was Non-compliant**. (*Id.* at ¶ 109.)  In response, Petrobras and/or Trafigura representatives had the fuel oil re-tested by Inspectorate, which deemed the fuel oil compliant.  (*Id.* at ¶ 110.)  That same day, Mr. Jose Banchs from Inspectorate, sent an e-mail to the Petrobras and/or Trafigura representatives with an attached "Certificate of Analysis showing that the fuel oil was compliant." (*Id.*)

67.     PREPA accepted the fuel oil tested by Alchem on October 22, 2010, despite Alchem's report that the fuel oil was Non-compliant.  (*Id.* at ¶ 112.)

68.     In May of 2010, PREPA accepted a fuel oil delivery from STUSCO to the Aguirre Thermoelectric Plant, **which Alchem had reported was non-compliant due to sulfur content**.  However, PREPA accepted the fuel oil because Saybolt reported that the fuel oil was compliant.  (*Id.* at ¶¶ 127-132.)

69.     Over the course of three (3) to four (4) months in the year 2010, Alchem tested fuel oil shipments from STUSCO and Petrobras and reported that they **were non-compliant on sulfur**.  (*Id.* at ¶ 207.)

70.     Plaintiffs state that beginning in 2012, Vitol and PetroWest delivered shipments of Non-Compliant Fuel Oil (said shipments exceed parameters in volume of water and sediment combined).  (*Id.* at ¶ 154.)  **Alchem reported the non-compliance**.

71.     On August 14, 2014, Alchem reported to PREPA that a Fuel Oil delivery by Petrobras at the Aguirre plant **was non-compliant with regards to BTUs**.  PREPA ordered Alchem to stop testing.  (*Id.* at ¶ 226.)

72.     PREPA's Fuel Oil Office told Alchem to report results of the tests of the fuel oil after thirty (30) seconds when in fact the tests should have taken five (5) minutes if done properly.  (*Id.* at ¶ 110.)

73.     Alchem understood that PREPA's Fuel Oil Office wanted consistent Compliant Fuel Oil test results, even for Non-Compliant Fuel Oil.  (*Id.* at ¶ 110.)  Alchem decided that if PREPA was not interested in accurate results, but instead would pay for false results showing that the fuel oil was compliant, [then] Alchem would participate in the Fuel Oil Cartel.  (*Id.* at ¶ 211.)  Thus, Alchem changed its calibration procedure for its sulfur testing instruments, which

would lead Alchem to test for sulfur the same way as Laboratory Participant Saybolt.  (*Id.* at ¶ 213.)

74.     Alchem admitted that it had hired employees to resolve the differences between its Non-Compliant Fuel Oil test results and Saybolt and Inspectorate's Compliant Fuel Oil test results.  (*Id.* at ¶ 214.)

75.     Alchem changed its calibration methods in ways that did not comply with approved methodologies in order to produce test results that would always show fuel oil was compliant even if it was not.  (*Id.* at ¶ 215.)

76.     Some employees refused to use the irregular testing methods.  However, Alchem insisted, pursuant to its agreement with PREPA and the Fuel Oil Supplier Participants, that irregular testing methods be used in order to achieve Compliant Fuel Oil test results for Non-Compliant Fuel Oil.  (*Id.* at ¶ 216.)

77.     Alchem's decision to change its calibration methods was a "business decision," not a technical decision.  (*Id.* at ¶ 218.)

   **K.  Laboratory Participants Testing Methodologies**

78.     The Complaint alleges that PREPA requested that the Laboratory Participants changed their methods for testing the volume of water and sediment in fuel oil.  (*Id.* at ¶¶ 156-157.)  The Laboratory Participants had been using approved methodologies. (*Id.* at ¶ 156.)

79.     Standard methodologies require that the testing instruments be calibrated using the standard, so that there is a degree of control. (*Id.* at ¶ 164.)  **Alchem calibrated its instruments every six (6) months and PREPA agreed that met the industry standard**. (*Id.* at ¶ 165.)

80.     Alchem changed its calibration methods in ways that did not comply with approved methodologies in order to produce test results that would always show fuel oil was compliant even if it was not.  (*Id.* at ¶ 215.)

81.     PREPA's Fuel Oil Office told Alchem to report results of the tests of the fuel oil after thirty (30) seconds when in fact the tests should have taken five (5) minutes if done properly.  (*Id.* at ¶ 110.)

82.     In 2010, PREPA's auditors were worried that Alchem was changing its calibration procedures.  (*Id.* at ¶ 219.)  However, on or about November 12, 2015, PREPA auditors found **Alchem's procedures and protocols to be acceptable and recommended that Alchem be qualified to provide fuel oil testing**.  (*Id.* at ¶ 231.)

### L.  Source of the Information

83.     Plaintiffs, in support of their allegations of fraud, kickbacks and an alleged "Fuel Oil Cartel," by way of the following: (1) a "referendum brought by Representative Rodriguez-Miranda of the Puerto Rico House of Representatives," which cites a newspaper called "El Vocero"; (2) a "special television program," aired by Univision on-or-about May 12, 2014, where Eduardo Bhatia, a Puerto Rico Senator, allegedly discusses the scheme; and (3) a Caribbean Business newspaper article, which reported on the "so-called Fuel Oil Cartel," based on a "confidential report."  (*Id.* at ¶¶ 76-79 and 149-150.)

84.     Plaintiffs also make reference to a report from an audit conducted by the Puerto Rico Office of the Comptroller from the middle of 2000 to early 2002. (*Id.* at ¶ 83.)  All of the evidence reviewed by the Office of the Comptroller was from prior to the year 2000.  (*Id.* at ¶¶ 90-96.) They also cite an employment discrimination suit filed in federal court prior to the year 2000, which makes reference to alleged misconduct dating *prior* to the year 1999, and a law suit

filed by PREPA in the year 2002 against a Laboratory for misconduct, which occurred between 1992 and 2001. (*Id.* at ¶¶ 84, 85, 86, 96, 97 and 98.)

85.     The Plaintiffs make reference to a November 2010 "draft report" produced by the 2009 PREPA internal auditing team discussing the matter of disputes between "Certificates of Analysis." (*Id.* at ¶¶ 118, 125, 134 and 135.)  Furthermore, reference is made to a "materially altered report" produced by the head of PREPA's Internal Audit Division and a "rebuttal report." (*Id.* at ¶¶ 145, 147 and 148)

**M.  Injury to the Plaintiffs as Plead**

86.     PREPA purchases the fuel oil used to produce electricity and passes the cost on directly to its customers.  (*Id.* at ¶ 66.)

87.     Customer's electric bills contain a "line item" reflecting the cost of "fuel" and "purchased power." (*Id.* at ¶¶ 66 and 67.)[5]  PREPA is reimbursed for those costs based on a fuel and purchased power cost recovery clause ("Fuel Adjustment Clause"), which allows it to recovery those costs though customer billing.  (*Id.* at ¶ 68.)

88.     Between June 2013 and June 2014, PREPA charged the Plaintiffs Two Billion Six Hundred Thirty Three Million Two Hundred Fifty Six Thousand Dollars ($2,633,256,000), under the Fuel Adjustment Clause.  (*Id.* at ¶ 69.)

89.     PREPA, by paying Compliant Fuel Oil prices for Non-compliant Fuel Oil, paid too much at the expense of the Plaintiffs. (*Id.* at ¶ 107.)

90.     Compliant Fuel Oil is more expensive than Non-compliant Fuel Oil.  Thus, PREPA's acceptance of Non-compliant Fuel Oil, while charging Plaintiffs and the Class for Compliant Fuel Oil, caused Plaintiffs to suffer significant out-of-pocket losses.  (*Id.* at ¶ 246.)

---

[5]  Plaintiffs state that the "line item" reflects the "fuel oil cost," however the "PREPA presentation" and "bill example" used to support that statement show that what that "line item" actually reflects the cost for purchasing "fuel" and "purchased energy," not just oil as suggested by using the term "fuel oil cost".  (Id. at ¶ 66 and 67.)

91.    Plaintiffs have been injured in their property by reason of these violations because Plaintiffs have made thousands of dollars in payments for fuel oil that they would not have made had the defendants not engaged in their pattern of racketeering activity. (*Id.* at ¶ 279.

## IV.    Arguments in Support of Dismissal

### (1)  The Complaint simply fails to state a RICO Claim under § 1962(c) or (d)

To state a RICO claim pursuant to § 1964, the Plaintiffs must allege three (3) essential elements:  (1) violation of § 1962; (2) injury to business or property; and (3) that that violation caused the injury (the injury was "by reason" of the substantive RICO violation).

Further, in order to adequately plead that first element, the violation of § 1962(c) alleged in this case,

> "[f]ive elements must coalesce to make out a substantive RICO violation. The government must show: '(1) an enterprise existed; (2) the enterprise participated in or its activities affected interstate commerce; (3) the defendant was employed by or was associated with the enterprise; (4) the defendant conducted or participated in the conduct of the enterprise; (5) through a pattern of racketeering activity.'"

*US v. Nascimiento*, 491 F.3d 25, 31 (1st Cir. 2007) (quoting *United States v. Marino*, 277 F.3d 11, 33 (1st Cir. 2002).

In this case, the Complaint is completely devoid of any statements, other than bold comment using the artful term "Laboratory Participants," suggesting that Alchem was (a) associated with the alleged Cartel Enterprise or (b) participated in any part of the alleged scheme, much less in the predicate acts necessary to qualify for racketeering activity.   Moreover, Plaintiffs fail to show the existence of an enterprise, other that the co-defendants themselves.

What the Complaint does clearly states is that on numerous occasions Alchem did report that fuel oil was non-complaint.  (D.E. # 1, Complaint, ¶¶ 61, 63 and 66.)  In fact, there is not a single statement in the Complaint saying that Alchem falsified a Certificates of Analysis or

falsified results to report Non-compliant Fuel Oil and compliant.  Not one.  The Complaint also states that Fuel Oil Supplier Participants excluded Alchem from performing testing.  (*Id.* at ¶¶ 62 and 63.)  Further, when Alchem provided Non-compliant Fuel Oil results, according to the Complaint, PREPA and the Fuel Oil Supplier Participants just switched between the other laboratories until they got compliant results and were able to accept the fuel oil. (*Id.* at ¶¶ 82, 109, 110, 123, 127-132, 168-171, 207 and 226.)  Lastly, the Complaint is also devoid of specific allegations of Alchem conspiring to participate in the scheme with the co-defendants.

Further, Plaintiffs' claims under 18 U.S.C.S. § 1962(c) are based on an alleged pattern of racketeering consisting entirely of the predicate acts of mail and wire fraud.  But, those substantive RICO allegations have to comply not only with the plausibility criteria articulated in *Twombly* and *Iqbal* but also with Fed. R. Civ. P. 9(b)'s heightened pleading standard.  And, Plaintiffs fail to meet those standards.  Moreover, Plaintiffs allegations that Alchem participated with the co-defendants in the scheme to defraud PREPA's client base are **truly vague** and baseless.  As will be shown below, the Plaintiffs' Complaint contains several deficiencies that are fatal to the continued prosecution of their action against Alchem.

### (2)  Alchem did not participate in the alleged RICO Enterprise

The first element of a RICO offense requires proof of the existence of an enterprise. The First Circuit in *US v. Nascimiento*, *Supra*, stated the following:

> The enterprise need not be a legitimate business or a form of organization sanctioned by state law. *United States v. Turkette*, 452 U.S. 576, 587 (1981). It "need only be a group of persons associated together for a common purpose of engaging in a criminal course of conduct." *United States v. Connolly*, 341 F.3d 16, 28 (1st Cir. 2003).  Despite the absence of any requirement of formal sanction, the government nonetheless must prove that the enterprise existed in some coherent and cohesive form. *Turkette*, 452 U.S. at 583. It follows that the enterprise must have been an 'ongoing organization' operating as a 'continuous unit.' Connolly, 341 F.3d at 25."

In all events, the enterprise must be distinct from the pattern of racketeering activity that constitutes the fifth, and final, element of a RICO offense. See *Turkette*, 452 U.S. at 583. An enterprise is chiefly distinguished from the pattern of racketeering activity by the fact that it possesses some goal or purpose more pervasive and more enduring than the instant gratification that can accrue from the successful completion of each particular criminal act. See *Connolly*, 341 F.3d at 25

The fact is that the Complaint is completely devoid of any allegations explaining how, if in any way, Alchem associated with the other co-defendants or had a common purpose to engage in criminal conduct.  Thus, as shown below, Plaintiffs fail to meet the essential element of pleading that Alchem was part of the alleged Enterprise.  Alchem further explains in sections a, b and c below.

**(a)  Alchem was not part of an "Association in Fact"**

Plaintiffs allege that the "Fuel Oil Cartel Enterprise" constitutes an association-in-fact enterprise within the meaning of § 1961(4) of RICO.  (D.E. 1, Complaint at ¶ 70.).

A RICO "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In sum,

> [The] term "enterprise" has been interpreted *inter alia* to include (1) legal entities such as legitimate business partnerships and corporations, and (2) illegitimate associations-in-fact marked by an ongoing formal or informal organization of individual or legal-entity associates, [] who or which function as a continuing organized crime unit "for a common purpose of engaging in a course of conduct." *Turkette*, 452 U.S. at 580-83 (Internal citations omitted).

*United State v. Cianci*, 378 F.3d 71, 79 (1st Cir. 2004).

In this case the Complaint does not allege that Alchem is part of an "organization" which has a "common purpose of engaging in a course of [criminal] conduct."  *Id*.  All it states is that the "Cartel Enterprise" is composed of the Defendants, *to wit*, PREPA Participants, the Fuel Oil Suppliers and the Laboratory Participants.  (See, D.E. # 1 at ¶ 2).  Note that apart from saying

that Alchem is a laboratory which tests fuel oil, which supposedly changed its testing methodologies in the year 2010, there are no statements regarding its allege role in the enterprise, or stating what purposes or goals Alchem had in the scheme/racket.   Neither are there any allegation on how Alchem used other members of the enterprise or controlled them as part of a conspiracy to further the enterprises' goals.   In fact, there **is not a single factual allegation** in the Complaint suggesting that that Alchem conspired with the other co-defendants to violate RICO and/or did in fact violate the law through its involvement in the allege association-in-fact enterprise.

Further, Plaintiffs cannot meet the burden of showing the existence of an association-in-fact enterprise based, *ipso facto*, on their mere allegations that the co-defendants (the alleged enterprises' associates though the Fuel Oil Cartel) engaged in criminal conduct that collectively may be characterized as a "pattern of racketeering activity."   *See United State v. Cianci*, 378 F.3d at 80.   The First Circuit has specifically stated,

> we have approved instructions based strictly on *Turkette's* explanation of how a criminal association might qualify as a RICO enterprise. *See*, e.g., [*United States v.*] *Patrick*, 248 F.3d at 17-19. In doing so, we have read *Turkette* to impose a requirement that those associated in fact "function as an ongoing unit" and constitute an "ongoing organization." *Id*. at 19. Also important to such an enterprise is that its members share a "common purpose." *See*, e.g., *id*.; *Clemente v. Ryan*, 901 F.2d 177, 180 (1st Cir. 1990) ("Although much about the RICO statute is not clear, it is very clear that those who are 'associates' . . . of a criminal enterprise must share a 'common purpose' . . . .")(citations omitted).

*Id*. at 82. Here there are no allegations of an "ongoing unit" or a "common purpose."

In fact, a careful review of the facts plead shows that if anything, Alchem was being **excluded** from working with PREPA and/or the Fuel Oil Suppliers.   (See, D.E. # 1, ¶¶ 62 and 63.)   Moreover, if anything Alchem was harmed by the Cartel Enterprise since every time if

determined that fuel oil was Non-complaint it lost business, since all further testing was sent to another laboratory. (*Id.* at ¶¶ 41, 42, 43, 60, 61, 66, 68, 69, 70 and 71.)

Lastly, the Supreme Court stated in *Reves v. Ernest & Young*, 507 U.S. 170, that participation required the following:

> In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, one the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, **but some part in directing the enterprise's affairs is required**.

*Id.* at 179 (Emphasis added). Here the Complaint does not contain a single allegation suggesting that Alchem had any "part in directing the enterprise's affairs." Simply said, Plaintiffs fail to plead that Alchem managed or operated any part of the alleged association, much less that it had a direct relationship with the Cartel Enterprise.

**(b)  Alchem's conduct and the alleged Pattern of Racketeering Activity**

A Careful review of the Complaint and/or the section of "Facts Plead in the Complaint relevant to Alchem" (*see above*, Section III, pgs. 13-23 at ¶¶ 16-77), clearly show that Alchem did not engage in any illegal conduct, much less in racketeering activities.

In this case, Plaintiffs allege that the co-defendants collectively engaged in a scheme to defraud the Plaintiffs though wire and mail fraud. That said, "[r]acketeering activity" means any act that violates one of the federal laws specified in the RICO statue, 18 U.S.C. § 1961(1), including the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343." *Giuliano v. Stanley Fulton*, 399 F.3d 381, 386 (1st Cir. 2005). "At least two acts of racketeering activities must occur within ten years of each other to constitute a 'pattern.'" *Id.* The Supreme Court has construed the pattern element as additionally requiring a showing that 'the racketeering predicates are

related, and that they amount to or pose a threat of continued criminal activity.'" *Id*. (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

Here, there is not a single allegation in the complaint showing that Alchem engaged in illegal conduct.  All the Plaintiffs state is that PREPA and the Fuel Oil participants hired the Laboratory Participants thousands of times *via phone call or e-mail* so that the Laboratory Participants could test the chemical composition and quality of "millions of barrels of fuel oil." (See, D.E. # 1 at ¶¶ 62 and 71.)   In fact, the only allegations in the complaint addressing Alchem's specific conduct relate to the testing of fuel oil **all state** that Alchem reported the fuel oil as Non-compliant.  (*Id*. at ¶¶ 82, 109, 110, 123, 127-132, 168-171, 207 and 226.)  In fact, and despite Plaintiffs attempt to cast a shadow upon Alchem's reputation by suggesting that it "change it methodologies,"[6] every single fact statement in the Complaint addressing Alchem's conduct suggests that it acted correctly and professionally. (*See above*, Section III, pgs. 20-23 at ¶¶ 59-77)

### (c)  Plaintiffs allege that Alchem and "enterprise" participants are the same

The First Circuit has "consistently interpreted [RICO's] requirement that a culpable person be 'employed by or associated with' the RICO enterprise as meaning that the same entity **cannot do double duty** as both the RICO defendant and the RICO enterprise." *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991) (quoting 18 U.S.C. § 1962(c))(Emphasis added).  However, here the Plaintiffs clearly allege in the Complaint that the co-efendants and the Cartel Enterprise are legally indistinguishable from one another.   They specifically state, from the onset, that the "Cartel Enterprise" is **defined and comprised** of the following

---

[6]  Plaintiffs allege that Alchem change its testing methodologies to meet PREPA's alleged demands to find Non-complaint Fuel Oil compliant.  However, at no time to they explain what the "proper methodologies" are or how Alchem or the other laboratories failed to comply with those standards.  At the very least, Plaintiffs should have explained what the standards are for testing the quality of No. 6 fuel oil.

Defendants: (1) *Defendant* PREPA Participants (PREPA and its agents and employees), (2) *Defendant* Fuel Oil Supplier Participants, and (3) Inspectorate, Saybolt and Alchem, the three (3) *Defendant* laboratories, which tested the fuel oil's quality on behalf of PREPA and/or the Fuel Oil Suppliers. (*Id.* at ¶ 2.)

The Supreme Court has also states that a Plaintiff must distinguish between the "person" that committed the predicate acts and the "enterprise" though which the "person" conducted the violation. *See*, *Cedric Kushner Ltd. v. King*, 533 U.S. 158, 161 (2001). Plaintiffs clearly failed to comply with such requirement.

### (3) Alchem's alleged Racketeering Activity

The final element in the RICO equation requires a showing that a defendant participated in the conduct of the enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). As stated above, such "activity" means any act that violates one of the federal laws specified in the RICO statue, "including the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343." *Giuliano v. Stanley Fulton*, 399 F.3d at 386. Further, the word "through" implies a nexus between these racketeering acts and the enterprise. That nexus exists when a defendant is able to commit the predicate racketeering acts either by means or as a result of his involvement with the enterprise. *See Marino*, 277 F.3d at 27.

In this case, there are no proper allegations that Alchem engaged in such "activity." All there are is generalized statements which do not comply with *Iqbal's* pleading requirements and/or Rule 9. Alchem explains below in sections a, b and c.

### a. Plaintiffs state no fact suggesting that Alchem committed "predicate acts"

An act of racketeering under RICO commonly is referred to as a "predicate act." *Walters v. McMahen*, 684 F.3d 435, 440 (4th Cir. 2012). A "pattern" of racketeering activity is shown

when a racketeer commits at least two distinct but related predicate acts.   *Id*. (citing *Sedima*, *S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985)).   While private litigants may recover injuries under 18 U.S.C. § 1964(c), their injuries must "flow from the commission of the predicate acts." *Sedima, Supra* at 497.

In this case, Plaintiffs **have not alleged a single illegal act committed by Alchem**, much less any predicate acts.   In fact, as repeatedly stated, the Complaint shows that Alchem performed its work honestly and professionally.   Further, although the Plaintiffs try to suggest that thousands of predicate acts occurred in order support of their civil conspiracy claim, they fail to plead sufficient facts to establish the elements those predicate act.   Because they failed to plead predicate acts in the Complaint, dismissal is warranted.   *Walters v. McMahen, Supra* at 440.

In sum, the Complaint entails mostly a generalized narrative of how the PREPA decided to receive and accept deliveries of fuel oil.   And, there is not a single specific claim that Alchem engage in any of the "mail" or "wire" fraud acts, which are the basis for Plaintiffs' RICO claims.

**b. The "mail" and "wire" fraud allegations fail to meet Rule 9(b) standards**

Regarding the "mail" and/or "wire" fraud allegations, **there is not a single allegation in the Complaint suggesting that Alchem incurred in such conduct**.   That said, according to the First Circuit, "[t]o prove wire fraud a Plaintiff must show: 1) a scheme to defraud by means of false pretenses, 2) the defendant's knowing and willful participation in the scheme with the intent to defraud, and 3) the use of interstate wire communications in furtherance of the scheme." *United States v. Cassiere*, 4 F.3d 1006, 1011 (1st Cir. 1993.)   Along the same lines, "[t]o allege mail fraud, the plaintiff must show: 1) a scheme to defraud, 2) the defendant's knowing and willful participation in the scheme with the intent to defraud, and 3) the use of the United States

mail in furtherance of the scheme." *Sebago Inc. v. Beazer East, Inc.*, 18 F. Supp.2d 70, 80 (D. Mass. 1998). No such allegations were included in the Complaint in this case.

Further, regarding the **materiality** of the statements contained in laboratory test results or Certificates of Analysis, the Complaint is completely devoid of any mention of PREPA or the Plaintiffs accepting a statement made by Alchem in such reports as true prior to making payments for fuel oil or their electric bills. Nor that they relied on that information as essential prior to deciding whether to purchase fuel oil. The First Circuit in *Sanchez v. Triple-S Management Corp.*, 492 F.3d 1, 10 (1st Cir. 2007), stated that "[a] defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes." Any claim of mail and wire fraud requires proof that RICO plaintiff in fact reasonably relied on the "fraudulent misrepresentations" and that the defendant "had a conscious, knowing intent to defraud." *Pelletier v. Zweifel*, 921 F.2d 1465, 1503 (11th Cir. 1991).

In sum, the wire and mail fraud statutes criminalize "deliberate fraud…where in order to get money or something else of monetizable value from someone you make a statement to him that you know to be false, or a half truth that you know to be misleading, expecting him to act upon it to your benefit and his detriment." *Emery v. American Gen. Fin., Inc.*, 71 F.3d 1343, 1346 (7th Cir. 1995). The materiality element of the "statement" is satisfied if the subject at issue is "of importance to a reasonable person in making a decision about a particular matter or transaction." *United States v. Winstead*, 74 F.3d 1313, 1320 (D.C. Cir. 1996). It this case, the Complaint fails to plead such elements.

Further, there is not a single act of fraud plead with particularity and/or with the requirements of Fed. R. Civ. P. 9. "'To satisfy the particularity requirement [of Fraud], the pleader must set out the time, place and content of the alleged misrepresentation with

specificity.'"  *SEC v. Tambone*, *Supra* at 442 (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999)).

In this case the Compliant just alleged that the "Laboratory Participants" engaged in a scheme to defraud, without mentioning Alchem with particularity, and Plaintiffs have been paying their electric bills for years.  There is not a single allegation contained in the Complaint suggesting that PREPA or Plaintiffs would not have paid, or will not continue, to pay their electric because some alleged fuel is Non-compliant.  Further, there are no allegations of affirmative or intentional misrepresentations on part of the Alchem.  Conspicuously absent here are any factual allegations of "affirmative and intentional misrepresentations."

### c. The Complaint fails to plead "intent" to deceive as to Alchem

Here the Complaint simply fails to plead the circumstances of fraud with specificity, and cannot not even meet the pleading standards required to establish scienter under Fed. R. Civ. P. 9(b).  Besides the fact that Plaintiffs fail to allege the time and date of statements and/or what if anything was false, they also fail to plead **intent** to deceive or defraud.  "In order to make out a civil claim under RICO by way of wire fraud, a plaintiff must allege that a group of defendants "engaged in a scheme to defraud **with the specific intent to defraud** and that they used . . . the interstate wires in furtherance of the scheme."  *Cordero-Hernandez v. Hernandez-Ballesteros*, 449 F.3d 240, 244 (1st Cir. 2006).  Failure to plead the "intent requirement is fatal to the Plaintiffs case.

All the Complaint says is that Alchem switched its methodologies in the year 2010. There is not a single allegation stating that Alchem intentionally falsifies lab results or intended to defraud anyone.  In sum, there are no statements whatsoever that Alchem had any specific intent to defraud.

**(4)  The Complaint does not plead "conspiracy" to violate RICO**

In examining the plaintiffs' allegations concerning the two RICO predicate acts, we first observe that the plaintiffs have alleged that Alchem violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).  Subsection (d) provides, in relevant part, that "[i]t shall be unlawful for any person to **conspire** to violate any of the provisions of subsection (a), (b), or (c) of this section." (*Id*.) (Emphasis added.)  This Court should dismiss the Complaint's RICO claims *in tot*, since it fails to properly plead RICO predicate acts or a conspiracy to engage in such acts.  Note that as to Alchem, Plaintiffs simply fail to allege and agreement or conspiracy.

*Goren v. New Vision International, Inc*., 156 F.3d 721 (7th Cir. 1998), says that "the touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Id*. at 732.  The Seventh Circuit cautioned "that the broad construction of the RICO conspiracy provision should not be used by the courts 'to criminalize mere association with an enterprise.'" *Id*. at 731-32.  In *Goren* the complaint failed to state a conspiracy claim because it failed to allege that each defendant entered into an agreement to violate RICO.  In this case, nowhere is it plead that Alchem agreed with the co-defendants to participate in the affairs of the enterprise or agreed to the commission of two or more specific predicate acts.  Further, there are no allegations of an agreement between any of them regarding the roles that they would play in the conspiracy.  **The mere fact that they are associated to the same "industry" is simply insufficient.**

The Supreme Court in *Salinas v. United States*, 522 U.S. 52, 63-64 (1998), described conspiracies under RICO as follows:

> A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 253-254 (1940). The partners in the criminal plan must agree to pursue the same criminal objective and may divide up

the work, yet each is responsible for the acts of each other. See Pinkerton v. United States, 328 U.S. 640, 646, 90 L. Ed. 1489, 66 S. Ct. 1180 (1946) ("And so long as the partnership in crime continues, the partners act for each other in carrying it forward"). If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.
…
A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense.

In sum, "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Id*.  Here there are no allegations that Alchem agreed to engage or support predicate acts that would constitute a pattern of racketeering activity.

The defect in Plaintiffs' RICO claim is simple and unequivocal. There are no factual allegations that, if proven, would show Defendants conspired to engage in a pattern of racketeering; rather, the allegations describe activity that definitively does not rise to the level of such a pattern.

Further, with regards to plaintiffs position that this case entails a contractual dispute between PREPA and its customers, to be found guilty of conspiracy,  parties must have agreed to commit an act that is itself illegal – parties cannot be found guilty of an act which is not itself against the law.  *Jackson v. Bell South Telecomms.*, 372 F.3d 1250, 1269-1270 (11th Cir. 2004). Here, Alchem did not commit any kind of violation nor did it conspire or agree with anyone.

### (5)  The RICO claim is based upon mere assertions and "Information and Belief"

In the post-*Twombly* and *Iqbal* era, pleading on information and belief, without more, is insufficient to survive a motion to dismiss for failure to state a claim.  The Fourth Circuit Court

of Appeals has stated that "conclusory statements" made upon "information and belief" are "insufficient to defeat a motion to dismiss." *Harman v. Unisys Corp.*, 356 Fed. Appx. 638, 641 (4th Cir. 2009).

In this case, Plaintiffs' **main arguments of motive** are based on mere "information and belief." Those are: (1) "PREPA accepted fuel oil that did not meet contractual or EPA specifications in exchange for, **on information and belief**, undisclosed kickbacks or commissions to the PREPA Participants;" and (2) that "Laboratory Participants were incentivized to participate in the scheme to defraud in order to secure future work from the PREPA and Fuel Oil Supplier Participants, as well as because PREPA had agreed, **on information and belief**, no to use its internal laboratory and instead use the laboratory participants to conduct the testing." (See, D.E. # 1 at ¶¶ 1 and 74.)(Emphasis added.) Plaintiffs' claims are predicated upon those two statements, since they entail the motive to engage in the alleged scheme. Unfortunately, those allegations are unsupported.

An exception may be allowed "where the facts are peculiarly within the possession and control of the defendant." *Artista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2nd Cir. 2010). **But, here there is no allegation of need to secure information**. "The Rule 9(b) standard can be relaxed where the facts relating to the alleged fraud are peculiarly within the perpetrators knowledge." *United States ex rel. Rafizadeh v. Continental Common*, Inc., 553 F.3d. 869, 873 n.6 (5th Cir. 2008). But, "[t]he claimant should allege in the pleadings that he did not have access to the facts related to the fraud in order to relax the requirements of Rule 9(b) and allow pleading 'on information and belief' to meet the particularity standard." *7-Eleven Inc. v. Puerto Rico-7 Inc*, 2008 U.S. Dist. Lexis 94764, 2008 WL 4951502, at *2 (N.D. Tex. Nov. 19, 2008) (citing *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 330 (5th Cir. 2003). That

"exception 'must not be mistaken for license to base claims of fraud on speculation or conclusory allegations.'" *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997). "Allegations on 'information and belief' remain subject to the particularity requirements of Rule 9(b)." *United States ex. rel. Herbert v. Dizney*, 295 F.Appx 717, 723 (5th Cir. 2008). There are no allegations in the Complaint regarding the need to secure more information or explaining if the Plaintiffs sought to investigate the facts of the case with the co-defendants prior to filing suit.

I sum, here the Complaint's main argument are unsupported and the filing is completely devoid of any statement or comment suggesting that the Plaintiffs need to secure evidence in the co-defendants' possession and control. Nor do they allege that needed information is in the hands of third parties.

### (6) Plaintiffs failed to conduct a pre-suit investigation as required by Rule 11

A proper pre-filing investigation of the facts and law related to this case would have strongly suggested to Plaintiffs that they should not have filed this law suit against Alchem. In fact, the very Complaint shows that Alchem is an innocent party to the alleged "scheme to defraud." (*Id*. at ¶¶ 62, 63, 82, 109, 110, 123, 127-132, 168-171, 207 and 226.) Regarding the facts, the Complaint mentions an unidentified "former Alchem employee," but makes no mention at all of misconduct on part of Alchem. (See, D.E. # 1 ¶¶ 105-107 and 157.) In fact, the Complaint is completely devoid of any mentioned of discussions, interviews, phone conversations or meetings with any other person from Alchem about the facts plead. All the Complaint contains are bold assertions about facts and it merely cites to the year 2002 Report by the Puerto Rico Comptroller, a television interview and newspaper articles.

An attorney's duty under Rule 11 is particularly important in cases alleging RICO violations, such as the present.  The Fifth Circuit Court of Appeals has noted,

> [that] an attorney's responsibility to conduct a reasonable pre-filing investigation is particularly important in RICO claims:  Given the resulting proliferation of civil RICO claims and the potential for frivolous suits in search of treble damages, greater responsibility will be placed on the bar to inquire into the factual and legal bases of potential claims or defenses prior to bringing such suit or risk of sanction for failing to do so.

*Chapman & Cole v. Itel Container Int'l B.V.*, 865 F.2d 676, 685 (5th Cir. 1989).

The purpose of Rule 11 is to "deter baseless filings."  *CQ Int'l Co. v. Rochem Int'l, Inc.,* 659 F.3d 53, 62 (1st Cir. 2011).  That said, a litigant has a duty under Rule 11 "to conduct a reasonable inquiry into the facts and law.  See, *Id*. at 63.

Note that this is a serious matter, and "a party who brings a suit without conducting a reasonable inquiry and based on nothing more than a prayer that helpful facts will somehow emerge, and who through sheer fortuity is rewarded for his carelessness, is nevertheless vulnerable to sanctions."  *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1300 (Fed. Cir. 2004).  See also, *Garr v. U.S. Healthcare, Inc.,* 22 F.3d 1274, 1279 (3rd Cir. 1994) ("A shot in the dark is a sanctionable event, even it hits somehow the mark.").  The strength of the Plaintiffs' case must be viewed not from hindsight, but from when the complaint was filed.  Cf. Rule 11(b) states that "by signing, filing, submitting, or later advocating" a pleading, the party represents that "(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery," and, "(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information."  Fed. R. Civ. P. 11(b)(3)-(4).

In sum, Rule 11 requires a person contemplating filing paper with the court to stop, think and investigate before doing so because the rules provides that, by submitting pleadings, written motion, or other paper to court, that person certifies that to best of their knowledge motion or legal arguments contained therein are supported by existing law, are non-frivolous, and are supported by existing evidence or are likely to be supported after reasonable inquiry.

This lawsuit against Alchem is objectively baseless.  Meritless cases like this one require the district court to engage in excessive claim construction analysis before it is able to see the lack of merit of the RICO allegations.  Further, it requires Alchem to expend tens of thousands of dollars in attorney's fees and costs to litigate this case.  In addition to the high cost of litigation, Alchem's business reputation is been irreparably harmed.  Is sum, here the Complaint is mostly based on a year 2002 Comptroller of Puerto Rico's report, a television interview and new paper articles.  It should be dismissed.

### (7)  Plaintiffs lack Article III Standing and lack an "injury-in-fact"

The party invoking federal jurisdiction bears the burden of establishing the standing elements.  *Lujan v. Defenders of Wildlife*, 504 US 555, 561 (1992).  That said, RICO Standing is more vigorous than Article III Standing.  *See*, *Warth v. Seldin*, 442 U.S. 490, 498 (1975).  That said, the Complaint does not describe any conduct on the part of Alchem which could have caused the Plaintiffs damages.  Further, Plaintiffs have not suffered damages.

Under *Beck v. Prupis*, 120 S. Ct. 1608 (2000), the Supreme Court stated that contrary to what occurs in a criminal RICO case, a civil RICO defendant will face no conspiracy liability under RICO unless an overt-act inflicts injury.  *Id.* at 1614, n.6.  "To prevail on a civil RICO claim, a plaintiff must prove that a defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and, additionally, must establish that (5) the

defendant caused injury to plaintiff's business or property." *Chaset v. Fleer/Skybox International, LP*, 300 F.3d 1083, 1086 (9th Cir. 2002). Regarding that fifth element, in the circuits that apply *Holmes v. Securities Investors Protection Corp.*, 503 U.S. 258 (1992), it means that a civil RICO plaintiff must show that (1) his injury was proximately caused by the [prohibited] conduct, and (2) that he suffered a concrete financial loss. *Fireman's Fund Ins. Co. v. Stite*s, 258 F.3d 1016, 1021 (9th Cir. 2001).

In other words, to have standing to bring a RICO claim, a plaintiff must have suffered injury "by reason of" a RICO violation. 18 U.S.C. § 1964(c). The phrase "by reason of" means causation under the traditional tort "requirements of proximate or legal causation, as opposed to mere factual or 'but for' causation." See *Regions Bank v. J.R. Oil Co., LLC*, 387 F.3d 721, 729 (8th Cir. 2004).

In this case, Plaintiffs have not explained how they suffered an "injury-in-fact," or how their allege damages were the "proximate cause" of Alchem's conduct. Thus, they cannot maintain Article III Standing. In sum, to meet the Article III standing requirement a plaintiff must have suffered an "injury-in-fact" that is distinct and palpable.

All Plaintiffs have said is, according to the Complaint, compliant fuel oil is more expensive than its Non-Complaint Fuel Oil. (D.E. # 1, Complaint, ¶ 3.) PREPA accepted the Non-Complaint Fuel Oil "in exchanged for, **on information and belief**, undisclosed kickbacks or commissions to PREPA Participants." (D.E. # 1, Complaint, ¶ 1.) (Emphasis added). As a result of the scheme, PREPA overpaid its fuel suppliers for Non-Complaint Fuel Oil and then passed the entire cost on to the Plaintiffs in their monthly electric bills. (D.E. # 1, Complaint, ¶ 1.)

In sum, the Complaint alleges that PREPA accepted Non-Compliant Fuel Oil, "while charging the Plaintiffs and Class the prices for Complaint Fuel Oil."  (D.E. # 1, Complaint, ¶¶ 3 and 246.)  That caused the Plaintiffs suffer significant out-of-pocket losses as the cost of those overcharges was passed on directly in the form of higher electricity costs.  (*Id.*)  Additionally, Plaintiffs explain that they "have been injured in their property by reason of these violations in that Plaintiffs have made thousands of dollars in payments for fuel oil that they would not have made had the defendants not engaged in their pattern of racketeering activity." (*Id.* at ¶ 279.)

But, nowhere in the Complaint does it say that how many times PREPA paid *full price* for the Non-Compliant Fuel Oil.  What the Complaint does state that PREPA and the Fuel Oil Suppler Participants drafted their contacts to provide that PREPA would automatically take a discount on the price of fuel oil for each shipment that did not meet the correct BTU requirement as reflected in the laboratory results.  (*Id.* at ¶ 158.)  Further, Plaintiffs boldly allege that PREPA would latter refund any "automatic" discount taken, when the Fuel Oil Supplier Participants provided evidence that the fuel oil had reflected the correct BTUs.  Thus paying full price for Non-compliant Fuel Oil.  (*Id.* at ¶ 159.)  Although they claim that situation, they do not give a single concrete example.  They only make general assertions.  Moreover, the Plaintiffs do not explain how their electric bill or what percentage entailed the excess price paid for Non-Compliant fuel oil.  The fact is that their damages are purely speculative and they cannot figure out which, if any, is their financial loss.

The Complaint makes reference to better environmental alternatives for producing electricity (d.e. # 1, Complaint, ¶ 50, 53, 54, 55, 56, 57, 58) and it raise environmental violation concerns.  (D.E. # 1, Complaint, ¶ 116-120.)  But, Plaintiffs so not say that they would not have paid their bills because they disapproved of the environmental effects of using Non-compliant

Fuel Oil.  Further, despite having three (3) natural person plaintiffs identified and two (2) corporate plaintiffs identified, there is not a single allegation in the Complaint explaining how their electric bill suffered.  Nor do we know if those Plaintiffs received their electric power from power plants fueled by fuel oil for that matter.  They very well could be receiving their power from natural gas or coal, which represents 34% of the electricity provide in Puerto Rico.  (See, D.E. # 1, Complaint at ¶ 52.)  Thus, failure to plead once again.

Further, please note that the plaintiffs makes inflammatory assertions regarding PREPA's charges for "fuel" and "energy purchased," by saying that such charge was 5.2% ($220 million) higher in the month of June of 2014 that it was in June of 2013.  In June of 2014, PREPA charged the Plaintiffs and Class "more than $220 million" alone, under the Fuel Adjustment Clause, a 5.2% increase over June of 2013.  (*Id.* at ¶ 69.)  And, the Court can take judicial notice that the average cost for a barrel of crude oil ("USD/bbl") was $99.74 in June of 2013, while the USD/bbl was 108.37 in June of 2014.  The Court may take judicial notice of such facts.

In sum, Plaintiffs injuries are speculative at most, and there is no link whatsoever between Alchem and the alleged injuries.  Thus, Plaintiffs lack standing to sue Alchem.

 **(8) Any injuries sustained prior to February 24, 2011 are time-barred**

The statute of limitations for a civil RICO action is four years. *See*, *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).  The statute begins to run at the time a plaintiff knew or should have known of the injury.  *Rotella v. Wood*, 528 U.S. 549, 553-554 (2000).  In this case, Plaintiffs allege that the scheme to defraud them commenced in January of the year 2001.  Further, they affirmatively allege that Alchem began participating in the alleged scheme at some point in the year 2010.  Specifically, they state that "[u]ntil 2010, Alchem did not participate in the Fuel Oil Cartel, generally followed proper methodologies, and

submitted actual test results to PREPA. (*See*, Plaintiffs' Statement, D.E. # 35 at pg. 11 ¶ ¶2; and, Complaint, D.E. # 1 at ¶ 206).)

The Plaintiffs allege that the doctrine of fraudulent concealment operates to toll the statute of limitations in this case, because they were injured by a scheme to defraud and remained ignorant of it "without any fault or want of diligence" of their own.  Regarding said doctrine,

> "Irrespective of the extent of the effort to conceal, the fraudulent concealment doctrine will not save a charging party who fails to exercise due diligence, and is thus charged with notice of a potential claim." *Truck Drivers & Helpers Union v. NLRB*, 993 F.2d 990, 998 (1st Cir. 1993). "To invoke the doctrine of fraudulent concealment, a plaintiff must plead and prove three elements: (1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.' … The burden rests squarely on the party pleading fraudulent concealment." *Berkson v. Del Monte Corp.*, 743 F.2d 53, 55 (1st Cir. 1984) (internal citations omitted).

*In Re Luporn Mktg. & Sales Practices Litigation*, 295 F.Supp. 2d 148, 183 (D .Mass. 2003).

In this case, the Complaint fails to articulate the reasons why the Plaintiffs were allegedly unable to discover the alleged scheme earlier on.  That said, please note that the Complaint discusses public documents, including a Comptrollers year 2002 Report and a civil law suit captioned *Negron v. Caleb Brett U.S.A.*, Inc., 212 F.3d 666, 670 (1st Cir. 2000), both of which the Plaintiffs had access to.  (*Id.* at ¶¶ 83-91.)  Thus, Plaintiffs argument regarding alleged undue concealment is simply unacceptable.

### (9)  The Filed Rate Doctrine Bars Plaintiffs Damages Claim

Platiniffs RICO claims are barred by the "filed rate" doctrine, which precludes suits against regulated utilities (such as PREPA) ground on unreasonable rates.  See, e.g., Square D. Co.v. Niagra Frontier Tarriff Bureau, Inc., 476 U.S. 409 (1986).  Plaintiffs cannot maintain their

RICO claims since their alleged damages are determined aby "comparing the approved rate and the rate that allegedly would have been approved absent the wrongful conduct." H.J., Inc. v. Northwestern Bell Tel. Co., 954 F.2d 485, 492 (8th Cir. 1992). In sum, the filed rate doctrine precludes the Plaintiffs from challenging the rates charged to them by PREPA, thus they cannot establish an injury/damages.

**(10)  Plaintiffs Unjust Enrichment Claim Fails Too**

Plaintiffs also seek restitution based on "unjust enrichment" doctrine claim. First and foremost, Plaintiffs' Complaint does to demonstrate that they have suffered damages. Under Puerto Rico Law, recovery of unjust enrichment requires the following: (a) an enrichment; (b) a corresponding loss; (3) a connection between the enrichment and the loss; and (4) the absence of a legal precept that would preclude application of the concept of unjust enrichment. *Municipio de Cayey v. Soto-Santiago*, 131 D.P.R. 304, 320, 1992 P.R. – Eng. 754, 881 (1992).

Second, even Plaintiffs bold assertions in the Complaint cannot support the first three (3) elements discussed above. Second, even if there were damages, they are completely speculative and there is no basis to allege that the co-defendants engaged in a scheme to defraud them. Much less is there any kind of connection between Alchem's conduct and their alleged loss.

Second, even if the Plaintiffs were able to meet the first three (3) requirements of an unjust enrichment cause of action, they would still fail to meet the last prong, with is the absence of a legal precept that would allow for recovery. Here, plaintiffs could attempt to redress any such losses though state contract and/or tort law. Moreover, they have already sought redress here under RICO. But, under Puerto Rico law, the doctrine of unjust enrichment is recognized as a general principle of equity and is, therefore, only applicable where there are no laws or statutes

to correct a harm caused.  *E.L.A. v. Colé Vazquez*, 164 D.P.R. 608, 632 (2005).  Here Plaintiff have other legal alternative.

Considering the fact that Plaintiffs do not meet any of the four (4) pongs necessary to prevail under an unjust enrichment cause of action theory, said Count should be dismissed.

### V.   <u>CONCLUSION</u>

Plaintiffs have not meet the requirements of pleading proper RICO claims or an unjust enrichment claim under state law against Alchem.  Moreover, it is apparent that they not only filed this suit against an innocent party, but they also failed to property investigate this case prior to filing the same.  Had they done so, they would not have filed against Alchem.

Alchem adds that Plaintiffs should not be granted leave to amend a Complaint either where, as here, such a remedy would be futile. *See Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996).  In this case, the Complaint is not only deficient factually, but also legally. Particularly, regarding the matter of properly pleading their alleged injury.  Thus, the Complaint should be dismissed, with prejudice.  If a Plaintiff cannot even figure out what its damages are, its certainly lacks Article III standing to file a suit such as this one.

**WHEREFORE**, Alchem very respectfully request that this Honorable Court take notice of the above and GRANT this Motion to Dismiss, in its entirety, with prejudice.

**CERTIFICATION OF SERVICE,** I hereby certify that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system with will send notification of such filing to all attorneys of record registered in the use of the CM/ECF system in this case.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 1st day of May, 2015.

**s/Rolando Emmanuelli Jiménez**
Rolando Emmanuelli-Jiménez
USDC – PR No. 214105
**Bufete Emmanuelli, C.S.P.**
P.O. Box 10779
Ponce, Puerto Rico 00732-0779
TEL. (787) 843-8406; Fax (787) 848-6586
E-mail: remmanuelli@me.com

**s/Thomas Trebilcock Horan**
Thomas Trebilcock-Horan
USDC - PR No. 220514
**Trebilcock & Rovira, LLC**
Ochoa Building
Suite 201, Tanca Street
San Juan, PR 00901
Phone No.  (787) 723-0439
E-mail: ttrebilcock@trebilcockrovira.com