IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| ISMAEL MARRERO-ROLÓN, ET AL., | |
| Plaintiffs, | |
| v. | CIV. NO.: 15-1167(JAG/SCC) |
| AUTORIDAD DE ENERGÍA ELÉCTRICA DE P.R., ET AL., | |
| Defendants. | |

## REPORT AND RECOMMENDATION

Alleging a RICO conspiracy aimed at defrauding Puerto Rico's electric ratepayers by procuring, selling, and burning substandard fuels while passing along to the ratepayers the costs of compliant fuel, the named plaintiffs and a putative class of all electric ratepayers has sued the Autoridad de Energía Eléctrica de Puerto Rico ("PREPA," as it is known in English) and numerous other individuals and corporations. Docket No. 1 ("Compl."). Collectively, the defendants have filed fourteen motions to dismiss, Docket Nos. 82, 102, 108, 110,

116, 121, 126, 130, 133, 135, 136, 137, 161, 164, which the presiding district judge referred to the undersigned for a report and recommendation, Docket No. 207. After carefully considering the defendants' motions and the plaintiffs' responses, I recommend that the Complaint's allegations be deemed sufficient in most regards.[1]

## 1.  Factual Background

The complaint in this case is eighty pages long and very detailed. Thus, in this section I will provide a summary of Plaintiffs' allegations, taking up the more specific allegations as necessary in the analysis that follows.

### 1.1 The Alleged Scheme

PREPA is a public company with a monopoly on power generation and electricity distribution in Puerto Rico. Two-thirds of the power PREPA generates comes from the burning of petroleum or fuel oil, all of which is imported to the island. Pursuant to a 1999 Consent Decree with the EPA, the fuel burned by PREPA must meet certain minimum specifications;

---

**1.**  Vitol requests oral argument on its motion to dismiss. Docket No. 213. But because of the huge number of parties and discrete legal issues, I believe holding arguments would generate more heat than light and would not assist me in my decision. I thus DENY Vitol's request.

Plaintiffs refer to this as Compliant Fuel Oil, and refer to oil that fails to meet these specifications as Non-Compliant Fuel Oil.

To purchase oil, PREPA is meant to request bids for Compliant Fuel Oil and choose the lowest bidder. When the oil arrives, it is tested by independent laboratories, which issue Certrificates of Analysis. These and other tests performed by laboratories hired by PREPA are meant to ensure that only Compliant Fuel Oil is burned. PREPA's costs for the purchase of fuel are passed directly on to consumers. Between June 2013 and June 2014, more than $2.6 billion was charged to PREPA clients as a pass-through cost for the purchase of fuel.

In essence, Plaintiffs allege that this system has been hijacked by what it calls the Cartel de Petroleo. In Plaintiffs' reckoning, the Cartel is made up of three branches: the PREPA

Participants,[2] the Fuel Oil Supplier Participants,[3] and the Laboratory Participants.[4] At the behest of the PREPA Participants, the Laboratory Participants regularly falsified fuel test reports such that it looked like PREPA was buying (and paying full price for) Compliant Fuel Oil, when in fact it was purchasing Non-Compliant Fuel Oil, which was worth less. The Laboratory Participants agreed to this arrangement to ensure future work from PREPA, while the PREPA Participants participated in exchange for kickbacks from the Fuel Oil

---

**2.** Specifically, the PREPA Participants are made up of the following defendants: PREPA; William Rodney Clark, the administrator of PREPA's Fuel Procurement Office from 1996 until May 2014; Edwin Rodríguez, the manager of PREPA's Fuel Procurement Office after May 2014; and Cesar Torres-Marrero, the Assistant Manager of PREPA's Fuel Procurement Office since May 2014.

**3.** Specifically, this group is made up of the following Defendants: Petrobras America Inc. and its parent company, Petroleo Brasileiro S.A. (collectively referred to as "Petrobras"); Shell Trading (US) Co. ("Shell Trading"); Trafigura A.G. and Trafigura Beheer B.V. (collectively, "Trafigura"); PetroWest, Inc.; Vitol, S.A., and Vitol, Inc. (collectively, "Vitol"); and Carlos Méndez & Associates ("Méndez").

**4.** Specifically, this group is made up of the following Defendants: Inspectorate America Corp. ("Inspectorate"); Bureau Veritas Holding, Inc. ("Bureau Veritas"); Core Laboratories N.V. d/b/a Saybolt ("Saybolt"); and Altol Chemical Environmental Laboratory Inc. and Altol Environmental Services, Inc. (collectively, "Alchem").

Supplier Participants. The Fuel Oil Supplier Participants, of course, received an inflated price for discount oil.

## 2.2 Plaintiffs' Discovery of the Alleged Scheme

According to Plaintiffs, the existence of the Cartel was revealed to the public principally by a May 2014 television program in which the president of Puerto Rico's Senate, Eduardo Bhatia, said that PREPA buys $3 billion of fuel a year, and the people in charge of making those purchases are getting a ten-percent commission, or as much as $300 million a year. Bhatia futher implied that those individuals "would do the unspeakable" to protect those commissions.

But long before the 2014 television report, there were indications that something was wrong at PREPA. For instance, in 2002, PREPA's Office of the Comptroller released an audit of PREPA's Fuel Oil Office. This report disclosed that prior to 1999, employees at an outside laboratory had been pressured to falsify hundreds of test results. In August 2002, PREPA then sued that laboratory (but not any of the Fuel Oil Supplier Participants) in federal court, accusing it of engaging in a conspiracy to provide Non-Compliant Fuel Oil at Compliant Fuel Oil prices. In the course of the lawsuit, PREPA denied knowledge of the scheme (though some witnesses gave

testimony to the contrary).

Much later, in October 2011, news reports emerged claiming that PREPA had on two occasions used Non-Compliant Fuel Oil and that an internal audit had been shutdown before it could be completed. As a result, PREPA hired an outside auditor, Ivan Clark. His report showed that between December 8 and October 2011, just six of almost 700 samples revealed Non-Compliant Fuel Oil.[5]

## 2.  Analysis

I will begin by taking up several miscellaneous—and yet case-dispositive—defenses that are raised by one or another of the defendants. Sustaining none of them, I then turn to the numerous arguments arrayed against Plaintiffs' RICO claim. And finally, I consider Plaintiffs' state-law unjust enrichment claim.

### 2.1 Miscellaneous Defenses

I will begin by considering several arguments that, if sustained, would lead to the dismissal of one or two defen-

---

**5.**  Plaintiffs allege that because samples are only held for ninety days, it would have been impossible for Ivan Clark to have tested so many. Internal auditors allegedly concluded that Ivan Clark's audit was illegitimate.

dants without wading into the RICO claims.

### 2.1.1 The claims against Bureau Veritas and Petróleo Brasileiro, S.A., should not be dismissed for insufficient service of process

The Complaint in this case was filed on February 24, 2015. Service had to be completed within 120 days of that date, Fed. R. Civ. P. 4(m), which period elapsed on June 24, 2015. Bureau Veritas and Petróleo Brasileiro were not served until June 29, 2015. Under such circumstances, the Court "must dismiss the action without prejudice" unless the plaintiff "shows good cause for the failure." *Id*. Plaintiffs claim to have good cause: when they filed the Complaint, the CM/ECF system automatically entered a service deadline of June *29*, 2015. Docket No. 1. I think it obvious that being told by the Court's docketing system that June 29, 2015, was the day by which Plaintiffs had to serve the defendants is a sufficiently good reason for their having waited until that date to do so. Moreover, as Plaintiffs point out, the Court can change the Rule 4(m) deadline, and it is plausible that the CM/ECF system's automatic entry of June 29, 2015, constituted such a change. And even if it did not, relying on that date would constitute good cause for a brief five-day delay in service. Accordingly, I would deny the

motions to dismiss for insufficient service of process.

### 2.1.2   The Court has personal jurisdiction over Bureau Veritas Holdings, Inc.

Bureau Veritas Holdings, Inc., argues that it should be dismissed from this action because it does not have contacts with Puerto Rico sufficient to justify personal jurisdiction over it. Bureau Veritas relies on general principles of personal juridiction. In doing so, it forgets, as Plaintiffs point out, that the RICO statute provides for nationwide service of process "when it is shown that the ends of justice require." 18 U.S.C. § 1965(b). A plurality of courts interpreting this provision have held that it gives personal jurisdiction over an out-of-state defendant so long as the Court has jurisdiction established by the minimum contacts of at least one other defendant. *FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1099 (D.C. Cir. 2008); *see also id.* (collecting cases); *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1231 (10th Cir. 2006) (coming to the same conclusion as *IFX Markets*). Here, the great majority of the facts giving rise to this case occurred in Puerto Rico and relate to Puerto Rico's electricity market. The ends of justice thus require that the entire case be heard by this court. Personal jurisdiction over Bureau Veritas is thus appropriate.

### 2.1.3   Petróleo Brasileiro is not immune under the Foreign Sovereign Immunity Act.

Petróleo Brasileiro, S.A., argues that, pursuant to the Foreign Sovereign Immunity Act, it is immune from suit in this case. Plaintiffs admit that Petróleo Brasileiro is a foreign state for FSIA purposes, but they argue that its immunity has been waived by virtue of its direct economic activity in the United States.

The FSIA waives the immunity of foreign states for, among other things, actions "based upon a commercial activity carried on in the United States" by that foreign state. 28 U.S.C. § 1605(a)(2). Petróleo Brasileiro's only argument about why this waiver does not apply is that it does not have any fuel contracts with PREPA. Docket No. 164-1, at 14 & n.5. But contracts with PREPA are not the *sine qua non* of commercial activity, and the Complaint alleges that Petróleo Brasileiro engaged in economic activity in the United States in other ways. For example, it provided Shell Trading with low-sulfur fuel specifically for the Puerto Rico market. Furthermore, a Petróleo Brasileiro executive, Roberto Costa, was allegedly involved in securing PREPA contracts for Petróleo Brasileiro's

American subsidiary, Petrobras America.[6]

Once a defendant establishes that it is a foreign state, the plaintiff has an initial burden of producing evidence that would support an exception to immunity. *Universal Trading & Inv. Co. v. Bureau for Representing Ukrainian Interests in Int'l & Foreign Courts*, 727 F.3d 10, 17 (1st Cir. 2013). In some cases, the court may thereafter have to hold a hearing and resolve factual disputes. *Id.* Here, however, Petróleo Brasileiro has not challenged any of Plaintiffs' facts (and has not filed a reply brief at all). Rather, Petróleo Brasileiro has argued that the facts stated in the Complaint are legally deficient. It has done so, moreover, by ignoring numerous facts bearing on its participation in the alleged scheme. Given that Petróleo Brasileiro bears the burden of persuading the Court of its immunity, *id.*, its arguments must be deemed deficient for this reason. I would thus deny its motion to dismiss on FSIA grounds, or, in the alternative, grant Plaintiffs leave to conduct jurisdictional discovery.

---

**6.**   I consider these allegations—and the potential problems with them—in more detail *infra* § 2.2.3.4.

### 2.1.4  Plaintiffs' Complaint does not fail to satisfy Rule 8's "short and plain statement" requirement.

Federal Rule of Procedure 8(a)(2) requires a pleading to contain "a short and plain statement of the claim." Occasionally, courts have struck pleadings for their failure to satisfy this frankly undemanding requirement. *E.g., Kuehl v. F.D.I.C.*, 8 F.3d 905, 908 (1st Cir. 1993) (affirming dismissal where plaintiffs' pleading was not only "excessively long and unnecessarily redundant," but where the plaintiffs had otherwise engaged in vexatious behavior). PetroWest argues that Plaintiffs' Complaint should accordingly be dismissed, as it "includ[es] an exorbitant amount of irrelevant and conclusory allegations." Docket No. 108, at 29.[7]

A quick review of the Complaint shows PetroWest's argument to be frivolous. On the whole, the Complaint is thorough and well-organized. It may well include unnecessary

---

**7.**  Oddly, PetroWest also argues that the Complaint should be dismissed because it contains "allegations that are evidently based on hearsay." Docket No. 108, at 29. Unsurprisingly, PetroWest fails to cite any authority purporting to hold that allegations in a complaint may not be based on hearsay. *See, e.g., Muzaffarr v. Ross Dress For Less, Inc.*, Civ. No. 12-61996, 2013 WL 1890274, at *2 (S.D. Fla. May 7, 2013) ("[T]here is no rule against hearsay statements in pleadings.").

facts or conclusory assertions, but they certainly do not predominate over the facts that are relevant and properly pled. Put simply, Plaintiffs' Complaint is long because this case is complex; it does not come close to deserving dismissal under Rule 8(a)(2). PetroWest's motion in this regard should be denied.

### 2.1.5   The Complaint should not be dismissed for violations of Rule 11.

Alchem argues that the claims against it should be dismissed because Plaintiffs failed to conduct a pre-suit investigation as required by Rule 11. Fed. R. Civ. P. 11(b) (requiring a reasonable inquiry into facts before including them in a pleading). In essence, Alchem complains that it should not have been sued because the claims against it are "objectively baseless," Docket No. 121, at 44, and that "the very Complaint shows that Alchem is an innocent party," *id.* at 42.[8] In support

---

**8.**   In the course of making this argument, Alchem referred (but accidentally did not attach) a settlement-negotiation letter from Plaintiffs' counsel. *See* Docket No. 182. Plaintiffs, quite correctly, complained that this constituted a breach of their confidentiality agreement. Docket No. 185. Alchem then gratuitously filed the letter without any viewing restrictions, knowing full well of the confidentiality agreement and Plaintiffs' wish to enforce it. Docket No. 190. I GRANT IN PART Plaintiffs' motion at Docket Nos. 186; GRANT

of this claim, Alchem cites numerous paragraphs in the Complaint that do in fact show that it tried to resist the Cartel. *Id.* (citing Compl. ¶¶ 62, 63, 82, 109, 110, 123, 127–132, 168–71, 207, 226). But these citations are misleading, because while the Complaint does say that, early on, Alchem resisted the Cartel, it also specifically alleges that by late 2010, Alchem had joined the Cartel's operations and by changing its testing methodology and firing an employee who resisted. Comp. ¶¶ 208–22. Of course, Alchem neglected to cite these paragraphs in making its sweeping claim that the Complaint failed to allege wrongdoing on its part.

As for the claims that the Complaint does make against Alchem, they are extremely specific and, on their surface, have indicia of having come from a documentary or eye-witness source. Alchem accuses Plaintiffs of basing the Complaint primarily on a 2002 Comptroller report, a television interview, and newspaper articles. But the allegations at issue date from 2010, not 2002, and were not apparently included in any

---

its motion at Docket No.187 and Alchem's motions at Docket No. 206 and 2011; STRIKE the filing at Docket No. 190; and deny further sanctions, with the caveat that I find the conduct of Alchem's counsel, Thomas Trebilcock-Horan, troubling. *See also infra* note 9.

interview or newspaper articles (at least none that the Complaint or Alchem cite). Thus, the allegations against Alchem, at least, do not come from these sources and, on the contrary, appear to come from elsewhere. The allegations may well turn out to be false, but there is nothing at all in the record from which I could determine (or which makes me suspect) that Plaintiffs have violated Rule 11. I would thus deny Alchem's request for Rule 11 sanctions.[9]

### 2.1.6   The EPA is not an indispensable party.

The requirement that PREPA burn Compliant Fuel Oil comes from a 1999 Consent Decree with the EPA, which was amended in 2004. According to PetroWest, the EPA is an indispensable party to this action, and the case should therefore be dismissed. PetroWest is incorrect.

---

**9.**   In its reply, Alchem claims that it did not request sanctions against Plaintiffs for a Rule 11 violation. Docket No. 182, at 5. This is false: Alchem asked that the Complaint be dismissed as a consequence of a Rule 11 violation; this would, obviously, constitute a sanction.

Ironically, in accusing Plaintiffs of violating Rule 11, Alchem moreover appears to have violated the Rule itself. Rule 11(c)(2) requires that before moving for Rule 11 sanctions, the aggrieved party must be served on the adverse party *but not filed* until 21 days later or if the adverse party withdraws the contention at issue. Alchem failed to abide by this provision, and so its motion should be denied for that reason as well.

In relevant part, a person is a necessary party if it has "an interest relating to the subject of the action" such that the court's disposing of the action without the person might "as a practical matter impair or impede the person's ability to protect [its] interest." Fed. R. Civ. P. 19(a)(1)(B)(i). PetroWest argues that the EPA's interest—enforcing the Consent Decree—might be impeded because, should it try to enforce the Consent Decree against PREPA, it would "be bound by the Court's final determination" as a matter of collateral estoppel. Docket No. 108, at 31. Beyond citing a basic description of the doctrine, though, PetroWest does not even attempt to argue this point.

If this case is decided on its merits, speaking simply the trier of fact could reach two conclusions: first, that PREPA did burn Non-Compliant Fuel Oil (which would mean it violated the Consent Decree); and second, that it did not burn Non-Compliant Fuel Oil (in which case it did not violate the Consent Decree). If the latter finding were made, PREPA could not rely on it in a later proceeding for violating the Consent Decree because such non-mutual defensive collateral estoppel is appropriate only where it would bar a *plaintiff*—in this scenario, the EPA—from relitigating a claim that it has already

lost against a different defendant. *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 770–71 (1st Cir. 2010). But because the EPA is not a party to this suit (and much less a *plaintiff* in it), PREPA could not seek protection under this doctrine. And if the Court found PREPA *did* burn Non-Compliant Fuel Oil, the EPA might be able to rely on that finding, *id.* (referring to non-mutual offensive collateral estoppel), but its interest would not be harmed by that fact.

Further, even if this analysis were incorrect, and the EPA were a necessary party to this litigation, that fact would not warrant dismissal of Plaintiffs' action. PetroWest fails to understand that Rule 19's default is to require the joinder of the necessary party, not the dismissal of the case. Fed. R. Civ. P. 19(a)(2). It is only where the necessary party cannot be joined that dismissal *might* be appropriate. Fed. R. Civ. P. 19(b). But as Plaintiffs point out, the EPA is amenable to this Court's process and its joinder would not destroy the Court's jurisdiction. As such, if the EPA were a necessary party, the Court would join it, not dismiss the action. Accordingly, PetroWest's motion should be denied.

## 2.2 RICO

I will now proceed to analyze the defendants' RICO arguments. I will begin with the statute of limitations argument that all of the defendants have joined. Then, I will discuss whether Plaintiffs have pled standing, an enterprise, and a pattern of racketeering activity. Finally, I will consider whether Plaintiffs have pled a RICO conspiracy and whether their claims are barred by the filed-rate doctrine.

### 2.2.1  Plaintiffs' claims should not be dismissed as time-barred.

There is a four-year statute of limitations on RICO claims. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 438 U.S. 143, 156 (1987). A claim accrues at the time the plaintiff knew or should have known about his injury. *Lares Grp., II v. Tobin*, 221 F.3d 41, 43–44 (1st Cir. 2000) (citing *Rotella v. Wood*, 528 U.S. 549 (2000)); *see also Matthews v. Kidder, Peabody & Co.*, 260 F.3d 239, 251 (3d Cir. 2001) ("[A] RICO claim accrues when the plaintiffs should have discovered *their injuries*."). In this case, Plaintiffs claim injuries beginning in 2002, well outside of the four-year limitations period. The relevant question then is when plaintiffs knew or should have known of their injuries. And to determine when Plaintiffs *should* have known, we look for

what the First Circuit has called "storm warnings": "telltale warning signs [that] augur that fraud is afoot," and which, "if sufficiently portentous, may as a matter of law be deemed to alert" the plaintiff to his injuries. *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir. 2002) (securities fraud case).

Plaintiffs claim that they first learned of their injuries in 2014, when a television program about PREPA's commissions aired and a former PREPA auditor disclosed what had been happening at PREPA. Compl. ¶ 265. Defendants, however, argue that Plaintiffs were on inquiry notice at least ten years earlier. Trafigura, for instance, points to "a publicly available lawsuit from 2000," PREPA's 2002 suit against a laboratory for falsifying test results, "internal PREPA audits," a news report from 2005, and a document made public by PREPA as part of a 2010 bond offering. Docket No. 82, at 24–25.[10] Additionally, the defendants point to the 2002 Comptroller report, which

---

**10.** In writing this opinion, I rely frequently on Trafigura's motion to dismiss because it is the best-written and most comprehensive of the motions pending before the Court. Because all of the motions make many common arguments, it has served as something of an exemplar in understanding the defendants' positions. I note, however, that the other motions are not more comprehensive in their accounting of the putative "storm warnings"; most, in fact, cite precisely the same information, including the same news article and bond offering.

they assert was public, *e.g.*, Docket No. 108, at 7, and an additional 2005 news article, Docket No. 110-2.

First, with regard to the lawsuits, there is no reason to think that they should have put Plaintiffs on inquiry notice. Nothing in the Complaint—and nothing to which the defendants point in their motion—suggests that any of these suits were the subject of press coverage, much less substantial press coverage of the type that knowledge of their subject matter might be appropriately imputed to Plaintiffs. *Cf. Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 435 (3d Cir. 2008) (finding knowledge of lawsuit could not be imputed to investor where, among other things, it "received no publicity whatever" and did not "result in published or broadly disseminated opinions"); *see also Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 363 (2d Cir. 2013) (following *Staehr*); *Holmes v. Parade Place, LLC*, Civ. No. 12-6299, 2013 WL 5405541, at *13 (S.D.N.Y. Sept. 26, 2013) (holding that knowledge of "well-publicized court proceedings" could be imputed to an investor in a securities fraud case).[11] Similarly, the 2002 Comptroller report and the

---

11.  *Staehr*, *Cohen*, and *Holmes* are all securities fraud cases. In that context, there is substantial precedent establishing that investors should be assumed to be aware of prospectuses, media, and other information

internal audits—if they were even public[12]—are not documents to which knowledge could be imputed to a reasonable electricity consumer in the absence of significant press coverage, which has not been alleged or shown. Likewise for the 2010 bond offering.[13]

----

about their investments. *See, e.g., Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 431 (2d Cir. 2008). This seems to be based in part on the "sophisticated" nature of such individuals. *See, e.g., AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 410 (S.D.N.Y. 2009), *aff'd*, 386 F. App'x 5 (2d Cir. 2010). This heightened standard of knowledge probably does not apply in the non-securities fraud context, especially where, as here, the plaintiffs are ordinary consumers. *See McIntyre v. United States*, 367 F.3d 38, 60 (1st Cir. 2004) (asking simply whether "a reasonable person" would have been aware of news coverage). And in applying a reasonable person analysis to the class of Puerto Rican electricity consumers it cannot be forgotten that Spanish is the first language of the vast majority of Puerto Ricans and the only language of many.

12. The Complaint is vague about whether the 2002 Comptroller report was made public at the time, though at least one defendant asserts that it was. As for the internal audits to which Trafigura points, I read the Complaint to suggest they were not publicly disseminated, and neither Trafigura or any other defendant has shown otherwise.

13. This is a nearly 200-page, English-language document directed at investors considering investing in a particular PREPA bond offering, not consumers of power. It includes one paragraph noting that Puerto Rico's Comptroller had found that PREPA had overcharged its customers. The document does not explain the basis for this finding but

That leaves the two news articles to which the defendants have pointed. The 2005 article from the Puerto Rico Herald (an English-language paper) simply mentions that in recent years Puerto Rico's Comptroller "ha[d] issued seven reports covering various areas of [PREPA]'s operations, including findings regarding the acquisition of fuel and overcharges on the electricity bill." There is no greater detail regarding these fuel acquisition findings or overbilling, and no reasonable reader of the article could on this thin basis be on inquiry notice of fraud. *See Seippel v. Sidley, Austin, Brown & Wood, LLP*, 399 F. Supp. 2d 283, 291 (S.D.N.Y. 2005) ("Available information must establish a 'probability, not a possibility' of fraud to trigger inquiry notice." (quoting *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 193 (2d Cir. 2003))). Similarly, the 2005 article from El Nuevo Día notes that PREPA had been charging its customers more for the purchase of fuel than it was actually paying its suppliers. Docket No. 110-2, at 2. The article neither states nor implies

does strongly imply that it was because the Comptroller had determined that PREPA had engaged in improper rate-setting (which PREPA disputed). Nothing in the note even hints at fraud in the purchase of fuel oil, which is the subject of this suit. I am thus doubtful that actual knowledge of this document would have put Plaintiffs on notice regarding the injuries they have asserted in this case.

that this is the result of fraud or criminality—or that it is even illegal. Rather, the article offers an explanation by PREPA's finance director to the effect that the money charged is used to pay statutory subsidies that PREPA must offer to certain of its customers. *Id.* at 3. Even if the reasonable consumer were imputed knowledge of these articles,[14] then, it would not suffice to put her on inquiry notice regarding the injuries that Plaintiffs now allege.

The bottom line is that the defendants' arguments rely on assumptions about what Plaintiffs knew or should have known and when they knew or should have known it. On the record before the Court, these questions cannot be resolved as a matter of law in the defendants' favor. At most, they are questions that must be decided at a later point by the trier of

---

**14.**  I am inclined to think that she should not be. The First Circuit has held that knowledge of media coverage can be imputed to a person when it is widespread. *McIntyre v. United States*, 367 F.3d 38, 60 (1st Cir. 2004). On the record now before the Court, I could not find that these facts were the subject of "widespread publicity," which is more properly a question for the finder of fact. *Id.* (internal quotations omitted); *see also Fisher v. Ciba Specialty Chems. Corp.*, Civ. No. 03-0566, 2007 WL 2995525, at *19 (S.D. Ala. Oct. 11, 2007) ("[T]he record evidence that Ciba contamination received substantial media attention during much of the period of concern raises a question of fact as tow whether that knowledge can be imputed to plaintiffs.").

fact.[15] *McIntyre*, 367 F.3d at 60 (referring to question of inquiry notice as "a fact-intensive inquiry that can sometimes be difficult to resolve on a motion to dismiss"); *see also Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999) (holding that "as a general rule, the issue of when a plaintiff in the exercise of due diligence should have known the basis for his claims is not an appropriate question for summary judgment"); *Mathews*, 260 F.3d at 250 (citing *Davis v. Grusemeyer*, 996 F.2d 617, 623 n.10 (3d Cir. 1993)); *AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 410 (S.D.N.Y. 2009) ("It was properly for the jury to determine in view of all the evidence whether the single report placed the plaintiffs on sufficient notice of the probability of fraud."), *aff'd*, 386 F. App'x 5 (2d Cir. 2010); *Fisher v. Civa Specialty Chems. Corp.*, Civ. No. 03-0566, 2007 WL 2995525, at *19 (S.D. Ala. Oct. 11, 2007); *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 183–84 (D. Mass. 2003) ("Whether a plaintiff

---

**15.** I have not considered the articles filed for the first time with Petrobras's reply brief, *see* Docket No. 197, but if I did, it would not alter my fundamental conclusion: that the question of whether the parties had inquiry notice on the basis of news articles is a question for the finder of fact. Moreover, the facts related by the two articles deal with the pre-2002 fraud that Plaintiffs claim PREPA attempted to conceal.

knew or should have known of an injury so as to trigger the running of a statute of limitations is, with rare exception, a jury issue."); *cf. Abdallah v. Bain Capital LLC*, 880 F. Supp. 2d 190, 198–99 (D. Mass. 2012) (Massachusetts law).

The Complaint should therefore not be dismissed as time-barred.

### 2.2.2   RICO Standing

The defendants allege that Plaintiffs have failed to show RICO standing because they cannot point to a concrete injury, cannot show but-for or proximate cause, and because their damages are too difficult to ascertain. I discuss these arguments now.

### 2.2.2.1 Plaintiffs have alleged a concrete injury.

A RICO plaintiff must show an injury to "his business or property." 18 U.S.C. § 1964(c). The defendants argue that Plaintiffs cannot do this. Their argument runs like this: Because of the 1999 Consent Decree, PREPA was obliged to burn Compliant Fuel Oil, which is more expensive than Non-Compliant Fuel Oil. The Cartel's scheme involved charging Plaintiffs for Compliant Fuel Oil while burning Non-Compliant Fuel Oil. But because PREPA was obligated to burn (and thus charge for) the more expensive fuel, Plaintiffs would have paid

precisely the same price for electricity even in the absence of the alleged fraud. For this reason, say the defendants, Plaintiffs can show no injury. This is a clever argument, but it is telling that the defendants have failed to cite any caselaw in its support.[16] *See, e.g.*, Docket Nos. 82, at 13–15; 116-1, at 19–21; 133, at 6–7; 135, at 5–7.[17] I am not convinced.

According to the Complaint, the costs PREPA pays for fuel are passed on directly to its customers through a line-item on their bill. Compl. ¶¶ 66–67. This is important because it means that, in addition to providing (and charging for) electricity,

---

**16.** Though the defendants do not rely on them, I have considered and rejected an analogy to cases rejecting benefit-of-the-bargain theories of damages. *See, e.g.*, *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods. Liability Litig.*, 915 F. Supp. 2d 1151, 1158 (C.D. Cal. 2013). In *Toyota Motor Corp.*, for example, the plaintiff sued regarding a nationwide problem in Toyota braking systems. *See id.* at 1157. Although his own car functioned properly, the plaintiff alleged that he would not have paid as much as he did if he had been aware of the problem. *See id.* at 1157–58. The court rejected that argument because the plaintiff received what he paid for: "a vehicle with a safe and operable" braking system. *Id.* at 1159. Here, by contrast, Plaintiffs allege that they paid more for a product than it was worth.

**17.** Disappointingly, Edwin Rodríguez's and PREPA's briefs on this point are verbatim copies of Trafigura's brief.

PREPA directly charges its customers for fuel.[18] But, say Plaintiffs, the prices they were charged for fuel were inflated as a result of fraud: PREPA passed along the costs for Compliant Fuel Oil while purchasing cheaper Non-Compliant Fuel Oil. As Plaintiffs argue, this amounts to overcharging, and overcharging as a result of illegality is a concrete and compensable economic injury. *Chattanooga Foundry & Pipe Works v. City of Altanta*, 203 U.S. 390, 396 (1906) (holding that the plaintiff was injured "in its property . . . by being led to pay more than the worth of the pipe"). I fail to see the legal relevance in the fact that the price to consumers would have been the same had PREPA actually purchased Compliant Fuel Oil.[19] What matters

---

18. Notably, in *Kansas v. UtiliCorp United, Inc.*, the Supreme Court referred to utility customers who paid passed-through fuel costs as purchasers of fuel. 497 U.S. 199, 207 (1990) (explaining that the utility customers "*bought their gas* from the utilities, not the suppliers" (emphasis added)). For this reason, and because the Complaint specifically pleads otherwise, I reject the argument made by some defendants that Plaintiffs have not pled but-for causation. *E.g.*, Docket No. 106, at 22 ("The problem with Plaintiffs' causal theory is that the Plaintiffs were purchasers of electricity, not fuel oil." (emphasis omitted)).

19. In a similar line of cases, the Courts have soundly rejected the notion that a business suffers no economic harm when it is able to pass an overcharge along to its own customers. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968) ("As long as the seller continues to

about that scenario is that there would have been no fraud, no overcharge, and thus no injury.[20] *Cf. S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 534 (1918) ("The carrier ought not to be allowed to retain his illegal profit, and the only one who can take it from him is the one that alone was in relation with him, and from whom the carrier took the sum."). Here, the passed-through costs were inflated as the result of an alleged fraud; Plaintiffs have thus alleged a concrete injury.

### 2.2.2.2 Plaintiffs have properly pled proximate cause.

Relying on *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990), many of the defendants argue that Plaintiffs, as indirect

---

charge the illegal price, he takes from the buyer more than the law allows."); *Cnty. of Oakland v. City of Detroit*, 866 F.2d 839, 847 (6th Cir. 1989) (holding that an injury is not "eradicated for constitutional standing purposes if the excessive charges were subsequently passed on").

**20.** One could view PREPA's customers as paying a premium for electricity as a result of the 1999 Consent Decree, which mandated the purchase of more expensive fuel. In similar cases, courts have held that a customer is injured when he pays that premium price but unwittingly receives a less valuable product. *In re Whirlpool Corporation Front-Loading Washer Prods. Liability Litig.*, 722 F.3d 838, 857 (6th Cir. 2013). Likewise Plaintiffs in this case argue that they were charged for the premium Compliant Fuel Oil but were in fact paying that premium price for the cheaper Non-Compliant Fuel Oil.

purchasers of fuel, cannot show proximate cause. In *UtiliCorp*, a group of natural gas suppliers were accused of illegally inflating the price of fuel. *See id.* at 204. This fuel was bought by a utility and the cost was passed on to consumers. *See id.* The State of Kansas sued the suppliers on behalf of the consumers, alleging antitrust violations. *See id.* at 204–05. In light of its opinion in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court rejected Kansas's claim, explaining that the consumers were "not the immediate buyers from the alleged antitrust violators"; instead, they "bought their gas from the utilities, not from the suppliers said to have conspired to fix the price of gas." *UtiliCorp*, 497 U.S. at 207. Essentially, the Court held that it was the utility that had the right to sue the suppliers for antitrust violations, and allowing the utility's customers to *also* sue the suppliers would risk multiple recoveries and create difficult apportionment problems. *Id.* at 207, 212. *UtiliCorp* applies with equal force in the RICO context, *e.g.*, *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 616 (6th Cir. 2004), and so, calling Plaintiffs indirect purchasers of fuel, the defendants argue *UtiliCorp* bars their claims.

The obvious difference between the facts of *UtiliCorp* and this case, though, is that while the utility in that case was an

innocent victim of the suppliers' price fixing, PREPA in this case is a co-conspirator with responsibility for inflating the fuel's price.[21] As the facts are alleged in the Complaint, neither PREPA nor any other defendant is a victim of the conspiracy and, rather, Plaintiffs, as the first payers of inflated fuel prices outside the conspiracy, are the scheme's most direct victims; indeed, it is Plaintiffs who, according to the Complaint, are the scheme's intended victims. Trafigura actually offers a quote from Judge Posner making precisely this point: "[I]n RICO as in antitrust and in tort and contract law generally, liability stops at the first victim." *Wooten v. Loshbough*, 951 F.2d 768, 770 (7th Cir. 1991) (Posner, J.), *quoted by*, Docket No. 82, at 16.

It need begin there, too. So the question is who, if not Plaintiffs, can sue for the overcharging alleged in the Com-

---

**21.** The closest the First Circuit has come to addressing this issue is *In re New Motor Vehicle Canadian Export Litigation*, 533 F.3d 1 (1st Cir. 2008). There, the plaintiffs, lessees of new cars, sued the car manufacturers for restricting imports, which they said led to higher rental prices. *See id.* at 2. After their claim was dismissed under *Illinois Brick*, the plaintiffs tried to recast their complaint as having alleged a vertical, rather than purely horizontal, conspiracy, so as to avoid the *Illinois Brick* rule. *See id.* at 3. The court declined to decide whether it would follow the cases holding that victims of a vertical conspiracy are not indirect purchasers, instead holding that the plaintiffs' new arguments were contradicted by their pleadings. *Id.* at 4.

plaint? Some of the defendants would say PREPA, but this makes no sense: PREPA is alleged to be a co-conspirator; surely it cannot recover from itself for its own wrongdoing. *Cf. Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1108–09 (1st Cir. 1994) (holding that under the antitrust laws, a voluntary and equal member of a conspiracy cannot recover damages from the conspiracy).[22] The defendants thus conveniently ignore the fact that their interpretation of *Illinois Brick* and *UtiliCorp* would leave to the conspirators "the fruits of their illegality." *Hanover Shoe*, 392 U.S. at 494, *quoted by*, *Illinois Brick*, 431 U.S. at 725–26. This is contrary to *Illinois Brick*'s purpose, and it cannot be permitted.[23] *See* 431 U.S. at 745 (explaining that the "long

---

**22.** Furthermore, because PREPA is a party to this case, if an adverse judgment is entered against it, that judgment would be preclusive in a suit by PREPA against the other defendants. Thus, the concerns about double recovery that other courts have raised when the alleged co-conspirator is not a party do not apply. *E.g.*, *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 307 F. Supp. 2d 136, 141 & n.5 (D. Me. 2004); *see also In re New Motor Vehicles Canadian Export Antitrust Litig.*, 533 F.3d 1, 4–5 (1st Cir. 2008) (raising same concerns).

**23.** The defendants rely principally on *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002), and *In re ATM Fee Litigation*, 686 F.3d 741 (9th Cir. 2012). Based on what I believe is a mis- or over-interpretation of *UtiliCorp*'s and *Illinois Brick*'s caution against creating exceptions for specific markets, *e.g.*, *UtiliCorp*, 497 U.S. at 216–17, these cases have

standing policy of encouraging vigorous private enforcement of the antitrust laws" would be furthered by its holding); *see also UtiliCorp*, 497 U.S. at 214 ("We have maintained, throughout our cases, that our interpretation of § 4 [of the Clayton Act] must promote the vigorous enforcement of the antitrust laws."); *Blue Shield of Va. v. McCready*, 457 U.S. 465, 473 n.10 (1982) (holding that "[o]nly by requiring violators to disgorge the fruits of their illegality can the deterrent objectives of the

---

declined to one degree or another to make an "exception" to the *Illinois Brick* rule for plaintiffs paying inflated prices due to a conspiracy stretching vertically over a chain of distribution. Thus *Dickson* held that the "exception" applied, at most, to price-fixing conspiracies, 309 F.3d at 214–15, and *In re ATM Fee* held that it did not apply when the overcharge was not paid directly by the plaintiffs, even if it was passed to the plaintiffs through the conspiracy, 686 F.3d at 751–52.

Essentially, I disagree that this case presents an "exception" to *Illinois Brick* rather than a fundamentally different factual scenario. *Cf. Blue Shield of Va. v. McCready*, 457 U.S. 465, 474–75 (1982) (declining to apply *Illinois Brick* where direct purchaser was not the injured party). Moreover, neither *In re ATM Fee* or *Dickson* explain who, if anyone, *could* sue for the overcharges alleged in each case. For these reasons, I would not follow either case to the extent it conflicts with my analysis. *See Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 480–83 (S.D.N.Y. 2012) (declining to follow *In re ATM Fee* and holding that where the "middlemen are alleged to be co-conspirators," the first purchasers outside of the conspiracy have standing to sue); *see also Paper Sys. Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 631 (7th Cir. 2002); Philip E. Areeda & Herbert Hovenkamp, Antitrust Law 173, ¶ 346 (2005 supp.) (criticizing *Dickson*).

antitrust law be fully served" (internal quotations omitted)).

Having failed to explain why anyone other than Plaintiffs are the "first victim," the defendants' *UtiliCorp* argument thus fails on its own terms: there would be no one else with whom to apportion damages, nor any possibility of double recovery; *UtiliCorp* would therefore not apply.[24] *Paper Sys. Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 631–32 (7th Cir. 2002) (Easterbrook, J.) (holding that where there is a conspiracy among members of a distribution chain, "the first non-conspirator in the distribution chain" has "the right to collect 100% of the damages");[25] *see also Loeb Indus., Inc. v. Sumitomo Corp.*, 306

---

**24.** Trafigura and others argue that because they did not directly sell oil to PREPA, but rather did so through intermediaries, Plaintiffs are even more remote victims than were the consumers in *UtiliCorp. E.g.*, Docket No. 82, at 17 n.4. This argument fails because Plaintiffs were nonetheless the first and intended victims of the overall conspiracy; in any case, this boils down to a proximate cause argument, *McCready*, 457 U.S. at 476, which I discuss (and reject) below.

**25.** In *Paper Systems* the plaintiffs, resellers of fax paper, accused the paper's manufacturers and certain middlemen of conspiring to raise prices. *See* 281 F.3d at 631. The plaintiffs lost in the district court, which relied on *UtiliCorp*, but the Seventh Circuit reversed, holding that because the plaintiffs were "the first purchasers from *outside* the conspiracy," they could sue and recover from "both the manufacturers and their intermediaries" so long as the conspiracy allegations could be proven. *Id.* at 631–32. I find *Paper Systems*, to which Plaintiffs cite in

F.3d 469, 481 (7th Cir. 2002); *Lowell v. Am. Cyanamid Co.*, 177 F.3d 1228, 1231 (holding that *Illinois Brick* does not apply to vertical conspiracies).[26]

As to the more basic argument that the causal chain is too attenuated to support proximate cause, I disagree. The alleged scheme, though complex in its particulars, is in fact rather simple in its fundamental structure: PREPA and its fuel suppliers decided, with the help of independent laboratories,

---

their brief, both analogous and persuasive. *See also Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 376–78 (3d Cir. 2004) (following *Nippon*); *In re Auto. Parts Antitrust Litig.*, Civ. No. 12-501, 2014 WL 4272772, at *10 (E.D. Mich. Aug. 29, 2014) (same); *Laumann*, 907 F. Supp. 2d at 482–83 (same); *Crane v. Int'l Paper Co.*, Civ. No. 02-3352-22, 2005 WL 3627139, at *7–8 (D.S.C. April 19, 2005) (same).

**26.**    *Illinois Brick* does not stand for the proposition, as the defendants would seem to have it, that a defendant cannot be sued under the antitrust laws by any plaintiff to whom it does not sell (or from whom it does not purchase. . . . The reason the plaintiffs' suit in *Illinois Brick* failed was not because the defendants did *not* sell to them. Rather, it was because the defendants *did* sell to a third party who (after *Hanover Shoe*) could recover for any injury they claimed.

*Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481–82 (7th Cir. 2002). *See also* Herbert Hovenkamp, Federal Antitrust Policy 679–80, § 16.6b3 (4th ed. 2011) (opining that when a plaintiff buys from an intermediary in a price-fixing conspiracy, "he is not really an indirect purchaser, but a direct one").

to falsify lab results such that a cheap fuel could be sold to its customers at the price of a more expensive fuel. In such a scheme, Plaintiffs' injuries—overcharges—were easily foreseeable and, speaking generally, each player's part was fundamental to the scheme. Plaintiffs cite the First Circuit's decision in *In re Neurontin Marketing & Sales Practices Litigation* ("*Kaiser*"), and I agree it is helpful: the causal mechanism in *Kaiser* was more complicated than here, but the *Kaiser* court did not understand it to present a difficult case. 721 F.3d 21, 38 (1st Cir. 2013) (referring to the "causal chain" as "anything but attenuated"); *see also id.* at 39 (referring to "the core proximate causation principle of allowing compensation for those . . . whose injury was plainly foreseeable and was in fact foreseen").[27]

---

**27.** On the basis of the Complaint, I would not dismiss Plaintiffs' claims because of speculative and undeveloped arguments suggesting that damages will be too difficult to prove. *E.g.*, Docket No. 110, at 18–19. The special damages problems presented in *Illinois Brick* and *UtiliCorp* are not present here, and while damages calculations would no doubt be complex, there is not at this time reason to think that this level of complexity would be so great so as to deny recovery. *See Loeb Indus.*, 306 F.3d at 493 (holding that courts regularly handle time-consuming and difficult damages calculations, and that they may do so where the damages are not "inherently speculative" or take the form of certain complex "econometric analys[e]s").

### 2.2.3   The RICO Enterprise

The defendants argue that Plaintiffs have failed to allege a distinct RICO enterprise, have failed to allege a common purpose, and have not pointed to sufficient evidence that each defendant was involved in the enterprise. These arguments are discussed below.

### 2.2.3.1 Plaintiffs have alleged a distinct RICO enterprise.

There are two possible types of RICO enterprises: legal entities and associations-in-fact. *Libertad v. Welch*, 53 F.3d 428, 441 (1st Cir. 1995). Here, the parties agree that because Plaintiffs are suing a diverse group of corporations and individuals, Plaintiffs are alleging an association-in-fact. RICO furthermore distinguishes between the "enterprise" and the "person" through whom the enterprise carries out its racketeering activity. 18 U.S.C. § 1962(c). The "person" and the "enterprise" must be distinct; it is the "person" that RICO plaintiffs seek to hold liable. *E.g.*, *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 448 (1st Cir. 2000). The defendants argue that because "the enterprise is composed of *all the Defendants*," Plaintiffs have "failed to adequately allege the existence of a separate enterprise." Docket No. 82, at 18.

This argument is not persuasive. Though all of the defen-

dants are indeed named as members of the association-in-fact enterprise, that enterprise is not sued as a defendant; rather, defendants are the "persons" who have associated with the "enterprise," a distinct entity consisting of all of the defendants. This is all that is required. *E.g.*, *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000) ("The prohibition against the unity of person and enterprise applies only when the singular person or entity is defined as both the person and the only entity comprising the enterprise. . . . To find that a defendant cannot be *part* of the enterprise would undermine the purposes of the RICO statute."); *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 995 (8th Cir. 1989) (same); *United States v. Perholtz*, 842 F.2d 343, 353–54 (D.C. Cir. 1988) (same).

### 2.2.3.2 Plaintiffs have alleged a common purpose.

The members of an association-in-fact must have a common purpose. *United States v. Turkette*, 452 U.S. 576, 583 (1981). According to the defendants, Plaintiffs have failed to sufficiently plead such a common purpose among the members of the association-in-fact. Trafigura argues that this is true because the Complaint's "allegations are at least equally consistent with independent action being taken by it" given

that its supposed co-conspirators are competitors. Docket No. 82, at 19; *see also* Docket No. 135, at 17 (PREPA). Inspectorate, meanwhile, argues that Plaintiffs have only argued a profit motive, which is insufficient under RICO. Docket No. 105, at 26; *see also* Docket No. 116-1, at 29–30 (Petrobras). And Vitol argues that Plaintiffs have improperly alleged hub-and-spoke conspiracy. Docket No. 106, at 20.[28] None of these arguments are convincing.

To begin, the common purpose Plaintiffs allege is obvious in the Complaint: the defendants conspired to falsify laboratory tests such that Non-Compliant Fuel Oil could be passed off as Compliant Fuel Oil. These allegations are well-pled, and the fact that some of the defendants or groups of defendants might have *also* had other objective is not problematic. *Cf. Ingram v. United States*, 360 U.S. 672, 679–80 (1959) ("A conspiracy . . . may have multiple objectives . . . ."); *United States v. Bobb*, 471 F.3d 491, 495–96 (3d Cir. 2006) (holding that the defendant was "part of a single conspiracy with multiple objectives"). Thus it is irrelevant that the Laboratory Participants were motivated by profit—a belief that they would get

---

**28.**  Other defendants simply generally argue that Plaintiffs failed to allege a common purpose.

more work by participating in the conspiracy—because that profit motive co-existed, according to the Complaint, with the objective of falsifying lab reports.

As for the argument that a RICO enterprise cannot be made up of competitors, it relies on a single treatise purporting to state a rule that competitors cannot be members of a RICO enterprise. Docket No. 82, at 19 (GREGORY P. JOHNSON, CIVIL RICO: A DEFINITIVE GUIDE 93–94 (3d ed. 2010) ("If the constituents are competitors . . . this prong will not be satisfied.")). The only decision I can find citing to this particular claim in that treatise rejected the argument; essentially, it held that where there is evidence (or, in this case, allegations) that the competitors were in fact operating with a common purpose, the fact that they are competitors is not problematic. *Negrete v. Allianz Life Ins. Co. of N. Am.*, Civ. No. 05-8908, 2011 WL 4852314, at *7 (C.D. Cal. Oct. 13, 2011) (following *In re Nat. Western Life Ins. Deferred Annuities Litig.*, 635 F. Supp. 2d 1170, 1174 (S.D. Cal. 2009)). I am persuaded by that holding, which applies with equal force in this case.[29]

---

**29.** Similarly, I am unpersuaded by the argument that no common purpose can be shown because PREPA, as a corporate entity, does not profit from the scheme. The Complaint alleges PREPA's knowledge of and

As to the hub-and-spoke argument, it proceeds from an incorrect premise. According to Vitol, the enterprise alleged by Plaintiffs is a "classic 'hub and spoke' RICO enterprise." Docket No. 106, at 20. In this reckoning, the PREPA Participants are the hub, and the Laboratory Participants and the Fuel Oil Supplier Participants are the two spokes. Vitol says that while these spokes "may constitute their own RICO enterprise[s]," the spokes and hub may not be considered a single enterprise in the absence of "evidence suggesting coordination between the spokes." *Id.* (citing *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 184 (D. Mass. 2003) ("Most courts have found that complaints alleging hub-and-spoke enterprises fail to satisfy the RICO enterprise requirement.")). The problem is that the Complaint in no way describes a hub-and-spoke or rimless-wheel conspiracy. Rather, it alleges coordination among each of the three groups of participants: the Fuel Oil Supplier Participants sell Non-Compliant Fuel Oil to the PREPA Participants at the price of

---

participation in the Cartel, and its other reasons for participating are thus not relevant. *See Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256–262 (1994) (holding that RICO does not require an economic motive).

Compliant Fuel Oil; *both* the PREPA Participants *and* the Fuel
Oil Supplier Participants hire the Laboratory Participants to
falsify test results to make these transactions possible. An
organizational chart of this conspiracy would thus resemble a
triangle, not a rimless wheel.

I would reject the defendants common-purpose
arguments.[30]

### 2.2.3.3 The defendants participated in the conduct of the enterprise's affairs.

Alchem and the Petrobras defendants argue that Plaintiffs
have insufficiently alleged their participation in the conduct of
the enterprise's affairs. *See* 18 U.S.C. § 1962(c). The Supreme
Court has held that the term "'conduct' requires an element of
direction." *Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993). The
Court thus applied an "operation and management test" but it
explained that enterprises are operated not just by their leaders

---

**30.** In addition to a common purpose, an association-in-fact need also have
"longevity sufficient to permit the associates to pursue the enterprise's
purpose" and "relationships among the associates." *Boyle v. United
States*, 556 U.S. 938, 939 (2009). Though some of the defendants
perfunctorily argue that these elements are not satisfied, the Complaint
gives substantial detail about the relationships between the defendants
and the amount of time the scheme has been in operation.

"but also by lower rung participants in the enterprise who are under the direction of upper management."[31] *Id.* at 184. The First Circuit understands this to cast a broad net, *United States v. Cianci*, 378 F.3d 71, 95 (1st Cir. 2004), and has held that it "suffices for this element that a defendant be 'plainly integral to carrying out the enterprise's activities,'" *United States v. Ramirez-Rivera*, No. 13-2285, — F.3d —, 2015 WL 5025225, at *8 (1st Cir. Aug. 26, 2015) (quoting *United States v. Shifman*, 124 F.3d 31, 35 (1st Cir. 1997)).

As I noted above, the Complaint alleges that Alchem began falsifying tests so as to maintain its business with PREPA and the Fuel Oil Suppliers. Compl. ¶¶ 211–15. Additionally, the Complaint alleges that Alchem fired an employee for not

---

**31.** Without citing caselaw, Shell Trading argues that the Complaint must be dismissed because it has failed to allege "the existence of a hierarchical structure" within the enterprise or "any mechanisms for decision-making." Docket No. 110, at 27–28. But the Supreme Court—in cases that Shell Trading cites, *id.* at 26, 28—has explicitly rejected the argument that such features are necessary to an association-in-fact. *Boyle v. United States*, 556 U.S. 938, 948 (2009) (citing *United States v. Turkette*, 452 U.S. 576 (1981)). It is thus difficult to believe that Shell Trading made this argument in good faith. *See id.* (holding that an association-in-fact "need not have a hierarchical structure or 'chain of command'" and that "decisions may be made on an ad hoc basis by any number of methods").

falsifying test results. *Id.* ¶ 244. Given that the falsification of test results was central to the conspiracy, Alchem's participation in that aspect of the enterprise is sufficient under First Circuit precedent. *See Ramirez-Rivera*, 2015 WL 5025225, at *8 (holding that ownership of drug points sufficed where control of drug points was central to the conspiracy). As for the Petrobras defendants, the Complaint is replete with specific allegations of Petrobras seeking to have non-compliant test results falsified. *E.g.*, Complaint, ¶¶ 110–11, 160–165, 205, 207. Indeed, Petrobras is alleged to now be in control of the enterprise. *Id.* ¶¶ 227–44. And, as noted above, Petróleo Brasileiro is alleged to have been involved, through one of its executives, in securing contracts with PREPA. These allegations, too, suffice under *Reves*.

### 2.2.3   Pattern of Racketeering Activity

The RICO Act makes a defendant liable for participation in an enterprise's affairs "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Such a pattern consists of the commission of two or more specified crimes (called RICO predicates) in the space of ten years. *United States v. Connolly*, 341 F.3d 16, 29 (1st Cir. 2003). Here, the RICO predicates alleged by Plaintiffs are mail and wire fraud. 18 U.S.C. §§ 1341,

1343. The defendants have generally argued that, as to each of them, Plaintiffs have failed to plead mail and wire fraud with particularity. Many have also argued that the Complaint fails to allege specific intent to defraud, and a few have questioned whether the Complaint properly alleges use of wires or mail. I take these issues up below.

Because Plaintiffs are alleging mail and wire fraud, their allegations regarding these offenses must comply with Rule 9, which requires that "the circumstances constituting fraud" be "state[d] with particularity." Fed. R. Civ. P. 9(b). Intent, however, "may be alleged generally." *Id.* In general, this requires "specification of the time, place, and content of an alleged false representation." *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 288 (1st Cir. 1987) (internal quotations omitted). But because "the major purpose of Rule 9 is to give adequate notice of the plaintiff's claim of fraud," *id.*, some courts have held that a plaintiff may also "inject precision or some measure of substantiation into a fraud allegation" by other means, *e.g.*, *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007); *Corporación de Seguros v. Reyes-Muñoz*, 826 F. Supp. 599, 609 (D.P.R. 1993) (sustaining complaint under Rule 9(b) where the plaintiff "pled other important details which should

serve to put defendants on notice of the claims being asserted against them"). Likewise, the First Circuit has "relaxed Rule 9(b)'s pleading standards" in the context of mail and wire fraud "'because of the apparent difficulties in specifically pleading mail and wire fraud as predicate acts.'" *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 229 (1st Cir. 2004). In such cases, the defendants are likely to have most of the relevant information regarding fraud, and so discovery may be appropriate to cure deficiencies in the pleading. *Id.* at 228–29. And at least one court in this circuit has reasonably suggested that where "an alleged scheme of fraud" involves "numerous transactions that occur over a long period of time," relaxing the Rule 9(b) standard may be appropriate because "pleading the precise specifics with regard to every instance of fraudulent conduct may be impractical." *In re Pharm. Indus.*, 478 F. Supp. 2d at 171–72.

With these standards in mind, a plaintiff pleading mail and wire fraud must allege: (1) a scheme to defraud, (2) the defendant's knowing participation in that scheme, and (3) the use of the mails or wires. *United States v. Hebshie*, 549 F.3d 30, 35 (1st Cir. 2008). There is no element of reliance in the mail and wire fraud statutes, though proof of "at least third-party reliance"

may be necessary to prove causation. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 659 (2008).

In general, I find it unnecessary to discuss the Complaint's allegations in great detail. The Complaint alleges that the Fuel Oil Supplier Participants—relevantly, Petrobras, Shell Trading, Trafigura, PetroWest, and Vitol[32]—have entered into contracts with PREPA to supply fuel oil and that in *every* case since 2002, the oil delivered has been Non-Compliant Fuel Oil. Compl. ¶¶ 105, 154–55. The Laboratory Participants (Alchem excepted for the moment), knowing this, nonetheless issued Certificates of Analysis showing that the delivered oil was Compliant Fuel Oil.[33] *Id.* ¶ 108. The Laboratory Participants did this at the

---

**32.** By reference to a lawsuit where PREPA sued it to void certain contracts, Vitol argues that it has not sold fuel to PREPA since 2012. Docket No. 106, at 12–13. But I cannot take judicial notice of any facts alleged or proved in a separate lawsuit, and so I must treat the Complaint's contrary allegations as controlling. *See Int'l Shipping Agency, Inc. v. Unión de Trabajadores de Muelles Local 1740*, Civ. No. 12-1996(SCC), 2015 WL 5022794, at *5 & n.4 (D.P.R. Aug. 21, 2015).

**33.** *See, e.g.*, Compl. ¶ 207 (over a period of several months in 2010, every Shell Trading shipment was shown non-compliant by Alchem and then given to Saybolt, after which the oil was accepted by PREPA); ¶ 110 (on October 22, 2010, Inspectorate said oil was compliant when it was not); ¶¶ 182–87 (after Inspectorate was decertified in 2007, PREPA continued to accept shipments of Non-Compliant Fuel Oil that it had falsely

direction of the PREPA Participants[34] and with the knowledge of the Fuel Oil Supplier Participants.[35] *Id.* ¶ 73. Méndez assisted Petrobras and Vitol in having their Non-Compliant Fuel Oil accepted by PREPA. *Id.* ¶¶ 37, 109–12. It is reasonable to infer that the Certificates of Analysis were sent—and payments for the oil and testing services made—through the mails and wires. *See Reyes-Muñoz*, 826 F. Supp. at 509 (inferring use of

---

certified as compliant).

**34.** *See, e.g.,* Compl. ¶ 104 (PREPA would take work away from Alchem if it repeatedly said shipments were Non-Compliant); ¶ 112 (in October 2010 PREPA accepted a shipment certified by Inspectorate despite a contrary finding by Alchem and a finding by PREPA's audit team that Inspectorate's results were invalid); ¶ 123 (similar). Regarding Clark, *see, e.g., id.* ¶ 92 (Clark was in charge of fuel procurement for PREPA); ¶ 170 (Clark called an Alchem representative into his office when Alchem repeatedly failed to certify a shipment). Regarding Rodríguez, *see, e.g., id.* ¶ 14 (Rodríguez took over Clark's duties when Clark retired); *id.* ¶¶ 199–202 (Rodríguez harangued an employee for failure to participate in the scheme). Regarding Torres, *see, e.g., id.* at 109–12 (Torres participated in the October 2010 acceptance of a Non-Compliant shipment); *id.* ¶ 136 (Torres tried to halt an audit of the Fuel Office, an effort that ultimately succeeded); ¶ 205 (Torres participated in a fake audit of Inspectorate).

**35.** The fact that the various participants all knew about the fact of the fraud—the falsified test results—is sufficient to impute to each of them specific intent to defraud, which, in any case, may be (and is) generally alleged.

mails and wires). Thus, each time a shipment of Non-Compliant Fuel Oil was knowingly accepted by PREPA along with a false Certificate of Analysis, the relevant PREPA, Fuel Oil Supplier, and Laboratory Participants aided and abetted each other in committing mail or wire fraud.[36]

---

**36.** The First Circuit has held that "aiding and abetting the commission of mail fraud" may constitute a RICO predicate. *Aetna Cas. & Sur. Co. v. P&B Autobody*, 43 F.3d 1456, at *12 (1st Cir. 1994) (unpublished). Subsequently, it has declined to decide whether that remains the law in light of *Central Bank of Denver, N.A. v. First Int'l Bank of Denver, N.A.*, 511 U.S. 164 (1994). *Schultz v. R.I. Hosp. Trust Nat. Bank, N.A.*, 94 F.3d 721, 731 (1st Cir. 1996). But it has also subsequently said that aiding and abetting a state law conspiracy *did* constitute a RICO predicate. *United States v. Marino*, 277 F.3d 11, 29–31 (1st Cir. 2002).

Though not precedential, I must accord *Aetna* significant persuasive value, especially in light of *Marino*. But even if I did not, I see nothing in *Central Bank* suggesting that *Aetna* was wrongly decided. Looking chiefly at the text of the statute, *Central Bank* held that no civil aiding-and-abetting liability existed under § 10(b) of the Securities Exchange Act. 511 U.S. at 177–78. The issue in *Central Bank* is thus more analogous to whether civil aiding-and-abetting a RICO violation exists than whether aiding and abetting mail fraud may be a predicate act. Moreover, following *Central Bank*'s direction to look at the text, I note that RICO defines "racketeering activity" to include conduct "*indictable under*" the mail or wire fraud statutes. 18 U.S.C. § 1961(1). Aiding and abetting mail or wire fraud is indictable under the substantive statute, *Aetna*, 43 F.3d 1456, at *12; thus, it is a predicate under § 1961(1). *See, e.g., Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 270 (3d Cir. 1995); *Morin v. Trupin*, 835 F. Supp. 126, 130 (S.D.N.Y. 1993); *Fireman's Fund Ins. Co. v. Plaza Oldsmobile Ltd.*, 600 F. Supp. 1452, 1457

To be sure, the Complaint does not say which participant(s) from each group was involved in each of the thousands of fraudulent oil deliveries that Plaintiffs say occurred, nor does it allege their specific dates. But I am at a loss as to how Plaintiffs could be expected to do so, as such information is extremely voluminous, goes back over a decade, and would be in the defendants' exclusive control. It is thus not the type of information that Plaintiffs can reasonably be expected to have plead with the level of specificity the defendants demand. Nonetheless, Plaintiffs *have* pled a great deal of specificity with regard to several of these transactions, implicating most of the defendants and illustrating their roles in the overall scheme.[37]

With regard to all but a few defendants, I would find that

---

n.2 (E.D.N.Y. 1985). *But see Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F. Supp. 248, 259 n.10 (S.D.N.Y. 1997).

**37.** For these reasons, I am not convinced by the defendants' arguments that Plaintiffs have made impermissible group allegations. Plaintiffs have pled significant factual detail, including as to the defendants' specific actions. Yet, the nature of the fraud claims prevents them from making specific allegations as to which party was involved in each fraudulent act. They have thus resorted to grouping the defendants according to their particular roles in the overall conspiracy. In doing so, they have not generally alleged that all of the defendants committed all of the predicate acts. Rather, they have been more careful and precise in their allegations.

the Plaintiffs have satisfied Rule 9(b) by putting the defendants on notice of the fraud allegations against them.[38] In the alternative, I would permit Plaintiffs discovery and leave to amend to add the necessary detail.

### 2.2.3.1 The Complaint fails to make sufficient allegations that Alchem participated in a pattern of racketeering activity.

Among the defendants, Alchem presents a special case. With regard to most of the other alleged participants, Plaintiffs make at least one and in most cases several specific allegations regarding their participation in the scheme. As Alchem's counsel has pointed out with vehemence, however, the allegations against Alchem by-and-large *absolve* it of participation in the scheme, and so it is difficult to let the more general predicate-act allegations suffice with regard to it.

As described in the Complaint, Alchem resisted participating in the enterprise for years; indeed, it appears that Alchem's

---

**38.** Given these findings, I do not believe that the defendants' continuity arguments warrant significant analysis. *See generally Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 45–46 (1st Cir. 1991) (explaining RICO's continuity requirement). Suffice it to say that the existence of thousands of fraudulent transactions over a period lasting more than a decade satisfies the statute.

president reported some of the fraudulent activities to PREPA's auditors. *E.g.*, Compl. ¶¶ 127, 206. Because of this, PREPA did not give it much work. *Id.* ¶ 206. In late 2010, Alchem needed that work, however, *id.* ¶ 208, it decided to start producing the results that PREPA wanted, *id.* ¶ 211. It thus switched to non-standard testing methodologies. *Id.* ¶ 215. A PREPA audit team learned of this change and asked Alchem not to persist in it. *Id.* ¶ 219. The Complaint alleges that the audit team was subsequently shut down, *id.* ¶ 220, but it fails to state whether Alchem actually performed any tests with the new, non-standard methodology. And there is reason, even on the face of the Complaint, to think that it did not. In 2014, for instance, Alchem was the only Laboratory Participant to properly calibrate its instruments. *Id.* ¶¶ 240–41. For this reason, the Complaint implies, Petrobras refused to certify it for testing its product. *Id.* ¶ 243. The employee responsible for this correct testing was fired, *id.* ¶ 244, but the Complaint does not say that Alchem subsequently returned to non-standard methodologies, falsified data, or was even certified by Petrobras.

In sum, while the allegations allege that Alchem *intended* to join the enterprise, and while it is alleged to have taken steps

(like firing an employee) for the enterprise's benefit, nothing in the Complaint can be read to allege Alchem's actual participation in a pattern of racketeering activity. For that reason, I would recommend that the § 1962(c) claim against it be dismissed.

### 2.2.3.2 The Complaint fails to sufficiently allege that Trafigura participated in a pattern of racketeering activity.

Unlike Shell Trading, PetroWest, Vitol, and Petrobras, the Complaint fails to allege that Trafigura actually entered into contracts with PREPA to supply it with fuel oil.[39] Instead, it mentions that Trafigura was a minority share holder of Puma, which Trafigura supplied with oil that was then sold to PREPA. Compl. ¶ 32. The only other relevant allegation against Trafigura is that on October 22, 2010 it "and/or" Petrobras delivered a tank of oil to PREPA. *Id.* ¶ 109. When

---

**39.** *Compare* Compl. ¶ 19 (Petrobras supplied PREPA $2 billion in fuel); ¶ 25 (Shell Trading supplied PREPA with $3 billion in fuel); ¶ 28 (PetroWest provided at least $3.7 billion in fuel to PREPA); ¶ 35 (Vitol paid provided at least $3.3 billion in fuel to PREPA), *with id.* ¶¶ 26–27 (failing to allege any relationship between Trafigura and PREPA); *see also id.* ¶ 37 (alleging that Méndez helped Petrobras and Vitol ensure that their Non-Compliant oil passed tests and was accepted by PREPA).

Alchem said the fuel was Non-Compliant, a Trafigura representative, along with Méndez "on behalf of *Petrobras*," "had Inspectorate" re-test it. *Id.* ¶ 110 (emphasis added). Inspectorate did so and returned a Certificate of Analysis showing the fuel as compliant. *Id.* After further intervention from Méndez, who was apparently representing Petrobras rather than Trafigura, *id.*, PREPA accepted the shipment despite an internal auditor's opinion that Inspectorate's results were "technically invalid." *Id.* ¶¶ 111–12.

At most this shows that on one occasion, Trafigura asked that fuel be retested. But there is nothing inherently inculpatory about such a request, and given the dearth of specific allegations regarding Trafigura, I am unwilling to infer that it (as opposed to PREPA, Petrobras, and Méndez) did so knowing of the correctness of Alchem's results, *i.e.*, with any intent to defraud. Moreover, given that Trafigura had no contracts with PREPA, even if this incident constituted a predicate act, I do not believe there are facts sufficient in the Complaint from whcih to infer a second. That is, while I find the general allegations against the Fuel Oil Supplier Participants to be sufficient in light of the Complaint's other detail about those Participants' activities, the specific factual allegations regarding

Trafigura are just too thin. Without specific allegations regarding Trafigura delivering oil to PREPA, I do not think the general allegations about every fuel shipment being out of compliance (much less those about knowledge) can be imputed to it. Accordingly, I recommend that the § 1962(c) count be dismissed as to Trafigura.

### 2.2.3.3 The Complaint fails to sufficiently allege that Bureau Veritas Holding participated in a pattern of racketeering activity.

Bureau Veritas is the owner of one of the corporate defendants, Inspectorate. The sole allegations against it in the Complaint state that it is "integrating Inspectorate as a brand within the company," and it has "exercised pervasive and excessive control over" Inspectorate so as to "control[] the subsidiary business as a whole." Compl. ¶¶ 39, 45. The latter of these are simply restatements of basic corporate veil-piercing law; they provide no factual detail whatsoever about how Bureau Veritas exercises such control, and so they are little more than "bland assertion[s]" that Inspectorate is an alter ego of or joint venture with Bureau Veritas. *Omni-Wave Electronics Corp. v. Marshall Indus.*, 127 F.R.D. 644, 647 (D. Mass. 1989) (internal quotations omitted). As such, they cannot suffice to withstand a motion to

dismiss. *Noonan v. Winston Co.*, 135 F.3d 85, 94 (1st Cir. 1998) (following *Omni-Wave*). As for the allegation regarding the "integrati[on]" of Inspectorate "as a brand within" Bureau Veritas, it is almost meaningless. Taken as true, it would say nothing about whether the corporate form was being respected. As such, I find that the allegations against Bureau Veritas fail as a matter of law and that the claim should be dismissed as to it.

### 2.2.3.4 Petróleo Brasileiro

Perhaps the most difficult case is what to do with Petróleo Brasileiro. The Complaint refers to Petróleo Brasileiro and its wholly-owned American subsidiary, Petrobras America Inc., as "Petrobras," without ever making specific allegations against either company. Thus the two companies together are alleged to have sold $2 billion in fuel to PREPA between August 2012 and November 2014, Compl. ¶ 19, but the Complaint is (I must assume purposely) vague as to which company held the contracts with PREPA. Petróleo vehemently denies having ever entered into any such contract, Docket No. 164, at 15–16, which fact Plaintiffs essentially admit, Docket No. 195, at 16. Plaintiffs maintain, though, that Petróleo supplied oil to Shell Trading and others to fulfill those compa-

nies' contracts with PREPA, *id.* at 16, but the paragraphs in the Complaint supporting those assertions suffer from the same infirmity as do the rest of the Petrobras allegations: they are nonspecific in referring to one of the two companies, *see* Compl. ¶¶ 24–25. On this same point, Plaintiffs' briefs mention Costa, a Petróleo executive, who is said to have assisted in negotiating contracts, something that, if true, could go some way towards sustaining an alter ego claim against Petróleo, as well as a § 1962(d) conspiracy claim. Docket No. 195, at 16–17. Again, though, the Complaint does not specify that Costa is associated with Petróleo specifically; it refers to him as an executive of the collective "Petrobras." Compl. ¶ 22.

What to do about this is problem is further complicated by the fact that the allegations against the collective "Petrobras" are more detailed and more damning than the allegations against perhaps any defendant other than PREPA. To the extent that the Complaint's allegations against "Petrobras" can be imputed to either Petrobras America or Petróleo Brasileiro, they certainly suffice to state a pattern of racketeering activity. But common sense and Plaintiffs' and Petróleo's briefs make me suspect that the allegations are, by and large, about Petrobras America alone. Nonetheless, given the claims that

Petróleo supplied oil and that its executive was involved in contract procurement, I would permit a period of discovery and leave to amend Plaintiffs' allegations against the Petrobras defendants. In doing so, Plaintiffs must not treat the two corporations interchangeably.

### 2.2.3   Filed-Rate Doctrine

The filed-rate doctrine provides that when a regulated entity files a tariff with a regulatory body, the tariff may not be "attack[ed] outside the regulatory process."[40] *Town of Norwood, Mass. v. New England Power Co.*, 202 F.3d 408, 416 (1st Cir. 2000). Trafigura thus argues that Plaintiffs' claims must fail because "their measure of damages will be 'determined by comparing the approved rate and the rate that allegedly would have been approved absent wrongful conduct.'" Docket No. 82, at 27 (quoting *H.J., Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 492 (8th Cir. 1992)).

As Plaintiffs point out, this argument fails for a very simple reason: because it is an affirmative defense, *e.g.*, *Rivera-Muñiz*

---

**40.** Though the First Circuit has not addressed the question, I am operating under the assumption, with which the parties seem to agree, that the doctrine also applies when an entity files its rate with a state regulatory commission. *See, e.g., Firstcom, Inc. v. Qwest Corp.*, 555 F.3d 669, 679–80 (7th Cir. 2009).

*v. Horizon Lines Inc.*, 737 F. Supp. 2d 57, 63 (D.P.R. 2010) (citing *E. & J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027, 1039 n.11 (9th Cir. 2007)),[41] the filed-rate doctrine will only require the dismissal of the Complaint if its applicability is apparent on the Complaint's face, *Jones v. Block*, 549 U.S. 199, 215 (2007). But the Complaint does not allege that PREPA has filed its rates, and, in its opposition to the motions to dismiss, it says that this is because the rates have not in fact been filed. Docket No. 154, at 66 & n.283. The defendants' filed-rate defense must therefore be rejected. *Rivera-Muñiz*, 737 F. Supp. 2d at 63.

In its reply brief, PREPA for the first time argues that it didn't file its rates with an independent regulatory agency (because no such agency existed until 2014 at the earliest),[42]

---

**41.** It seems that relatively few courts have analyzed whether the filed-rate defense is an affirmative defense, though I have found numerous cases referring to it that way. In any case, there appears to be a consensus that it is a merits defense rather than, for example, a jurisdictional one. *See Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1233 n.6 (S.D. Fla. 2015) (collecting cases). *But see In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1266–66 (W.D. Wash. 2009) (dismissing case on basis of the filed-rate defense where plaintiffs had not pled its inapplicability, but where the plaintiffs' complaint acknowledged that the industry at issue was regulated by tariffs).

**42.** The Energy and Transformation Relief Act, Law No. 57 of May 22, 2014, established an independent regulatory agency with power over

but, rather, was *its own* regulatory agency. Docket No. 172. For this it relies on statutes that, before May 2014, gave to its Board of Directors the power to set rates and required certain procedures be followed before such action was taken. *See id.* at 3–4. On the basis of these statutes, PREPA argues that it "was its own state regulatory body," and so the filed-rate doctrine should apply. *Id.* at 5.

Even if PREPA had raised this argument in its motion to dismiss, I would not find it convincing. As Justice Stevens put it, the filed-rate doctrine is meant to ensure that "courts respect the public [regulatory] agency's control over market prices and industry practices." *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 144–45 (1990) (Stevens, J., dissenting). Thus the doctrine "protects *the agency*'s authority over tariffed rates." *Town of Norwood*, 202 F.3d at 416 (emphasis added); *see also Saunders v. Farmers Ins. Exchange*, 440 F.3d 940, 944 (8th Cir. 2006) (holding that the doctrine's "core" is the "allocat[ion] between a *regulatory agency* and the courts the authority to approve and enforce rates *filed with the agency*" (emphasis

---

PREPA's rates. It is not clear whether PREPA has actually filed rates with that agency yet, and certainly the Complaint does not state that it has.

added)). Importantly, it is "the *filing* of the tariffs" with a regulatory agency that "triggers the filed rate doctrine"; if the company does not file its rates, "the filed rate doctrine would by its terms no longer operate." *Town of Norwood*, 202 F.3d at 419.

This all matters because, at the end of the day, PREPA may have to follow statutory processes in its rate-setting, but it sets its own rates and does not file them with any regulatory body. *See In re Alcon (Puerto Rico) Inc.*, 70 P.U.R. 4th, at *8 (F.E.R.C. Aug. 19, 1985) (Stalon, Commissioner, dissenting) (explaining that PREPA is a "non-regulated utility" without oversight from a state commission). The filed-rate doctrine was developed in deference to the expertise of independent regulatory agencies; it was not meant to protect utilities from suit based on their own self-"regulation." *See H.J., Inc.*, 954 F.2d at 489 ("[T]he focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on *agency* procedures and rate determinations." (emphasis added)). PREPA has not cited—and I have not found—any case where the filed-rate doctrine has been applied to a non-regulated or self-regulated entity; rather, the existence of a separate and independent regulatory agency seems to be fundamental to the doctrine's

application. Without a much stronger showing, I would the
doctrine to PREPA based on the pre-May 2014 statutory
regime.

### 2.2.4   The RICO Conspiracy Claim

Thus far, I have discussed whether Plaintiffs have stated a
claim against the defendants for violations of RICO's main
substantive provision, § 1962(c). Plaintiffs also allege violations
of § 1962(d), which provides for the liability of persons who
"conspire to violate" § 1962(c). In large part, the defendants'
arguments against the RICO conspiracy claim are premised on
Plaintiffs' failure "to establish a substantive RICO violation."
Docket No. 82, at 28 (citing *Miranda v. Ponce Fed. Bank*, 948 F.2d
41, 44–45 (1st Cir. 1991)). But because Plaintiffs have stated
such a violation, these arguments are unavailing.

The defendants' other line of attack focuses on what they
claim is a requirement that, to be held liable under § 1962(d),
the Plaintiffs must allege that the defendant had to "involve
himself, directly or indirectly, in the commission of at least two
predicate offenses." *Feinstein v. Resolution Trust Corp.*, 942 F.2d
34, 41 (1st Cir. 1991), *quoted by*, Docket No. 82, at 29. These
citations are misleading because, while they correctly state the
law in this Circuit before 1997, they neglect to mention that

those cases were explicitly overruled by the Supreme Court's opinion in *Salinas v. United States*. *See* 522 U.S. 52 (1997) (identifying the First Circuit's decision in *United States v. Winter*, 663 F.2d 1120, 1135–36 (1st Cir. 1981), as among those it was overruling). In *Salinas*, the Court rejected the very arguments that the defendants make here, writing that "an actor who does not himself commit or agree to commit the two or more predicate acts requisite to a" § 1962(c) conviction may nonetheless be liable under § 1962(d) if he "adopt[s] the goal of furthering or facilitating the criminal endeavor." *Id.* at 64. An overt act is not even required for § 1962(d) liability; the conspirator need only "agree[] to facilitate . . . some of the acts leading to the substantive offense." *Id.* 63, 65.

The question is whether the Complaint states sufficient facts for a conspiracy count to be sustained against those defendants against whom the substantive count was insufficient. As to Alchem, I believe it does. Above, I concluded that the Complaint failed to plead that Alchem had participated in two predicate acts; thus the substantive count failed. But the Complaint does plead that Alchem *agreed* to participate in the scheme, and to that end it changed the way its tests were calibrated and fired an employee who resisted. Although the

Complaint lacks facts suggesting that any tests were actually performed under this altered calibration method, the fact of the agreement suffices to state a claim under § 1962. Alchem's motion to dismiss the conspiracy account should therefore be denied.

With regard to Bureau Veritas and Trafigura, however, I would sustain the motion to dismiss the conspiracy count, and for much the same reasons as I would the substantive count. Simply put, the Complaint is wholly lacking in allegations that Bureau Veritas was aware of the scheme, much less that it agreed to join it; likewise, the Complaint's veil-piercing allegations are insufficient to attribute Inspectorate's actions to Bureau Veritas. I would therefore dismiss the conspiracy claim against Bureau Veritas. Similarly, the only substantive allegation against Trafigura is that it sent an email on one occasion asking that a sample be retested. Nothing in the Complaint suggests that this constituted—or was the result of—an agreement to participate in the RICO scheme. I therefore recommend that the conspiracy count be dismissed as to both of these defendants.

### 2.3 Unjust Enrichment

Inspectorate argues that under Puerto Rico law, an unjust enrichment claim must be dismissed when another statute provides a remedy for the injury asserted. Docket No. 105, at 31–32 (citing *El Toro Elec. Corp. v. Zayaz*, 6 P.R. Offic. Trans. 133, 138 (1977) (holding that unjust enrichment claims cannot be sustained where the plaintiff has another avenue of redress)). Numerous courts in this district have held that this applies even at the pleading stage and in spite of the federal courts' general acceptance of alternative pleadings. *E.g.*, *Rivera-Muñiz*, 737 F. Supp. 2d at 55–56; *Westernbank P.R. v. Kachkar*, Civ. No. 07-1606(ADC/BJM), 2009 WL 6337949, at *29 (D.P.R. Dec. 10, 2009), *adopted*, 2010 WL 1416521 (D.P.R. March 31, 2010); *Ocaso, S.A. v. P.R. Mar. Shipping Auth.*, 915 F. Supp. 1244, 1263 (D.P.R. 1996); *Medina & Medina v. Country Pride Food Ltd.*, 631 F. Supp. 293, 302 (D.P.R. 1986); *see also In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*, Civ. No. 00-1898, 2013 WL 5230814, at *11 (S.D.N.Y. July 17, 2013). And while these cases all arose in the context of alternative remedies provided by other state statutes, the First Circuit has applied a companion doctrine in a federal-question suit (though on summary judgment). *P.R. Tel. Co., Inc. v. SprintCom, Inc.*, 662 F.3d 74, 97 (1st Cir. 2011)

(holding that unjust enrichment does not apply where case governed by a contract); *accord Kachkar*, 2009 WL 6337949, at *29 (explaining the relevance of contracts to the unjust enrichment analysis).

Frankly, these cases leave me at a loss. I see nothing in the doctrine as stated by the Supreme Court of Puerto Rico that would unequivocally mandate dismissal at the pleading stage, at least where the alternative remedy was, as here, a contingent one. Moreover, the cases have tended to assert the doctrine's applicability rather than explain it, and they have done so only in the context of alternative *state law* remedies. And yet, in light of Plaintiffs' half-hearted defense of their unjust enrichment claim, which does nothing but cite the general rule that alternative pleadings are allowed, I see no choice but to follow the weight of the precedent. Accordingly, I recommend that the unjust enrichment claim be dismissed.

### 3.  Conclusion

For the reasons stated above, I RECOMMEND that the presiding judge GRANT the motions to dismiss of Trafigura and Bureau Veritas and dismiss the claims against each of them. I further recommend that the Court GRANT IN PART the motion of Alchem and dismiss the § 1962(c) and state-law

unjust enrichment claims against it. Finally, I RECOMMEND that the remaining defendants' motions to dismiss be GRANTED as to the unjust enrichment claims and DENIED in all other respects.[43]

IT IS SO RECOMMENDED.

The parties have fourteen days to file any objections to this report and recommendation. Failure to file the same within the specified time waives the right to appeal this report and recommendation. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150-51 (1st Cir. 1994); *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 28th day of September, 2015.

S/ SILVIA CARREÑO-COLL

UNITED STATES MAGISTRATE JUDGE

---

**43.** I also GRANT the motions at Docket Nos. 168, 209, and 211; and DENY the motions at Docket Nos. 185 and 193.