UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| ISMAEL MARRERO ROLÓN, ANNE CATESBY JONES, JORGE VALDES LLAUGER, PUERTO RICO BATHROOM REMODELING, INC., PERFORMANCE CHEMICALS COMPANY, INC., | Civ. No. 3:15-cv-01167-JAG |
| Plaintiffs, | FIRST AMENDED CLASS ACTION COMPLAINT (PURSUANT TO COURT ORDER DATED MARCH 31, 2016) |
| v. | **JURY DEMAND** |
| AUTORIDAD DE ENERGÍA ELÉCTRICA A/K/A PUERTO RICO ELECTRIC POWER AUTHORITY; WILLIAM RODNEY CLARK; EDWIN RODRIGUEZ; CÈSAR TORRES MARRERO; INSPECTORATE AMERICA CORPORATION; BUREAU VERITAS HOLDING, INC.; CORE LABORATORIES N.V. D/B/A SAYBOLT; ALTOL CHEMICAL ENVIRONMENTAL LABORATORY INC. D/B/A ALCHEM LABORATORY; ALTOL ENVIRONMENTAL SERVICES, INC. D/B/A ALTOL ENTERPRISES; PETROBRAS AMERICA INC.; PETROLEO BRASILEIRO S.A; CARLOS R. MÈNDEZ & ASSOCIATES; SHELL TRADING (US) COMPANY; PUMA ENERGY CARIBE LLC; PUMA ENERGY INTERNATIONAL, B.V.; TRAFIGURA A.G.; TRAFIGURA BEHEER, B.V.; PETROWEST, INC.; VITOL S.A., INC.; VITOL, INC.; JOHN DOES 1-100, | |
| Defendants. | |

**TABLE OF CONTENTS**

**Page**

I.   OVERVIEW ........................................................................................................1

II.   JURISDICTION AND VENUE ........................................................................3

III.   PARTIES ...........................................................................................................3

   A.   Plaintiffs .................................................................................................3

   B.   Defendants ..............................................................................................4

      1.   PREPA Participants. ...................................................................4

      2.   Fuel Oil Supplier Participants. ...................................................6

      3.   Laboratory Participants. ............................................................11

      4.   John Does 1-100. .......................................................................12

IV.   BACKGROUND ON ELECTRICITY SUPPLY IN PUERTO RICO...........13

   A.   Puerto Rico Electric Power Authority (PREPA) ..................................13

   B.   PREPA Purchases Fuel Oil to Combust for Electricity ........................14

   C.   PREPA's Procurement Process for Fuel Oil.........................................16

   D.   PREPA Passes the Cost of the Fuel Oil Directly to Consumers of Electricity ..............................................................................................18

V.   THE SCHEME TO DEFRAUD ......................................................................20

   A.   The Fuel Oil Cartel Enterprise or "Cartel de Petroleo" .......................20

   B.   After the Office Of the Comptroller Uncovered the Fuel Oil Cartel Enterprise in 2002, PREPA Pretends to Clean House But Does Not ...................24

   C.   Business As Usual: The Fuel Oil Cartel Enterprise From 2002-Present ..............30

      1.   2002-Present: The Fuel Oil Suppliers purposefully deliver and PREPA accepts Non-Compliant Fuel Oil throughout the Class Period. .................................................................................31

      2.   The Fuel Oil Cartel Enterprise devised ways to ensure that Non-Compliant Fuel Oil would be accepted and paid for at the more-expensive Compliant Fuel Oil prices. .............................43

          a.      PREPA paid the Fuel Oil Participants full price for Non-Compliant Fuel Oil after the evidence of non-compliance was destroyed. ................................................... 43

          b.      The Fuel Oil Cartel Enterprise admitted that it requires fuel oil to be tested with instruments purposefully calibrated to obtain desired (not truthful) results ........................................... 44

              (1)      PREPA and Saybolt. ................................................. 44

              (2)      PREPA and Inspectorate. ....................................... 46

              (3)      PREPA and Alchem. ............................................. 53

   D.      The Fuel Oil Supplier Participants Thank Clark a/k/a "The Emperor" for His Participation in the Fuel Oil Cartel Enterprise ........................................... 65

   E.      PREPA Cedes Control of the Fuel Oil Cartel Enterprise to Petrobras in September 2014 ................................................................... 66

   F.      Plaintiffs and the Class Were Damaged ................................................................... 70

   G.      Use of Mails and Wires ................................................................... 71

VI.      CLASS ACTION ALLEGATIONS ................................................................... 72

VII.     FRAUDULENT CONCEALMENT AND TOLLING OF STATUTES OF LIMITATIONS ................................................................... 75

VIII.    CAUSES OF ACTION ................................................................... 76

COUNT I  VIOLATION OF 18 U.S.C. § 1962(C) (THE FUEL OIL CARTEL ENTERPRISE) ................................................................... 76

COUNT II  VIOLATION OF 18 U.S.C. § 1962(D) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(C) ................................................................... 80

COUNT III  VIOLATION OF COMMON LAW OF UNJUST ENRICHMENT ....................... 81

PRAYER FOR RELIEF ................................................................... 82

# I.      OVERVIEW

1.      Plaintiffs and the Class complain of a scheme perpetrated by all Defendants to procure and provide the Puerto Rico Electric Power Authority ("PREPA") (in Spanish, Autoridad de Energía Eléctrica, or "AEE") with millions of barrels of fuel oil for the combustion of electricity under the guise the fuel oil met the specifications of contracts between PREPA and certain of its Fuel Oil Suppliers, as well as specifications set by the Environmental Protection Agency ("EPA") in a 1999 Consent Decree, as amended in 2004 (collectively, "Compliant Fuel Oil"). In fact, Defendant Fuel Oil Suppliers supplied PREPA with fuel oil that did not meet contractual or EPA specifications ("Non-Compliant Fuel Oil"), but was nonetheless accepted by PREPA in exchange for, on information and belief, undisclosed kickbacks or commissions to the PREPA Participants (defined below).[1] As a result of this scheme, PREPA overpaid its fuel suppliers for fuel oil and passed through the entire cost of the Non-Compliant Fuel Oil to Plaintiffs and the Class on their regular monthly electricity bills.

2.      The scheme was perpetuated by the Fuel Oil Cartel Enterprise defined as and comprised of: (i) Defendants PREPA and other employees and agents of PREPA, including, on information and belief, the former Administrator of the Fuel Oil Office, Defendant William Clark, the current Administrator of the Fuel Oil Office, Edwin Rodriguez, the Assistant Administrator of the Fuel Oil Office, Cesar Torres Marrero, and other governmental employees or agents, who were or are responsible for all of the activities associated with fuel procurement for PREPA (the "PREPA Participants"); (ii) Defendants Petrobras America Inc. and Petroleo Brasileiro S.A. (collectively, "Petrobras"); Shell Trading (US) Company ("STUSCO"); Carlos R. Mèndez & Associates ("Mendez"); Puma Energy Caribe LLC and Puma Energy International,

---

[1] According to the Internal Revenue Service, "Illegal bribes and kickbacks may be identified in port related industries in the forms of checks, cash, gifts, and lavish entertainment."

B.V. (collectively "Puma"); Trafigura A.G. and Trafigura Beheer, B.V. (collectively, "Trafigura"); PetroWest, Inc. ("PetroWest"); Vitol S.A., Inc. and Vitol, Inc. (collectively, "Vitol"); and other John Does, which contracted with PREPA to provide Compliant Fuel Oil but actually provided cheaper Non-Compliant Fuel Oil at the more expensive prices, in exchange for paying undisclosed commissions or kickbacks to the PREPA Participants ("Fuel Oil Supplier Participants") and (iii) Defendants Inspectorate America Corporation, Bureau Veritas Holding, Inc. (collectively "Inspectorate"), Core Laboratories N.V. d/b/a Saybolt Laboratory ("Saybolt"), Altol Environmental Services, Inc. d/b/a Altol Enterprises ("Altol") and Altol Chemical Environmental Laboratory Inc. d/b/a Alchem Laboratory ("Alchem"), and other John Does, which falsified laboratory test reports to show that Non-Compliant Fuel Oil delivered by the Fuel Oil Supplier Participants was compliant when it was not, in exchange for the continued business of the Fuel Oil Supplier and/or the PREPA Participants.

3.     PREPA pays billions of dollars per year for fuel oil. Compliant Fuel Oil, which is supposed to meet specifications in PREPA contracts and the EPA Consent Decree, is more expensive than Non-Compliant Fuel Oil, which is dirtier and more harmful to the environment. Compliant Fuel Oil is more expensive because diesel oil is mixed with No. 6 fuel oil to reduce the percentage of sulfur and other harmful ingredients. Thus, PREPA's acceptance of Non-Compliant Fuel Oil, while charging Plaintiffs and the Class the prices for Compliant Fuel Oil, caused Plaintiffs and the Class to suffer significant out-of-pocket losses as the cost of those overcharges was passed on directly in the form of higher electricity costs.

4.     Plaintiffs sue on their behalf and on behalf of all persons and entities who paid for electricity in Puerto Rico during the period January 1, 2002, to the present to recover their out-of-pocket losses, compensatory damages, punitive damages, and attorneys' fees and expenses

- 2 -

under the Racketeer Influenced Corrupt Organizations Act ("RICO") and for the disgorgement of profits under the common law of unjust enrichment.

## II.     JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, and 18 U.S.C. § 1964(c), because this action alleges violation of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

6.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Defendants reside in and conduct business in this judicial district, and because a substantial part of the acts or omissions giving rise to the claims set forth herein occurred in and near this judicial district.

## III.     PARTIES

A.     **Plaintiffs**

7.     Plaintiff Ismael Marrero Rolón is a natural person residing in Morovis, Puerto Rico, is paying and has paid for electricity during the Class Period, and suffered out-of-pocket losses as a result of Defendants' wrongdoing alleged herein.

8.     Plaintiff Anne Catesby Jones is a natural person residing in San Juan, Puerto Rico, is paying and has paid for electricity during the Class Period, and suffered out-of-pocket losses as a result of Defendants' wrongdoing alleged herein.

9.     Plaintiff Jorge Valdes Llauger is a natural person residing in Rio Grande, Puerto Rico, is paying and has paid for electricity during the Class Period, and suffered out-of-pocket losses as a result of Defendants' wrongdoing alleged herein.

10.     Plaintiff Puerto Rico Bathroom Remodeling, Inc. is a Puerto Rico corporation with its principal place of business located in San Juan, Puerto Rico. Plaintiff paid for electricity

- 3 -

during the Class Period as a commercial client, and suffered out-of-pocket losses as a result of Defendants' wrongdoing alleged herein.

11.     Plaintiff Performance Chemicals Company, Inc. is a Puerto Rican corporation with its principal place of business located in Cataño, Puerto Rico. Plaintiff paid for electricity during the Class Period as an industrial client and suffered out-of-pocket losses as a result of Defendants' wrongdoing alleged herein.

**B.     Defendants**

**1.     PREPA Participants.**

12.     The Puerto Rico Electric Power Authority ("PREPA") (in Spanish, Autoridad de Energía Eléctrica, or "AEE") is a public corporation and government instrumentality organized under the laws of the Commonwealth of Puerto Rico with its principal place of business located in San Juan, Puerto Rico. PREPA is an agency that owns the electric distribution system for the main island, Vieques, and Culebra, as well as all but two generating stations. PREPA began in the 1920s as a government irrigation system, but its responsibilities grew over the years to encompass island electrification.[2]

13.     PREPA is one of the largest public power agencies in the United States. In 2012, PREPA was ranked as first in number of customers served (approximately 1.5 million) and first in revenues ($4.4 billion in FY2011).[3] According to PREPA, its sales distribution and customer base is broken down as follows:[4]

---

[2] http://www.eia.gov/state/analysis.cfm?sid=RQ.

[3] Powerpoint entitled "Puerto Rico Electric Power Authority: A Stronger PREPA," Puerto Rico Credit Conference (2012).

[4] http://translate.googleusercontent.com/translate_c?depth=1&hl=en&prev=/search%3Fq%3DAutoridad%2 Bde%2BEnerg%25C3%25ADa%2BEl%25C3%25A9ctrica%2Bde%2BPuerto%2BRico%26safe%3Doff%26rlz%3 D1T4PLXB_enUS604US604%26biw%3D2021%26bih%3D1044&rurl=translate.google.com&sl=es&u=http://www .aeepr.com/INVESTORS/companyprofile.asp&usg=ALkJrhgYG8aiZUsCEKPYUQUiengBK1UH_Q.



14.     William Rodney Clark is a resident of Puerto Rico and a citizen of the United States. Clark was the Administrator of PREPA's Fuel Procurement Office from July 1996 to May 2014, and worked in the office from 1988 to 2014. As Clark states on his own LinkedIn biography, from 1994 to 2014, he was "[r]esponsible for all the activities associated with fuel procurement such as preparation of bid invitations, bid evaluation, management of contracts, scheduling, invoice processing and price assessment. Also, responsible for all administrative aspects of PREPA's Fuel Procurement Office including official representation of PREPA with the US Coast Guard, Puerto Rico Ports Authority, Harbor Pilots and Inspection companies serving as official gaugers for the importation of goods into US territory. These activities represent approximately … 70% of all operating expenses for the company."[5]  In fact, within PREPA, according to a former employee, Clark was referred to as the "Emperor" for his power in the Fuel Oil Cartel Enterprise.

15.     Edwin Rodriguez is a resident of Puerto Rico and a citizen of the United States. Rodriguez became the Manager of PREPA's Fuel Procurement Office in or about May 2014 when Clark retired. Prior to May 2014, Rodriguez was Clark's right-hand man and was referred to as the "Magician" for his role in the Fuel Oil Cartel Enterprise.

---

[5] www.linkedin.com/pub/dir/William+R/Clark (last viewed Sept. 30, 2014).

16.     Cėsar Torres Marrero is a resident of Puerto Rico and a citizen of the United States. Torres has held the positions of Service Coordinator for the Fuel Oil Office and, on information and belief, became the Assistant Manager of PREPA's Fuel Procurement Office in or about May 2014 when Clark retired and Rodriguez was promoted.

**2.     Fuel Oil Supplier Participants.**

17.     Petrobras America Inc. is incorporated in the State of Delaware, maintains its principal place of business at 10350 Richmond Avenue, Suite 1400, Houston, Texas 77042, and a business location at 361 San Francisco Street, Penthouse, Old San Juan, Puerto Rico 00901. Petrobras America Inc. (PAI) is a wholly owned subsidiary of Brazil's Petroleo Brasileiro SA.

18.     Petroleo Brasileiro S.A. a/k/a Brazilian Petroleum Corporation-Petrobras is a corporation organized under the laws of The Federative Republic of Brazil, with a principal place of business located at Avenida República do Chile, 65, 20031-912 – Rio de Janeiro – RJ, Brazil. Petrobras maintains an agent for service in the United States located at Petróleo Brasileiro S.A. – Petrobras, 570 Lexington Avenue, 43rd Floor, New York, NY 10022.

19.     Petrobras America Inc. and Petroleo Brasileiro S.A. (collectively "Petrobras") supplied PREPA with fuel oil during the Class Period. For example, just for the period August 2012 to November 2014, PREPA paid Petrobras nearly $2 billion for fuel oil supplied or to be supplied during that same period.

20.     Petrobras is no stranger to the kickback and fuel oil scheme described below. In late 2014, Petrobras became embroiled in a scandal involving a sprawling kickback scheme that resulted in Brazilian prosecutors filing charges against 35 people including Petrobras executives.

21.     Prosecutors allege that a group of as many as 16 contractors formed a cartel to drive up the prices of Petrobras projects. The companies, which include Brazilian multinationals

- 6 -

Odebrecht SA, Camargo Corrêa SA, Construtora OAS SA and others, are suspected of colluding to inflate the cost of work performed for Petrobras.

22.     According to an agreement made public in federal court documents, a former Petrobras executive, Roberto Costa, is cooperating with authorities. Videotapes released by the court – which have riveted Brazilians to their TVs – show Mr. Costa telling investigators that for at least seven years he and others siphoned millions in kickbacks from companies to whom Petrobras awarded inflated construction contracts. They then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves, according to the tapes.

23.     Mr. Costa described the kickbacks from the companies as a "three percent political adjustment" and said he personally raked-off tens of millions of dollars, according to the tapes.

24.     As relates to this case, Mr. Costa was an instrumental player for Petrobras in securing fuel oil contracts with PREPA. In 2006, on behalf of Petrobras, Mr. Costa personally attended a contract signing ceremony with PREPA, together with PREPA President Luis Aníbal Aviles Pagan (who signed on behalf of PREPA) and PREPA directors Luis F. Jimenez Pagan and Edwin Rivera Serrano.[6]

25.     Shell Trading (US) Company ("STUSCO") is a Delaware corporation with its principal place of business at One Shell Plaza, 910 Louisiana Street, Houston, Texas, and its office in Puerto Rico at Route 901 Km. 2.7, Yabucoa 00967. According to its website, STUSCO "conducts a substantial trading-for-profit business, which includes the buying and selling of crude oil, finished products and feedstocks, as well as trading oil futures. As part of the global

---

[6] http://tbpetroleum.com.br/news/petrobras-signs-fuel-oil-agreement-with-puerto-rico/.

Shell Trading network, STUSCO buys and sells more than 5 million barrels of hydrocarbons per day in physical markets, making it one of the largest petroleum supply organizations in North America and the world."[7] During the Class Period, STUSCO sometimes served as an intermediary between Petrobras and PREPA, entering into contracts for the supply of fuel oil to PREPA of more than $3 billion and purchasing fuel oil from Petrobras to fulfill the contracts.[8] For example, in 2011, PREPA renewed its 7.8 million barrels a year contract with STUSCO, which required STUSCO to deliver 60,000 barrels almost every two to three days to PREPA's Aguirre power plant. Petrobras supplied the fuel oil to STUSCO for this and other contracts.[9]

26.     Trafigura A.G. is a business organization, similar to a U.S. corporation, with a principal place of business in Lucerne, Switzerland and with a business location at 1401 McKinney Avenue, Suite 2375, Houston, Texas 77010 and in Puerto Rico at Centro Ind. De Mercadeo, Floor 8, Luchetti Ind. Park, Carr. #2 km 2.0, Bayamon 00000.

27.     Trafigura Beheer B.V. is a business organization, similar to a U.S. limited liability company, with a principal place of business located at Gustav Mahlerplein 102 1082 MA Amsterdam, Netherlands. (Trafigura A.G. and Trafigura Beheer B.V. are collectively referred to as "Trafigura").

---

[7] http://www.shell.us/aboutshell/shell-businesses/trading.html (last accessed Feb. 17, 2015).

[8] "Puerto Rico cancels LSFO tender, renews contract with Shell," available at http://www.platts.com/latest-news/shipping/houston/puerto-rico-cancels-lsfo-tender-renew..." (last accessed Oct. 1, 2014).

[9] http://www.platts.com/latest-news/oil/houston/brazilian-colombian-fuel-oil-premiums-rise-on-6602798 (last accessed Feb. 14, 2015).

28.     Recently, one publication in Brazil reported that Trafigura paid bribes or kickbacks to Mr. Costa while he worked for Petrobras in 2013, depositing at least $446,800 in a secret account maintained on Mr. Costa's behalf at the Bank Lombard Odier in Switzerland.[10]

29.     PetroWest, Inc. ("PetroWest") is a Puerto Rican corporation with its principal place of business located at Carr 345 KM 1.5, Parque Industrial, Hormigueros 00660. PetroWest supplied PREPA with fuel oil during the Class Period. For example, just for the period 2010 to 2014, PREPA agreed to pay PetroWest more than $3.7 billion for fuel oil supplied. Trafigura and Petrobras supplied the fuel oil to PetroWest to fulfill the contracts with PREPA.

30.     Puma Energy Caribe LLC ("Puma Energy Caribe") is a Puerto Rico limited liability company with a principal place of business at Centro Internacional de Mercadeo Torre 1 #100 Carr 165, Suite 804, Guaynabo Puerto Rico 00968.

31.     Puma Energy International, B.V. ("Puma Energy International") is a business organization, similar to a U.S. limited liability company, with a principal place of business at 2 Qual de la Poste, 1204, Geneva, Switzerland. Vitol and Trafigura have supplied fuel oil to Puma Energy Caribe and Puma Energy International (collectively "Puma") during the Class Period to fulfill contracts with PREPA.

32.     Trafigura purchased the rights to the Puma brand in 1997.[11] Trafigura also owned nearly 50% of Puma through 2013. Trafigura supplied fuel oil to Puma to fulfill Puma's contracts with PREPA for fuel oil during the Class Period. For example, for the period 2011 to 2014, PREPA agreed to pay Puma nearly $1 billion for fuel oil supplied.

---

[10] "Tuition at Petrobras: The shell companies, offshore accounts, the list of contractors – and the indications of corruption that the former Director Paulo Roberto Costa failed to destroy before his arrest," Epoca (April 4, 2014), available at http://epoca.globo.com/tempo/noticia/2014/04/bpropinab-na-petrobras.html.

[11] http://www.pumaenergy.com/en/we-are-puma-energy/brand-history (last accessed Feb. 14, 2015).

33.     Trafigura is also not a stranger to the how the scheme to defraud worked in Puerto Rico. For example, Trafigura Beheer B.V. paid $31 million in bribes to the People's National Party ("PNP") in Jamaica.[12] Trafigura claimed the bribes to the Prime Minister, PNP chairman, Energy Minister, and Information Minister, among others, were payments on a commercial agreement relating to the procurement of oil, while the PNP claimed the payments were donations.[13]

34.     Vitol, S.A. is a Swiss "société anonyme," similar to a U.S. corporation, with its principal place of business at Boulevard du Pont d'Arve 28, in Geneva, Switzerland, and with an office in Puerto Rico located at 3108 Ave Julio Monagas, Ponce, Puerto Rico, 00717-2200.

35.     Vitol, Inc. is a Delaware corporation with a principal place of business at 1100 Louisiana, Suite 5500 in Houston, Texas, and an office in Puerto Rico located at 3108 Ave Julio Monagas, Ponce 00717-2200. Vitol, S.A. and Vitol, Inc. (collectively, "Vitol") supplied PREPA with fuel oil during the Class Period. For example, just for the period 2005 to 2013, PREPA agreed to pay Vitol more than $3.3 billion for fuel oil supplied.

36.     Vitol is also familiar with the scheme to defraud used by the Fuel Oil Cartel Enterprise. For example, Vitol S.A., Inc. pled guilty in November 2007 to the crime of Grand Larceny in the First Degree in the State of New York for paying approximately $13,000,000 in "surcharges" or illegal kickbacks to Iraqi government officials in exchange for Iraqi crude oil, when all monies paid for Iraqi crude oil were supposed to be paid into a United Nations trust account under the United Nations Oil-For-Food Programme.[14]

---

[12] http://repeatingislands.com/2011/04/28/puma-energy-buys-the-caribbean-petroleum-corporation/.

[13] http://www.timesofmalta.com/articles/view/20130208/opinion/Trafigura-s-toxic-history.456710.

[14] *See People of the State of New York v. Vitol S.A.*, SCI No. 5867/07 (Sup. Ct. N.Y.).

37.     Carlos R. Méndez & Associates ("Mendez") is a Puerto Rico corporation with its principal place of business located at 3108 Avenue Julio E Monagas, Ponce, PR 00717-2200. Mendez has represented Fuel Oil Supplier Participants, including, but not limited to, Petrobras and Vitol, in Puerto Rico to, *inter alia*, ensure that (i) the Laboratory Participants submitted test results showing the fuel oil delivered by the Fuel Oil Supplier Participants was compliant when it was Non-Compliant Fuel Oil, and (ii) PREPA accepted the delivery of Non-Compliant Fuel Oil from the Fuel Oil Supplier Participants based on the falsified test results from the Laboratory Participants.

**3.      Laboratory Participants.**

38.     Inspectorate America Corporation ("Inspectorate") is a Texas corporation with its principal place of business located at 12000 Aerospace Avenue, Suite 200, Houston, Texas 77034, and its head office in Puerto Rico located at Carr 127 KM 19.1 Tallaboa, Peñuelas 00624.

39.     Bureau Veritas Holding, Inc. ("Bureau Veritas") is a Delaware corporation with its principal place of business located at 1601 Sawgrass Corporate Pkwy Ste. 400, Sunrise, Florida 33323-2827. Bureau Veritas acquired Inspectorate in 2010, is integrating Inspectorate as a brand within the company, and is hereinafter collectively referred to as "Inspectorate."

40.     Core Laboratories N.V. d/b/a Saybolt ("Saybolt") is a Netherlands limited liability company, which maintains offices at Km 13, 4 Road 127 Guayanilla, Puerto Rico 00656.

41.     Altol Chemical Environmental Laboratory Inc. d/b/a Alchem Laboratory ("Alchem") is a Puerto Rico corporation with its principal place of business at Parque Industrial Sabanetas Edificio M-1380, 00731 Ponce, Puerto Rico.

42.     Altol Environmental Services, Inc. d/b/a Altol Enterprises ("Altol") is a Puerto Rico corporation with its principal place of business at Parque Industrial Sabanetas Edificio M-1380, 00731 Ponce, Puerto Rico.

**4.     John Does 1-100.**

43.     On information and belief, Defendants John Does 1-100 are either residents of or doing business in this judicial district, are transacting business at premises in this judicial district, and are subject to the jurisdiction of this Court. Defendants, alone or through their agents, servants or employees, are purchasing, contracting, procuring, manufacturing, providing, distributing, selling, offering for sale and/or testing fuel oil to be combusted to produce electricity for Plaintiffs and the Class in Puerto Rico.

44.     When reference in this complaint is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

45.     Upon information and belief, parent corporations named herein exercised pervasive and excessive control over their subsidiary entities named herein such that the parent corporations controlled the subsidiary businesses as a whole and thereby conducted business in Puerto Rico. Moreover, upon information and belief, the subsidiary corporations named herein have acted as agents of their parent corporations in conducting business in the Commonwealth or selling products for use and distribution within the Commonwealth.

- 12 -

## IV.     BACKGROUND ON ELECTRICITY SUPPLY IN PUERTO RICO

**A.     Puerto Rico Electric Power Authority (PREPA)**

46.     Puerto Rico typically gets two-thirds of its electricity from petroleum or fuel oil. The island neither produces nor refines fuel oil, so all petroleum products are imported, shipped in through the ports of San Juan, Humacao, Yabucoa, and Ponce.[15]

47.     PREPA gets close to half of its electricity revenues from commercial sector consumption and just over one-third from residential consumption. Per capita, Puerto Rico's electricity consumption is about two-fifths of the U.S. average.[16]

48.     High world petroleum prices have driven typical Puerto Rico power prices to two to three times the U.S. average.[17]

49.     The electric power and transportation sectors are the largest petroleum consumers in Puerto Rico. Traditionally in Puerto Rico, about two-thirds of petroleum-based electricity generating capacity consumed No. 6 residual fuel oil, and one-third consumed No. 2 diesel fuel.[18] However, during the last three to four years, PREPA decided to use nearly 100% No. 6 fuel oil. Despite the commonwealth's overall low energy consumption, Puerto Rico's per capita petroleum consumption is about four-fifths of the U.S. average, primarily because of its dependence on residual fuel oil and diesel fuel for two-thirds of the islands' electricity.[19]

50.     There are many ways to generate electricity, such as burning fossil fuels like coal, or natural gas, or oil; harnessing the power of rushing water, or the light of the sun, or the wind;

---

[15] http://www.eia.gov/state/analysis.cfm?sid=RQ.

[16] http://www.eia.gov/state/analysis.cfm?sid=RQ.

[17] http://www.eia.gov/state/analysis.cfm?sid=RQ.

[18] http://www.eia.gov/state/analysis.cfm?sid=RQ.

[19] http://www.eia.gov/state/analysis.cfm?sid=RQ.

burning biomass, or garbage waste; or taping landfills for methane gas.[20] None of these options possess the lethal combination of high costs and deleterious environmental impact that burning fuel oil does. According to the Environmental Protection Agency, burning oil to create electricity emits about 50 percent more carbon dioxide per megawatt-hour than natural gas and only about 25 percent less than coal, while producing nearly as much sulfur dioxide and nitrogen oxides as coal does.

51.     According to the Energy Information Administration, petroleum liquids accounted for about 2.5 percent of U.S. electricity generation in 2004, or 100,391 thousand megawatt-hours. By last year, that amount had fallen by 86 percent, and petroleum liquids accounted for just 0.3 percent of total electricity generation.

52.     In Puerto Rico however, the Energy Information Administration notes, in 2012, "65% of Puerto Rico's electricity came from petroleum, 18% from natural gas, 16% from coal, and 1% from renewable energy." The Fuel Oil Cartel Enterprise has worked to prevent renewable energy projects from replacing the use of fuel oil to combust for electricity.

**B.     PREPA Purchases Fuel Oil to Combust for Electricity**

53.     Two major categories of fuel oil are burned by combustion sources: distillate oils and residual oils. These oils are further distinguished by grade numbers, with Nos. 1 and 2 being distillate oils; Nos. 5 and 6 being residual oils[21]; and No. 4 being either distillate oil or a mixture of distillate and residual oils.

54.     Distillate oils are more volatile and less viscous than residual oils. They have negligible nitrogen and ash contents and usually contain less than 0.3 percent sulfur (by weight).

---

[20] Gross, "Why Is Puerto Rico Burning Oil to Generate Electricity?", available at http://www.slate.com/articles/business/the_juice/2014/05/puerto_rico_is_burning_oil_to_generate_electricity_it_s_completely_insane.html (last accessed Sept. 30, 2014).

[21] No. 6 fuel oil is sometimes referred to as Bunker C.

Distillate oils are used mainly in domestic and small commercial applications, and include kerosene and diesel fuels. Based on 2010 data, Puerto Rico imports 28,000 barrels of distillate oils per day.[22] However, that number has dropped as the amount of residual oils has increased.

55.     Because residual oils are produced from the residue remaining after the lighter fractions (gasoline, kerosene, and distillate oils) have been removed from the crude oil, they contain significant quantities of ash, nitrogen, and sulfur. Fuel oil No. 6, sometimes referred to as "sludge," emits particulate matter that has been linked to aggravated asthma, cancer, lung and heart disease and premature death.[23] Based on 2010 data, Puerto Rico imports 60,000 barrels of residual oils per day.[24]

56.     Switching from No. 6 oil to No. 2 heating oil reduces particulate matter emissions by about 95%, SO2 by about 68% and nitrogen oxides (NOx) by about 65%. Switching from No. 6 oil to natural gas reduces particulate matter emissions by about 96%, SO2 by over 99% and NOx by about 75%. In terms of global warming pollution, switching from No. 6 oil to No. 2 heating oil reduces heat-trapping $CO_2$ emissions by about 7%, and natural gas reduces $CO_2$ emissions by about 30% compared to No. 6 oil.

57.     The following Figure 3 depicts the dramatic difference in pollutants generated by No. 6 oil compared to No. 2 heating oil or natural gas:

---

[22] http://www.eia.gov/state/data.cfm?sid=RQ#ImportsExports.

[23] Available at http://www.edf.org/health/report/dirty-heating-oil-new-york-city.

[24] http://www.eia.gov/state/data.cfm?sid=RQ#ImportsExports.



Environmental Defense Fund & Urban Green Council

58.     Of Puerto Rico's main four plants, Aguierre and Palo Seco only use No. 6 fuel oil; San Juan has the capability of using No. 2 or No. 6 fuel oil, but the units that use No. 2 fuel oil have been shut down for several years; and the South Coast (or Costa Sur) uses No. 6 fuel oil or natural gas.[25]

## C.     PREPA's Procurement Process for Fuel Oil

59.     Below is a depiction of how the process for procurement of the fuel oil for electricity was *supposed* to work, from contracting through to the charges to consumers of electricity, *i.e.*, Plaintiffs and the Class, for the fuel oil:

---

[25] http://translate.googleusercontent.com/translate_c?depth=1&hl=en&prev=/search%3Fq%3Daeepr.com%26safe%3Doff%26rlz%3D1T4PLXB_enUS604US604&rurl=translate.google.com&sl=es&u=http://www.aeepr.com/INVESTORS/oiprofile.asp&usg=ALkJrhj9Ym5KuFTp_GXLGO03O5PpsorCtg.  The Guayama and Peñuelas plants are privately-owned. *Id.*



60.     First, during the Class Period, PREPA's Fuel Oil Office sent out requests for bids to the world's oil companies. These RFPs included what the industry refers to as specifications for the quality of fuel oil. The contracts for fuel oil were supposed to be awarded to the lowest bidders who could provide the quality of fuel oil specified.

61.     PREPA contracts with its fuel suppliers to supply various quantities of fuel of specified grade and of specified characteristics, at prices to be determined by, *inter alia*, the grade and characteristics of fuel supplied to PREPA.

62.     The fuel suppliers hire private laboratories (via telephone call or email) when the cargo arrives to perform tests as to the chemical composition and quantity of the fuel oil before it is delivered to purchasers, in this case PREPA. The private laboratories issue a certificate, called

- 17 -

a Certificate of Analysis, to be delivered to PREPA with the fuel oil. Historically, the Fuel Oil Suppliers have used Laboratory Participants Saybolt and Inspectorate, but not Alchem, to provide the Certificates of Analysis for their deliveries.

63.     PREPA and the fuel oil suppliers also jointly hire a second laboratory in Puerto Rico to perform an Inspection Test as to the volume of the delivery. The cost of the Inspection Test is paid for by both parties. Until 2014, Laboratory Participants Inspectorate, Saybolt, and Alchem were authorized to conduct Inspection Tests for PREPA, but only Inspectorate and Saybolt were authorized to conduct Inspection Tests for the Fuel Oil Suppliers.

64.     PREPA also hires a laboratory in Puerto Rico to perform tests as to the chemical composition of the fuel ("Sample Analysis"), which is documented in a Certificate of Analysis. Until 2014, Defendants Alchem and Saybolt were authorized to provide Sample Analysis for PREPA; Inspectorate was not. As of late 2014 however, PREPA authorized Inspectorate to provide Sample Analysis.

65.     Based on Inspection Tests and Sample Analyses, PREPA is supposed to determine if the fuel oil complies with the specifications established in the purchase contracts and Consent Decree – and is supposed to accept or reject the fuel oil based on the tests. Prior to closing its internal laboratory in 1994, PREPA regularly rejected Non-Compliant Fuel Oil. Once PREPA closed its internal laboratory pursuant to the agreement of the Fuel Oil Cartel Enterprise however, PREPA no longer rejected Non-Compliant Fuel as described in more detail below.

**D.      PREPA Passes the Cost of the Fuel Oil Directly to Consumers of Electricity**

66.     PREPA uses the fuel oil within days or weeks to combust and produce electricity. PREPA purchases the oil used to generate electricity and passes the cost of the fuel oil directly

- 18 -

on to its customers, which appears on the customers' bills within two billing cycles. According to a presentation prepared by PREPA's Executive Director and its Chief Financial Officer: [26]



67.     Thus, each customer's bill contains a line item reflecting the fuel oil costs. An example follows:

| Cargos Corrientes por Venta de Electricidad | | |
|---|---|---|
| Tarifa Básica | | $35.16 |
| Compra De Combustible 700 kWh x $0.167044 | | 116.93 |
| Compra De Energia 700 kWh x $0.061281 | | 42.90 |
| | Total Servicio | $194.99 |

68.     According to the Notes to the PREPA's Audited Financial Statements, "Clients are billed monthly. *** Revenues include amounts resulting from a fuel and purchased power cost recovery clause (Fuel Adjustment Clause), which is designed to permit full recovery through customer billings of fuel costs and purchased power."[27]

---

[26] Powerpoint entitled "Puerto Rico Electric Power Authority: A Stronger PREPA," Puerto Rico Credit Conference (2012).

[27] Financial Statements, Required Supplementary Information and Supplemental Schedules for the Puerto Rico Electric Power Authority for the Years Ended June 30, 2013 and 2012, at 30.

69.     By way of example, the Fuel Adjustment Clause resulted in charges to Plaintiffs and the Class Members of more than $220 million in June 2014 alone, a 5.2% increase over June 2013. Moreover, from June 2013 to June 2014, the Fuel Adjustment Clause resulted in charges to Plaintiffs and the Class Members of $2,633,256,000.[28]

## V.     THE SCHEME TO DEFRAUD

**A.     The Fuel Oil Cartel Enterprise or "Cartel de Petroleo"**

70.     The Fuel Oil Cartel Enterprise, dubbed by the media and government representatives in Puerto Rico as the "Cartel de Petroleo," has been defined to include "various interest groups, such as suppliers – including oil smugglers – political parties, grantees, [PREPA] employees, bondholders and bankers, and individuals with political ambition and connections." The Fuel Oil Cartel Enterprise constitutes an association-in-fact enterprise within the meaning of § 1961(4) of RICO.

71.     PREPA and/or the Fuel Oil Supplier Participants hired the Laboratory Participants thousands of times (every time a delivery of fuel oil arrived) via phone calls or emails pursuant to which the Defendant Laboratory Participants provided fuel testing services for millions of barrels of fuel oil purchased by PREPA annually from the Fuel Oil Supplier Participants.[29]

72.     The testing services provided by the Laboratory Participants included tests of fuel oil to be delivered to PREPA from the Fuel Oil Supplier Participants, and were conducted on behalf of PREPA and the Fuel Oil Supplier Participants. The Laboratory Participants performed tests to verify the quality of fuel oil delivered and the minimum and maximum allowable levels

---

[28] Monthly Report to the Governing Board (June 2014), at 4, available at http://www.aeepr.com/INVESTORS/ financialinformation.asp.

[29] In fact, the Comptroller's Office found in 2002 that one of the deficiencies of PREPA's Fuel Office was its failure to issue formal purchase orders for the retention of the laboratories. During the Class Period, PREPA did not rectify this deficiency so that it could hide the fact that it would move the testing to another laboratory willing to falsify results if a particular laboratory reported that the fuel oil was non-compliant.

of certain fuel compounds, including, but not limited to, sulfur, vanadium, asphaltenes, and BTU content. The results of these tests were supposed to enable PREPA to determine whether fuel to be delivered to PREPA met contractual specifications and the EPA Consent Decree, *i.e.*, whether it was Compliant Fuel Oil.

73.     The Laboratory Participants, under the direction and/or knowledge of the PREPA Participants, including Defendants Clark, Rodriguez, Torres, other PREPA employees or agents, and other employees or agents of the Commonwealth of Puerto Rico, and under the direction and/or knowledge of the Fuel Oil Supplier Participants, routinely and consistently falsified the results of thousands of fuel test reports for fuel oil to be delivered to, or in the process of delivery to, PREPA. Such falsifications occurred purposefully, repeatedly and systematically throughout the Class Period.

74.     The Laboratory Participants, under the direction and/or knowledge of the PREPA Participants acting in concert with and under the direction and/or knowledge of the Fuel Oil Supplier Participants, falsified these fuel test reports to ensure that PREPA would always pay full price for fuel oil despite the fact the Fuel Oil Supplier Participants were delivering cheaper Non-Complaint Fuel Oil. The Laboratory Participants were incentivized to participate in the scheme to defraud in order to secure future work from the PREPA and Fuel Oil Supplier Participants, as well as because PREPA had agreed, on information and belief, not to use its internal laboratory and instead use the Laboratory Participants to conduct the testing.

75.     The PREPA Participants directed and participated in the scheme, agreeing to accept and pay full price for Non-Compliant Fuel because the Fuel Oil Supplier Participants agreed to pay the PREPA Participants undisclosed kickbacks, including lavish trips and parties. The Fuel Oil Supplier Participants were incentivized to participate in the scheme to defraud, and

- 21 -

to pay kickbacks, in order to ensure that they received billions of dollars in contracts for the supply of fuel oil to PREPA at higher prices than for the Non-Compliant Fuel Oil being delivered.

76.     According to a referendum brought by Representative Rodriguez Miranda of the Puerto Rico House of Representatives and referred to the Committee of Internal Affairs,[30] the PREPA Participants and other '"middlemen' involved in the sale of the fuel," including "mid-level officials," received commissions, or kickbacks, valued at over $100 million.

77.     The Senate President, Eduardo Bhatia, was interviewed for a special television program entitled "¿Por qué pagamos tanto? En su totalidad," which aired in Puerto Rico on or about May 12, 2014.[31] Senator Bhatia explained that PREPA purchases more than $3 billion a year in fuel oil from the Fuel Oil Supplier Participants, and "the one in charge of making those purchases in Puerto Rico," *i.e.*, the PREPA Participants, "receives a commission for the sale of about 10 per cent, which means, in Puerto Rico there is a group of people that gets close to 300 million dollars per year in commissions," and who "would do the unspeakable to keep the current model within the Authority unchanged."[32]

78.     Senator Bhatia asserted that the scheme involved an "enormous amount of money," which is "impoverishing Puerto Rico" and "stunting the economic development of Puerto Rico."[33] Because PREPA passes through the costs of the fuel oil directly to Plaintiffs and the Class, Plaintiffs and the Class are the direct and intended victims of the scheme because they

---

[30] The referendum cites to the newspaper El Vocero.

[31] Video of "¿Por qué pagamos tanto? En su totalidad," at 42:11-42:57, available at http://video.univision.mobi/shows-de-tv/video/2014-05-13/por-que-pagamos-tanto-totalidad?id=436583.

[32] *Id.*

[33] *Id.* at 42:49-42:57.

are the ones being "impoverished," bearing the payments for Compliant Fuel Oil even when Non-Compliant Fuel Oil is delivered.

79.     Moreover, criticizing PREPA for failing to seriously implement alternative forms of making electricity, Caribbean Business reports "that the so-called Fuel Oil Cartel inside the public utility is addicted to cheap bunker-C oil because they get richer every time the cost of oil goes up (as was discovered in a confidential report obtained by this newspaper)."[34]

80.     Paying illegal kickbacks to secure contracts for the supply of fuel oil is the normal way of doing business for several Fuel Oil Supplier Participants. For example, Paulo Roberto Costa, a jailed former executive of Petrobras who oversaw its refining operations until 2012, recently revealed that he paid kickbacks to more than 30 Brazilian government leaders for oil contracts, including three governors, the energy minister and more than 30 legislators; he testified that the illegal kickbacks were in the amount of three percent of the value of the contracts.[35]

81.     Mr. Costa was an instrumental player for Petrobras in securing fuel oil contracts with PREPA. In 2006, on behalf of Petrobras, Mr. Costa personally attended a contract signing ceremony for a PREPA fuel oil contract *in Rio de Janeiro, Brazil*, together with PREPA President Luis Aníbal Aviles Pagan (who signed on behalf of PREPA) and PREPA directors Luis F. Jimenez Pagan and Edwin Rivera Serrano.[36]

---

[34] "Why does PREPA ignore the idea of an undersea cable from Florida to Puerto Rico?" (May 29, 2014), available at http://www.caribbeanbusinesspr.com/prnt_ed/why-does-prepa-ignore-the-idea-of-an-undersea-cable-from-florida-to-puerto-rico-9958.html.

[35] Romero, "Oil Scandal Erupts Again as Brazilians Near Election," New York Times (Sept. 7, 2014), available at http://www.nytimes.com/2014/09/08/world/americas/as-brazil-vote-nears-testimony-ties-top-political-figures-to-corruption-scandal.html?_r=0 (last accessed Oct. 4, 2014).

[36] http://tbpetroleum.com.br/news/petrobras-signs-fuel-oil-agreement-with-puerto-rico/.

82.     In sum, the following figure reflects how the Fuel Oil Cartel Enterprise schemed to fraudulently conduct the fuel oil procurement process in Puerto Rico:



**B.      After the Office Of the Comptroller Uncovered the Fuel Oil Cartel Enterprise in 2002, PREPA Pretends to Clean House But Does Not**

83.     From the middle of 2000 to in or about early 2002, the Office of the Comptroller conducted an internal audit of PREPA's Fuel Oil Office. The audit team included both auditors from the Comptroller's Office as well as a technical consultant from the Environmental Division. Before he was assigned to the audit, the technical consultant, who was then an Environmental Compliance Auditor but had previously been PREPA's Laboratory Director, Abraham Ortiz

- 24 -

("Ortiz"), asked his supervisor, who was then head of the Environmental Division, Luis Morales Tañnon ("Morales"), whether he could disclose to the Comptroller Office auditors the years of controversies that had faced PREPA's Fuel Oil Office. Morales told Ortiz that the audit presented an "opportunity" to bring the wrongdoing of PREPA's Fuel Oil Office to light.

84.     Ortiz disclosed to the auditors, and the Comptroller's Office ultimately documented in its report, that, in June 1999, an employee of a private laboratory, which was later disclosed to be Caleb Brett Laboratories ("Caleb Brett"), sued the laboratory for unjust dismissal in the District of Puerto Rico.

85.     During the course of the lawsuit, the terminated employee established that Caleb Brett had required its employees, including the plaintiff, to alter the results of 500 to 600 tests as to the chemical composition and quality of the fuel oil sold to PREPA.[37] The purpose of the alterations was to show compliant test results for Non-Compliant Fuel Oil. Ultimately, the First Circuit Court of Appeals affirmed the jury verdict in favor of the employee.[38]

86.     PREPA officially claimed it had not known about Caleb Brett's fraudulent actions taken in conjunction with the Fuel Oil Supplier Participants. However, during the course of the

---

[37] See *Negron v. Caleb Brett U.S.A., Inc.*, 212 F.3d 666, 670 (1st Cir. P.R. 2000). The names of the other oil suppliers are not disclosed in the public record electronically available.

[38] *Negron v. Caleb Brett U.S.A., Inc.*, 212 F.3d 666, 670-671 (1st Cir. P.R. 2000) (stating "Viewing the record in its entirety, we observe ample evidence from which a reasonable jury could infer that Negron was frequently pressured to alter test results and certificates and that her repeated refusals ultimately resulted in her termination. Negron herself testified that beginning in 1993, Fortuno asked her to alter results to conform to specifications mandated in customer's contracts. She explained that an out-of-specification product would have a financial impact on Caleb Brett's customers. Although Fortuno testified that he never instructed Negron to make alterations, his testimony was refuted by his secretary's admission that she altered 500-600 certificates from 1993-1994 and the testimony of Negron's secretary that she witnessed heated discussions between Fortuno and Negron regarding customers' preferences. Furthermore, Negron's husband confirmed that Negron was distraught about Fortuno's requests, and the former president of the College of Chemists, Dr. Rodulfo Gauthier, testified that Negron consulted him regarding her ethical dilemma. Gautier testified that a chemist is under a duty to report lab results accurately and he advised Negron to consult the Board of Ethics, indicating that her license could be affected. Moreover, a reasonable jury could have found that the appellant's proffered reason for terminating Negron – that she had performance problems and was difficult to work with – was pretextual in light of the absence of disciplinary measures in her personnel file, her consistent salary increases, her positive performance evaluations, and testimony from her co-workers. A jury is entitled to weigh the credibility of the witnesses and could infer that Negron had been asked to do something improper or illegal.").

- 25 -

lawsuit, Ortiz and other employees testified that they had known about and reported deficiencies with the Laboratory Participants, including regarding Caleb Brett's wrongdoing, to PREPA's middle and upper management since at least the late 1980s.

87.    However, these complaints went unheeded and were covered up by PREPA management. PREPA management wanted to put a halt to inquiries and knowledge of the Laboratory Director and other employees of the internal laboratory.

88.    Thus, in 1994, PREPA shut down its internal laboratory.[39] In official reports, PREPA claimed that having a single internal laboratory at a central location was inefficient, because the laboratory provided sampling and analysis services to all four of PREPA's fuel oil plants. PREPA claimed that requiring its laboratory employees to travel to collect samples and then transport those samples back to lab was a waste of time. PREPA reported that it wanted to establish a fuel oil lab in each plant, which would reduce the time between sampling and the analysis of the fuel oil. In fact, however, PREPA was covering its tracks.

89.    While PREPA's official explanation sounded logical, PREPA never had any intention of creating or re-opening any internal laboratories that would be responsible for sampling or analyzing incoming fuel oil. PREPA had no intention of allowing its Laboratory Director or other employees to intervene in or halt the actions of the Laboratory Participants or Fuel Oil Supplier Participants. Thus, PREPA actually closed its internal laboratory in order to suspend any inquiries into the actions of the Laboratory Participants (which were reporting results that fuel oil was compliant when it was not) or the Fuel Oil Supplier Participants (which were supplying Non-Compliant Fuel Oil at the more-expensive Compliant Fuel Oil prices). PREPA also transferred its Laboratory Director to the Environmental Division to the position of

---

[39] In 1994, Defendant Clark also became the Administrator of the Fuel Oil Office.

Environmental Compliance Officer, where he did not have an independent right to conduct an audit unless expressly assigned.

90.     While PREPA was able to quash the inquiries of the Laboratory Director in the early 1990s, PREPA could not prevent Ortiz from disclosing the circumstances to the Comptroller's Office during the course of the 2000-2002 audit. In fact, the Comptroller noted that, despite the documented incidents of Caleb Brett, two years later, PREPA had made no claim against Caleb Brett. Paying Caleb Brett nearly $2 million for its services, PREPA had in fact increased its use of Caleb Brett after the claims of wrongdoing surfaced.

91.     During the course of the audit, the Comptroller's Office found serious deficiencies with the Laboratory Participants' methodologies and documented its findings in the 2002 audit report. For example, while visiting the Aguierre plant to observe how a laboratory handled an incoming cargo of fuel oil, the audit team observed an employee of a Laboratory Participant measuring the volume of the cargo. Rather than measuring the volume of all 10 cargo compartments on the ship, the Laboratory Participant only measured every other compartment. Moreover, while purporting to take the measurements of 50% of the compartments, the Laboratory Participant did not contemporaneously document the measurements. Instead, after he finished pretending to take the measurements for the benefit of the observing auditors, the Laboratory Participant took out his notebook and wrote down compliant measurements for 10 cargo compartments – even though he had only purported to take the measurements of five compartments. The audit team concluded that the Laboratory Participants intended the measurements and testing for show only, because the laboratories intended to document compliant measurements regardless of their falsity.

- 27 -

92.    The auditors also researched and visited PREPA's Fuel Oil Office. After learning of the unfettered control Defendant Clark maintained over all aspects of fuel procurement, the Comptroller's Office documented that the organization of the Fuel Oil Office provided the opportunity for corruption. The Comptroller reported that the Administrator of the Fuel Oil Office, *i.e.* Clark, performed all of the following functions:

      a.      Clark selected the potential suppliers and sent them the requests for bids directly;

      b.      he received and kept custody of the bids or offers submitted by the bidders;

      c.      he advised the Bidding Board as to the bidding process;

      d.      he recommended the adjudication of the bids to the Bidding Board;

      e.      he sent out the letters of adjudication;

      f.      he approved the purchase orders issued to the providers; and

      g.      he received, examined, and approved the invoices for payment as submitted by the providers and recommended the extension of contracts to the Executive Director.

93.    The Comptroller concluded that Defendant Clark's control over fuel procurement prevented PREPA from exercising adequate control of the purchase of fuel oil, created an environment that promoted the commission of irregularities, and prevented the irregularities from being detected in a timely manner.

94.    Among other things, the Comptroller examined eight bids (of 14) for $756,230,000 between January 1998 to December 2000 for the purchase of fuel oil and determined:

      a.      PREPA acquired $232,081,470 worth of fuel oil from two fuel oil companies without having a contract between the parties;

      b.      PREPA did not maintain a record of contracts;

- 28 -

      c.      PREPA awarded bids to fuel suppliers that were unqualified bidders in the amount of $540,000,000; and

      d.      In 88 percent of the deliveries of fuel oil, PREPA contracted with the same laboratories that had performed the tests of the chemical composition and quality of the fuel that the Fuel Oil Suppliers used.

95.      The Comptroller documented that these actions, among others, put PREPA at risk for the acquisition of Non-Compliant Fuel Oil, which would cause PREPA to pay for Non-Compliant Fuel Oil at the higher Compliant Fuel Oil prices. The Comptroller noted that the actions can cause excessive disbursements of public funds when a higher price is paid for fuel oil of lesser quality.

96.      Prompted by the Comptroller's findings, in August 2002, PREPA filed a lawsuit against Caleb Brett in the United States District Court for the District of Puerto Rico.[40] PREPA alleged violations of the Racketeering Influenced Corrupt Organizations Act,[41] common law fraud, and breach of contract, alleging that Caleb Brett falsified test results and engaged in a conspiracy with fuel suppliers to provide Non-Compliant Fuel Oil for Compliant Fuel Oil prices during the 1992-2000 period.[42] PREPA alleged that it had no prior knowledge of Caleb Brett's actions.

97.      While PREPA sued Caleb Brett for conspiring with Fuel Oil Suppliers, PREPA did not sue any Fuel Oil Supplier for overcharging PREPA hundreds of millions of dollars for the Non-Compliant Fuel Oil delivered to and accepted by PREPA as a result of the falsified test results from Caleb Brett.

98.      PREPA alleged that, between 1992 and 2001, Caleb Brett, "acting in concert with and with the encouragement of certain of PREPA's fuel suppliers, … falsified these fuel test

---

[40] *Puerto Rico Elec. Power Auth. v. Caleb Brett USA, Inc. et al.*, No. 02-2210 (D.P.R.).

[41] 18 U.S.C. § 1962(c).

[42] *Id.*, ¶ 19.

reports in order to keep such fuel suppliers "happy" by ensuring that PREPA would pay always full price for fuel even when such fuel did not meet contractual specifications for, among other things, sulfur, vanadium, asphaltenes and BTU output."[43]  While PREPA alleged that it had not known of the fraud, several witnesses were called to testify during the course of the lawsuit regarding PREPA's knowledge, including PREPA's former Laboratory Director (who was still an employee of PREPA).

99.     After PREPA's former Laboratory Director was deposed and he told the truth of PREPA's complicity in the conspiracy, PREPA and Caleb Brett reached a confidential agreement and PREPA dismissed its lawsuit. However, PREPA failed to refund any monies to Plaintiffs and the Class – who bore the higher costs for Non-Compliant Fuel Oil.

100.     In 2004, PREPA did re-open an internal laboratory, but largely restricted its capacity to function by staffing it leanly and by restricting the scope of its work. In fact, unlike before, the internal laboratory had no responsibility to sample or analyze incoming fuel oil for PREPA while the fuel oil was still in the barges and before PREPA officially accepted the fuel oil.

**C.     Business As Usual: The Fuel Oil Cartel Enterprise From 2002-Present**

101.     Despite the Comptroller's findings in 2002, the 2004 Consent Decree, and PREPA's lawsuit against Caleb Brett to cover up the scheme, business continued "as usual" at PREPA and among the Fuel Oil Cartel Enterprise between 2002 and the present. Specific examples of the scheme throughout follow:

---

[43] *Id.*, ¶ 19. The lawsuit was settled in 2006.

1.      **2002-Present: The Fuel Oil Suppliers purposefully deliver and PREPA accepts Non-Compliant Fuel Oil throughout the Class Period.**

102.    For the period 2002 to the present, the Fuel Oil Supplier Participants purposefully sent Non-Compliant Fuel Oil to Puerto Rico and PREPA accepted the Non-Compliant Fuel Oil while paying the higher prices for Compliant Fuel Oil. In addition to the evidence supplied throughout this Complaint, additional non-exhaustive evidence follows:

103.    *Every* shipment of fuel oil delivered by the Fuel Oil Participants to PREPA since 2002 is out of specifications in at least five areas and thus non-compliant.

104.    A range of 15 to 30 deliveries of fuel oil via ship or barge arrive per month in Puerto Rico. Of those, Alchem would be asked to test several per month. Testing occurs in stages, with the sulfur test first. If Alchem reported non-compliant results for sulfur, PREPA would ask Alchem to retest the fuel oil. If the results of the second test also showed the fuel oil was non-compliant, PREPA would immediately move the remainder of the testing to Laboratory Participant Saybolt, because Saybolt would provide compliant results regardless of their falsity. If Alchem reported non-compliant results for any other critical parameter, PREPA would also request that Alchem repeat the tests until Alchem sent results showing the fuel oil was compliant (or testing would be shifted to Saybolt).

105.    According to a former Alchem laboratory employee, every shipment of fuel oil Alchem has tested over the last 20 years contained Non-Compliant Fuel Oil. Of the approximate 13 parameters the fuel oil is supposed to meet, every shipment of fuel oil is always out of specifications in at least five areas. These shipments of Non-Compliant Fuel Oil came from the Fuel Oil Supplier Participants Petrobras, Trafigura, PetroWest, Puma, STUSCO, and Vitol, among others.

- 31 -

106.    According to the former Alchem employee and PREPA's former Laboratory Director, over the last 20 years (since PREPA shut down its internal laboratory in 1994), PREPA has always accepted the deliveries of Non-Compliant Fuel Oil from the Fuel Oil Supplier Participants and paid the more-expensive Compliant Fuel Oil prices. PREPA has never rejected a complete shipment of fuel oil.

107.    As an example, the former Alchem employee explained that, from 2010-2013, 100% of the shipments from the Fuel Oil Supplier Participants were out of specifications on viscosity, which confirms that 100% of the shipments were Non-Compliant Fuel Oil. By paying Compliant Fuel Oil prices for Non-Compliant Fuel Oil, PREPA paid too much at the expense of Plaintiffs and the Class.

108.    Despite the fact that 100% of the shipments contained Non-Complaint Fuel Oil, PREPA and the Fuel Oil Suppliers took steps to ensure that the Laboratory Participants issued Certificates of Analysis showing that the fuel oil was compliant. PREPA and the Fuel Oil Suppliers would just move the testing of the Non-Compliant Fuel Oil between Laboratory Participants until a Laboratory Participant issued a Certificate of Analysis showing the fuel oil was compliant.

109.    For example, on or about October 22, 2010, Petrobras and/or Trafigura delivered a tank of fuel oil to Puerto Rico that was transferred into PREPA Tank 1007. PREPA initially had Alchem test the fuel oil, which showed that the fuel oil was non-compliant.

110.    Juan Giorgetti from Trafigura and Carlos R. Mèndez of Carlos R. Mèndez & Associates on behalf of Petrobras then had Inspectorate re-sample the fuel oil. Jose Banchs from Inspectorate sent an email to Giorgetti and Mèndez on October 22, 2010, attaching a Certificate of Analysis showing that the fuel oil was compliant.

- 32 -

111.    Forwarding Banchs' email to Torres in the Fuel Oil Office, Mèndez "respectfully requested" that the non-compliant results obtained by Alchem be revised or audited because "once more they are way too far off the parameters" and the results are not representative of the tank. However, on October 26, 2010, an internal audit team from PREPA determined that Inspectorate's results were technically invalid.

112.    Nonetheless, pursuant to PREPA's participation in the Fuel Oil Cartel Enterprise with Petrobras, Trafigura, Mendez, and Inspectorate, the Fuel Oil Office (through Clark and Torres) accepted the fuel oil based on Inspectorate's results and despite the results from Alchem, which PREPA had originally retained, showing the fuel oil was non-compliant.

113.    PREPA's internal audit teams also confirmed on multiple occasions that the Fuel Oil Supplier's delivery of Non-Compliant Fuel Oil was the rule, not the exception.

114.    In early 2008, Alchem reported to PREPA that a fuel oil delivery was out of specifications for sulfur (and thus should be rejected); however, Saybolt reported that the same delivery was within specifications.[44] Despite the conflicting results, PREPA accepted the fuel oil.

115.    In order to assess why conflicting results were circulated and the fuel oil was nonetheless accepted, on April 29, 2008, members of PREPA's Evaluating Committee of Suppliers (or audit team) visited the facilities of the Alchem and Saybolt laboratories. On information and belief, the audit team members included Cesar Torres (from the Fuel Oil Office), Raul McClin (then the head of the Environmental Division), Ruth Dones (from the internal laboratory), and a representative of the Purchasing Division. While it was standard operating procedure to document the findings of an audit such as this, the audit team failed to do so. On information and belief, the committee members did not prepare a report of their findings

---

[44] Report OAI-1009, Office of Internal Audit.

nor did they follow up on the deficiencies observed because Torres, on behalf of the Fuel Oil Office, was determined not to blow the cover on the scheme to defraud.[45]

116.    In another example, on December 24, 2008, in an apparent mistake by a temporary employee, a chemist from PREPA documented in writing the actual results of tests showing that fuel oil in a reserve tank was non-compliant in asphaltenes. However, PREPA burned the Non-Compliant Fuel Oil. About one month later, when a secretary in the Environmental Division was preparing required monthly reports to the EPA, the secretary read the report with the non-compliant results and alerted her supervisor, prompting the Environmental Division to request an audit of PREPA's procedures.

117.    An investigator from the Environmental Division, Magali Colon, was assigned to conduct the audit of PREPA's internal laboratory.

118.    The June 2009 internal audit report revealed at least 50-60 different deficiencies in the internal laboratory, including six to eight of them which were considered highly critical because they would directly affect the accuracy of the test results for the sulfur content of the fuel oil. The auditor determined that the tests for sulfur content were not being done properly and were thus invalid. The auditor also concluded that the problem was with the Fuel Office, which was providing the instructions to the laboratory as to how to ensure compliant results. When the Environmental Division supervisors, including the head of the Environmental Division Francisco Lopez, learned of the results, they instructed that the same type of audit should be conducted of the Laboratory Participants.

119.    By this time, the Environmental Division had requested that Ortiz participate in an audit of the Fuel Oil Office and Laboratory Participants as a technical consultant.

---

[45] Report OAI-1009, Office of Internal Audit.

120.    Because the Environmental Division had no jurisdiction over the Fuel Office, the audit had to be conducted by PREPA's Office of Internal Audit. Thus, Ortiz, then an Environmental Compliance Officer, was transferred to the Internal Audit Division (which reported directly to PREPA's Governing Board) to participate.

121.    From the Internal Audit Division, Carmen R. Alicea and Jose Gandia joined the audit team to which Ortiz was the technical consultant. The audit team spent four to six months becoming educated on the current state of affairs. They visited the Laboratory Participants, discussed the processes for management of the fuel oil, visited the fuel oil plants, reviewed documents, and observed actual day-to-day processes. The audit team then conducted the audit and investigation, which included the actions of Defendant Clark, the PREPA Participants, Fuel Oil Supplier Participants, and Laboratory Participants.

122.    During the planning stage, the audit team received a call about a specific shipment of fuel oil from Fuel Oil Supplier Participant STUSCO that was non-compliant but PREPA was accepting it. This shipment caused the audit team to initially focus on incoming shipments.

123.    Over two or three months, the audit team sampled approximately ten (10) deliveries of fuel oil. Every shipment, except one delivered to Costa Sur, was from Defendant STUSCO. For each and every delivery of fuel oil, PREPA kept passing the testing responsibilities to different Laboratory Participants to test until the fuel oil finally got a passing result. The auditors concluded that the scheme to defraud (and Fuel Oil Cartel Enterprise) was active, and was the rule, not the exception.

124.    During the course of the audit, the audit team visited each of the Laboratory Participants Saybolt, Inspectorate, and Alchem. *Each* Laboratory Participant complained to the audit team regarding the way PREPA's Fuel Oil Office conducted business. Each of the

- 35 -

Laboratory Participants told the audit team that they had received instructions directly from the Fuel Oil Office to always certify Non-Compliant Fuel Oil as compliant, regardless of test results.

125.    The Office of Internal Audit prepared a draft report, which was submitted for initial review in or about October or November, 2010. However, before that time, the findings of the auditors were being leaked to the Fuel Oil Supplier Participants. Before a draft report was completed, agents for the Fuel Oil Supplier Participants, including Carlos R. Mendez, were writing to PREPA's management disputing the auditors' findings, despite the fact that the only people who were supposed to know the findings were the audit group and the Laboratory Participants.

126.    According to Ortiz, the draft report was submitted in October or November, 2010 and included a variety of findings, including disclosure of the scheme between the PREPA Participants, Fuel Oil Supplier Participants and Laboratory Participants, *i.e.*, the Fuel Oil Cartel Enterprise.

127.    A particularly egregious example of the scheme was included in the report because it was reported to the audit team by Alchem's President, Alving Tollinchi Delgado, who called the auditors. On May 19, 2010, PREPA's Office of Fuel Oil accepted 67,015.69 No. 6 barrels of fuel oil from Defendant STUSCO to the *Aguirre* Thermoelectric Plant at a cost of $4,799,638.

128.    During this incident, Defendant Inspectorate offered inspection services, as to measurements, in terms of the amount of fuel supplied to PREPA. While Inspectorate also provided its services as to the analysis of sulfur in the fuel for Defendant STUSCO, Alchem analyzed sulfur content for PREPA.

129.    After two tests showed that the fuel oil was non-compliant, Alchem reported that the fuel was outside the critical parameter specifications regarding sulfur, with a result of 0.51%. The Consent Agreement with the Environmental Protection Agency (EPA) and Contract 902-09-09 stated that the fuel's sulfur content must be less than or equal to 0.50%.

130.    Rather than reject the delivery, PREPA, through the Fuel Oil Office overseen by Defendant Clark, instructed Alchem to resample the fuel. Defendant STUSCO asked Defendant Saybolt laboratory to resample as well.

131.    Alchem and Saybolt resampled the fuel: Alchem reported that the result exceeded the specifications (0.51%), while Saybolt reported the fuel at exactly the maximum limit of 0.50%. PREPA's Fuel Oil office determined to accept the Saybolt result as valid, despite the fact that Saybolt was hired by STUSCO.

132.    Subsequently, PREPA's Office of Internal Audit determined that the Saybolt results were fraudulent. The evidence demonstrated that Saybolt reported the compliant sulfur results at 8:14 p.m. via electronic mail to STUSCO. In fact, however, Saybolt did not analyze the sample of fuel until 8:49 p.m. According to the log of the schedules, *Saybolt reported its results 35 minutes before conducting the analysis of the sample*. The audit team confronted Saybolt, but Saybolt could not provide an explanation for the glaring discrepancy.

133.    PREPA's Office of Internal Audit found that the acceptance of the Non-Compliant Fuel Oil without the proper technical justification was unacceptable and exposed PREPA to liability. The auditors concluded that the Fuel Oil Office's practices allowed the purchase of less-expensive Non-Compliant Fuel Oil at a higher cost, thus increasing the bills to PREPA's clients, *i.e.*, Plaintiffs and the Class.

134.    In the draft report, the Office of Internal Audit recommended to the Governing Board that it instruct the Fuel Oil Office to report to the audit evaluation committee every time a conflict or dispute between Certificates of Analysis occurred. The audit team documented that, at that time, the only Laboratory Participant correctly performing Sample Analysis was Alchem; Saybolt and Inspectorate had seriously deviated from approved methodologies.

135.    In November 2010, the auditors presented the draft report to a number of their superiors, including, but not limited to, the President of PREPA's Governing Board, Luis Garcia Passalacqua, who met with the audit committee and made changes directly to the report; the head of the Environmental Division; the head of the Internal Audit Division, and all of the administrative directors inside PREPA. During the next several weeks, drafts of the report were exchanged with the audit team. Moreover, Passalacqua advised the auditors that the report would be made final and presented to the full Board of Directors in November 2010.

136.    However, by mid-November 2010, Defendant Torres from the Fuel Oil Office was trying to halt the audit and the presentation of the audit report to the Governing Board, claiming that the audit was threatening the operation of the Fuel Oil Office. The Fuel Oil Office was further requesting that any further audit include personnel from PREPA's internal laboratory and the Fuel Oil Office. Apparently Torres and/or Clark were complaining to others inside PREPA regarding the audit, including Josué A. Colón Ortiz, the Director of Generation, Transmission and Distribution, and Angel Rivera Santana, PREPA's Director of Planning & Environmental Protection.

137.    Intervening on behalf of Torres and the Fuel Oil Office, Josué A. Colón Ortiz and/or Angel Rivera Santana contacted the Head of the Internal Audit Division, Gilberto Rivera Lebron, and requested a copy of the draft audit report. They further relayed Torres' complaints.

- 38 -

138.    Defending the audit, Gilberto Rivera Lebron sent an email dated November 22, 2010 to Angel Rivera Santana, with copies to Josué A. Colón Ortiz; Miguel A. Cordero López, PREPA's Executive Director; Francisco E. López Garcia, the Head of the Environmental Protection and Quality Assurance Division; and Luis Roman Burgos.

139.    In the email, Gilberto Rivera Lebron insisted that at no time did the audit halt the operations of the Fuel Oil Office nor the acquisition of fuel oil, contrary to Torres' suggestions. Lebron explained that the audit team would prepare two reports. The first report to be presented to the Governing Board on November 30, 2010, would include the audit team's conclusions and recommendations. He explained that the second report would include an evaluation of the techniques of the internal laboratory and Laboratory Participants. He explained that one of those recommendations was that the internal laboratory should stop acting as the arbitrator or referee on behalf of the Fuel Oil Office when the Laboratory Participants issued different test results for the fuel oil.

140.    Lebron wrote, for that reason, putting together a group of auditors comprised of the internal laboratory and the Fuel Oil Office was not recommended. Lebron stated that Francisco E. López Garcia, the Head of the Environmental Protection and Quality Assurance Division (who was copied on the email) had recently met with the audit team, including the technical consultant, and was in accord with their positions.

141.    Just 20 minutes later, PREPA's Governing Board President, Luis Garcia Passalacqua, sent a follow up email to the same group.  Directing his anger at Defendants Clark and Torres, Passalacqua stated that the group did not understand who the Internal Audit Division worked for. He asserted that the audit had been requested by the Governing Board and should not be interrupted. He stated that, if there was someone who did not like it, it was because they

- 39 -

had something to hide. He wrote that a person who has done nothing wrong should be receptive of the audit.

142.    Passalacqua further contended in the email that Defendant Clark's and Torres' allegations defiled the image of PREPA and needed to be stopped, and appropriate charges should be brought. He explained that all the group needed to do was read the Comptroller's Report, and it would be clear that a disaster existed in the Fuel Oil Office. He stated that the audit team's report would uncover the reasons why the Governing Board requested the audit, and those that had failed in their duties would need to respond accordingly.

143.    Despite Passalacqua's strong words, the audit team did not present the audit report to the Governing Board on November 30, 2010. However, Passalacqua assured the audit team that the report would be presented to the Governing Board before the end of 2010.

144.    The auditors left for Christmas break in 2010, expecting to return in January 2011 to learn of the results of the presentation and next steps.

145.    Instead, when the auditors returned to PREPA in January 2011, they learned that the audit group had been disbanded and the report had been materially altered and gutted to cover up the scheme. While the head of the Internal Audit Division, Gilberto Rivera Lebron, presented Alicea and Gandia with the materially altered report to sign, Alicea and Gandia refused because it was no longer accurate. Ultimately, despite not having participated in the audit and despite the fact that the report had been materially altered from the audit team's final version, Rivera signed the report.

146.    The materially altered report, whose primary findings and recommendations were eliminated, was presented to a Vice President of PREPA's Governing Board, José Pérez

Canabal, who was indicted in 2014 for fraud related to the grant of a renewable energy contract of $190 million for which there was an alleged kickback of $20 million.

147.    The auditors were understandably upset that their team had been disbanded and report modified without their input, and contested the decision to disband the audit team and alter their report with the administrator of the Office of Internal Audit in 2011 through multiple written communications to no avail. Covering its tracks, PREPA transferred Alicea to Mayaguez, Gandia to the Purchasing Department, and remanded Ortiz back to the Environmental Division.

148.    The auditors also learned that Defendant Clark had prepared a rebuttal report to the draft audit – which was accepted despite the fact that Clark was one of the persons being investigated by the auditors.

149.    After PREPA buried the internal auditors' report and transferred the auditors out of the Internal Audit Division, news reports leaked in October 2011 that "PREPA on least two occasions used diesel fuel with higher-grade sulfur levels." Media also reported that the "internal Prepa audits [] had been shut down before being completed."[46]

150.    The EPA then began an investigation, threatening "substantial penalties as well as criminal penalties against personnel who signed off on the fuel's sulfur content without verifying whether it met standards." [47]

151.    PREPA knew it had to act fast to try and cover up its scheme again. Thus, PREPA hired an "independent" auditor, Ivan Clark ("Ivan"), to audit the fuel oil purchases. While Ivan, who was not independent because he previously served under a $1 million contract with PREPA as an air compliance monitor, purported to conduct an audit, his purported results were not physically possible.

---

[46] http://www.caribbeanbusinesspr.com/prnt_ed/news02.php?nw_id=7332&ct_id=0.

[47] http://www.caribbeanbusinesspr.com/prnt_ed/news02.php?nw_id=7332&ct_id=0.

152.    While Ivan reported that, for the period December 2008 to October 2011, the audit analyzed 699 fuel-quality samples and just six "turned up" non-compliant fuel, neither PREPA nor the Laboratory Participants have ever maintained that many samples. Because the holding time for samples of fuel oil before they are destroyed is just 90 days, the most samples ever maintained at any one time is no more than approximately 50 samples.

153.    Accordingly, the internal auditors concluded that Ivan's audit was not legitimate. Ivan apparently compared the Certificates of Analysis issued by the Laboratory Participants hired by the Fuel Oil Suppliers to the Certificates of Analysis issued by the Laboratory Participants hired by PREPA, which were the same by design. Accordingly, Ivan's audit was PREPA's continued effort to cover up its participation in the Fuel Oil Cartel Enterprise.

154.    In separate examples, beginning in or about 2012, Vitol and PetroWest began delivering Non-Compliant Fuel Oil which was over the maximum limit of one percent (1%) volume in water and sediment combined.

155.    According to tests conducted by Alchem, every shipment of fuel oil by Vitol and PetroWest starting in or about 2012 contained more than the maximum allowable one percent (1%) volume of water and sediment combined, regularly up to two percent (2%), and sometimes up to three percent (3%) in water and sediment.

156.    When Alchem reported the non-compliant results for water and sediment, PREPA asked Alchem to determine the volume of water separately from the sediment, which is not consistent with the approved methodologies for the type of fuel oil being delivered and lack of processing conducted by PREPA when the fuel oil was delivered. Because the Laboratory Participants had been using the approved methodology for testing the volume of water and sediment together, PREPA had to issue two new separate purchase orders to have Alchem

- 42 -

conduct the tests of water and sediment separately. The Laboratory Participants complied with PREPA's request in order to hide the high water and sediment content of the fuel oil, which would otherwise demonstrate the fuel oil was non-compliant.

157.    According to a former Alchem employee, once the Laboratory Participants changed the testing methods for water and sediment in order to hide the fact that fuel oil was non-compliant, Petrobras then also began delivering fuel oil that was high in water and sediment. On information and belief, Petrobras knew that the fuel oil was non-compliant for volume of water and sediment, but believed that the revised testing protocol would adequately hide the non-compliance.

**2.      The Fuel Oil Cartel Enterprise devised ways to ensure that Non-Compliant Fuel Oil would be accepted and paid for at the more-expensive Compliant Fuel Oil prices.**

**a.      PREPA paid the Fuel Oil Participants full price for Non-Compliant Fuel Oil after the evidence of non-compliance was destroyed.**

158.    During the Class Period, the Fuel Oil Supplier Participants consistently delivered fuel oil that was out of specifications with respect to BTUs. PREPA and the Fuel Oil Supplier Participants thus drafted their contracts to provide that PREPA would automatically take a discount on the price of the fuel oil for each shipment that did not meet the correct BTU requirement as reflected in the laboratory results.

159.    After PREPA made the discounted payments to the Fuel Oil Supplier Participants, PREPA used the fuel oil. About three months later, after the Non-Compliant Fuel Oil was used (and the evidence destroyed), the Fuel Oil Supplier Participants provide PREPA with a Certificate of Analysis showing that the used fuel oil reflected the correct BTUs. PREPA then provided a refund, *i.e.*, paid the Fuel Oil Supplier Participant the price for Compliant Fuel Oil, even though the contemporaneous testing results showed that the fuel oil was non-compliant.

- 43 -

PREPA's transactional database contains the evidence of the discounts and subsequent refunds, demonstrating the failure of the fuel oil to meet specifications and PREPA's payments for Compliant Fuel Oil pursuant to the scheme to defraud.

        **b.**     **The Fuel Oil Cartel Enterprise admitted that it requires fuel oil to be tested with instruments purposefully calibrated to obtain desired (not truthful) results.**

        **(1)**     **PREPA and Saybolt.**

160.     In 2007, PREPA asked Defendant Alchem to test a delivery of fuel oil from Defendant Petrobras, while Petrobras asked Defendant Saybolt to test the fuel oil.

161.     At 8 a.m., Alchem reported that the sulfur levels in the fuel oil were non-compliant (at .75 when the maximum allowable was .70), but Saybolt reported compliant test results for the sulfur levels (at .70).

162.     Thus, PREPA immediately stepped in, asserting that it would act as the referee or arbiter between the laboratories.

163.     PREPA's current Laboratory Director, Lavinia Lebron, visited Alchem together with representatives of Saybolt. Lebron brought PREPA's control fuel oil samples, which are called standards, with her for reference.[48]

164.     Prior to collecting fuel oil to be tested, standard methodologies require that the testing instruments be calibrated using the standard, so that there is a control.

165.     At the outset of the meeting Lebron, Alchem, and Saybolt discussed the proper calibration of the instruments. While Alchem stated that it purportedly calibrated its instruments every six months, which PREPA agreed met industry methods, Saybolt admitted that it does not calibrate its standards with control fuel oil. PREPA and Saybolt discussed that Saybolt had not

---

[48] Control fuel oil (or standards) is sold by certified companies to ensure that all laboratories' instruments are calibrated to the same control point. Calibration of instruments should be done at least annually.

calibrated with control fuel oil since at least 2005. Thus, because Saybolt was using a Non-Compliant Fuel Oil to calibrate its instruments, the results from those instruments would show "compliant" results because Saybolt was testing Non-Compliant Fuel Oil with instruments calibrated to accept results based on the same.

166.     Moreover, PREPA admitted that it used diesel oil, which was a Non-Compliant Fuel Oil, to calibrate its instruments, thus ensuring that Non-Compliant Fuel Oil would be accepted by PREPA under the scheme to defraud.

167.     Also at the meeting, Alchem and Saybolt discussed the methods used to test the fuel oil. While the methods required that the laboratories submit the samples to a certain time of exposure in the instrument in order to obtain an accurate reading, *e.g.*, 5 minutes, Saybolt admitted that it only submitted its sample for a very short period, *e.g.*, 30 seconds. By submitting the sample to exposure in the testing instrument for a very short period, Saybolt ensured that the test results would be compliant, as opposed to non-compliant.

168.     Next, with the PREPA, Saybolt, and Alchem representatives observing, each laboratory took new readings using Alchem's standards. Once again, Alchem's reading came out to .75. This time, however, Saybolt's reading came out non-compliant at .705. Thus, Alchem's representative contended that there was no longer a dispute among the laboratories, stating "We all agree that the fuel is non-compliant."

169.     Rather than rejecting the Non-Compliant Fuel Oil, PREPA's representative then demanded that Alchem's and Saybolt's representatives accompany her to PREPA to have PREPA's laboratories re-test the fuel oil. Alchem's representative refused and left, because he believed that there was no longer any dispute regarding the results and requiring him to go to PREPA was outside his area of responsibility.

- 45 -

170.    However, the supervisor of the Alchem representative then told him that Defendant William Clark from PREPA had called, demanding that the Alchem representative go to PREPA. Accordingly, he did so at his supervisor's insistence.

171.    Once there, PREPA's lab returned a result of .67, which was compliant. According to the Alchem representative, this example is typical: throughout the Class Period, pursuant the scheme to defraud, PREPA requires repetitive analysis until the test results show Compliant Fuel Oil.

### (2)    PREPA and Inspectorate.

172.    Inspectorate's involvement in the scheme to defraud was documented during, *inter alia*, multiple inspections or audits.

173.    In or about the late 1990s, Inspectorate reopened in Puerto Rico after a hiatus, and has been used throughout the Class Period by the Fuel Oil Suppliers to provide test results showing Compliant Fuel Oil being delivered in Puerto Rico.

174.    Upon re-opening in the late 1990s, Inspectorate requested that PREPA certify it as a supplier qualified to conduct Sample Analyses of fuel oil. An audit evaluation committee, comprised of Ortiz and several others, was convened. The audit team made an appointment and visited Inspectorate to observe its procedures, among other things. During the audit, multiple Inspectorate personnel were present.

175.    That evening after the PREPA audit team had left Inspectorate, Ortiz received an anonymous telephone call, suggesting that the audit team should return to Inspectorate unannounced. Ortiz received permission from his supervisor to do so.

176.    When Ortiz arrived at Inspectorate the next day, Ortiz was introduced to Luis Fortuno as the General Manager of Inspectorate. Ortiz was surprised because Fortuno had not been present for the audit the day before. In fact, it appeared that Inspectorate had purposefully

- 46 -

hid the fact that Fortuno was Inspectorate's General Manager. Ortiz knew that Fortuno was the former General Manager of Caleb Brett who had previously ordered the falsification of 500-600 tests of fuel oil being delivered to PREPA and who had fired the chemist who refused to falsify test results.

177.    Ortiz immediately reported this development to his audit team and supervisor. The audit then stalled; PREPA did not reject Inspectorate but it also did not certify Inspectorate as a qualified supplier.

178.    Fortuno left Inspectorate shortly thereafter. In or about 2000, the new General Manager of Inspectorate again requested that PREPA audit Inspectorate for the purpose of certifying Inspectorate as a qualified supplier. The audit team did so, but rejected Inspectorate as a qualified supplier because, *inter alia*, Inspectorate did not maintain a Quality Manual documenting the procedures it followed in testing fuel oil.

179.    Over the course of the Class Period, Ortiz participated in at least 10 audits of Inspectorate which resulted in rejection as a qualified supplier for PREPA. However, despite PREPA's rejection of Inspectorate, the Fuel Oil Suppliers continued to use Inspectorate for Sample Analysis and PREPA's Fuel Oil Office continued to rely on the test results from Inspectorate certifying Compliant Fuel Oil.

180.    During one of the audits, on or about October 24, 2007, a PREPA audit team conducted an inspection of Inspectorate and requested that Inspectorate produce its Quality Manual, i.e. a documented manual of procedures that a laboratory follows to demonstrate that its procedures comply with approved methodologies. Inspectorate had not maintained a Quality Manual at least since 1999 and did not have one during the audit meeting in 2007.

- 47 -

181.    On November 20, 2007, PREPA's audit team wrote a letter to Inspectorate and noted that one of the audit deficiencies was Inspectorate's failure to maintain a Quality Manual.

182.    During a November 28, 2007 conference call, Inspectorate agreed to work on the deficiencies. Also, the audit team met with personnel from Inspectorate's headquarters, including on information and belief Frank Ricardi, who agreed to produce a Quality Manual.

183.    On February 29, 2008, Inspectorate sent PREPA three binders of information, including a "Quality Manual" intended for the Fuel Office to demonstrate Inspectorate's compliance with the scheme to defraud implemented by the Fuel Oil Cartel Enterprise.

184.    For example, Section 8.3 of Inspectorate's Quality Manual provided that Inspectorate could amend Certificates of Analysis, without defining any criteria or parameters for the amendments. Given that Certificates of Analysis should reflect the actual results of test results, no amendments should occur.

185.    Similarly, Section 7.5.1e provided that Inspectorate would take corrective action to establish compliance of fuel oil before issuing final Certificates of Analysis. However, given that Inspectorate could not turn Non-Compliant Fuel Oil into Compliant Fuel Oil, unless it altered the samples or falsified the test results, Inspectorate was admitting that it complied and would comply with the scheme to defraud.

186.    Section 5 of the Quality Manual further provided that, if Inspectorate test results showed that a sample of fuel oil was out of specifications or non-compliant, Inspectorate should not report the results. Instead, Section 5 provided that Inspectorate should send the sample to another Laboratory Participant, obtain results showing that the fuel oil was compliant, and then report the results from the other Laboratory Participant on the Certificate of Analysis.

187.    While the audit team refused to certify Inspectorate to conduct Sample Analysis, the Fuel Oil Supplier Participants continued to use Inspectorate to do so and issue Certificates of Analysis. Moreover, PREPA's Fuel Oil Office continued to accept Inspectorate's results from the Fuel Oil Suppliers and thus accepted Non-Compliant Fuel as Compliant Fuel.

188.    Then, in or about December 2011, the head of PREPA's purchasing division was Rodolfo Romano. While Romano had been employed at PREPA in the late 1990s, he had recently returned to PREPA and was not aware of the scheme to defraud. Upon his return, Romano received a telephone call from Inspectorate requesting an audit to become certified as a qualifying supplier.

189.    Romano thus called Ortiz, who he knew previously as PREPA's Laboratory Director and who was then an Environmental Compliance Officer, and inquired whether Ortiz still conducted audits of laboratories. When Ortiz said that he did, Romano requested an audit of Inspectorate.

190.    PREPA's regulations required that an audit team be convened, comprised of a Quality Auditor (such as Ortiz), a representative of the Fuel Office, and a representative of the Purchasing Department. Ortiz discussed the composition of the audit team with his supervisor, Raul McClin. McClin and Ortiz agreed that the Fuel Office would refuse to participate in the audit if they thought that Ortiz was the Quality Auditor, because Ortiz knew about and internally had been trying to stop the scheme to defraud emanating from the Fuel Oil Office for years.

191.    Accordingly, although Ortiz would be the Quality Auditor for the audit, McClin and Ortiz decided to tell the Fuel Office that McClin would be the Quality Auditor, Defendant Rodriguez would be the representative of the Fuel Office, and Odette Chardon would be the

representative of the Purchasing Division. McClin and Ortiz led Rodriguez to believe he would be the lead member of the audit team.

192.    The audit of Inspectorate took place in 2012. The morning of the audit, McClin checked out a company car and drove it to PREPA's parking lot. Once Rodriguez and Chardon were in the car, McClin texted Ortiz and moved to the back seat. Ortiz then emerged quickly from PREPA, got in the front seat, and drove the audit team to Inspectorate in Ponce, before Rodriguez could object to Ortiz's presence.

193.    Because Inspectorate had a history of audits that resulted in PREPA's rejection of Inspectorate as a qualified supplier (and even though the Fuel Oil Suppliers regularly used Inspectorate for Sample Analyses), Inspectorate had three people present for the PREPA audit: Nina Andersen, who was a National Quality Assurance Manager from Inspectorate's Houston office, Rudy Gordion, the local General Manager for Inspectorate, and Jose Banchs, a chemist and Inspectorate's local Laboratory Director.

194.    During the audit, PREPA's team asked Inspectorate for its fuel oil sulfur calibration data. Banchs produced the following calibration data from both 2006 and 2011:[49]

---

[49] The circles around the dates are added and not in the original. The dates are in year/month/day format.



195.    Because Ortiz assumed that Inspectorate would be using the 2011 calibration data since calibration of instruments should be conducted annually, Ortiz inquired why Banchs produced calibration data from 2006. Banchs responded: "Because that's the one I use." Andersen immediately objected, stopped the audit, and requested time to talk to Banchs.

196.    When Inspectorate's personnel returned to the audit, Banchs did not say anything more. Anderson requested that PREPA provide Inspectorate with time to calibrate its instruments, and admitted calibration should be conducted annually. She stated that the local laboratory did not have any control fuel oil, or standards, with which to calibrate its instruments, and that she had asked for standards to be sent to the laboratory via Federal Express.

197.    Because of Inspectorate's past audit failures, Ortiz requested that Inspectorate document its calibration, retrain its personnel as to proper calibration procedures, certify those procedures, and then request that PREPA return to re-audit Inspectorate. Anderson agreed.

- 51 -

198.    Inspectorate never called back to advise the audit team that it had complied. In fact, on information and belief, Inspectorate continues to use the 2006 calibration data to this day.

199.    During the audit team's ride home, Rodriguez received multiple phone calls during which he appeared agitated or angry. Rodriguez then received a telephone call from Rudy Gordion, Inspectorate's local General Manager who had been present at the audit. Rodriguez stated to Gordion: "I am not going to ask him that; you ask him yourself." Rodriguez then put the phone on speaker and laid it on the armrest next to Ortiz, who was driving in the front seat.

200.    Gordion asked Ortiz: "What happens if we calibrate the instruments and then the next barge [of Fuel Oil] is out of specs?" Ortiz responded: "Then all of the work you have done [for the Fuel Oil Suppliers ] for the last 6 years will be out of specs [or out of compliance]."

201.    Gordion expressed that he was concerned with the audit team's requirement that Inspectorate re-calibrate its instruments, and insisted that the PREPA audit team talk with their superiors before imposing such a requirement. After Ortiz continued to insist that approved methodologies required annual calibrations to ensure that test results were accurate, Ortiz hung up the phone.

202.    After Ortiz hung up the phone, Rodriguez yelled at Ortiz, accusing him of not complying with PREPA's scheme. Ortiz pulled over into a parking lot, and the audit team exited the car for lunch. Rodriguez continued to yell at Ortiz, contending that Ortiz was trying to establish public policy for fuel oil and he did not have the authority to do so. Rodriguez further accused Ortiz of using "a big magnifying glass" to audit fuel oil practices, which was not necessary. During this time, Rodriguez was yelling in Ortiz's face, causing McClin, Ortiz's supervisor, to get between Rodriguez and Ortiz. At that point, Ortiz told his supervisor he would

- 52 -

not be in the same car with Rodriguez and handed the car keys to McClin. Ortiz made other arrangements to return home.

203.    When Romano learned what happened, he convened a meeting of the audit group. During this meeting however, Rodriguez again became angry with Ortiz. As a result, Romano ended the meeting. PREPA then shut down the audit.

204.    Ortiz understood that Rodriguez's role was to protect the Fuel Oil Cartel Enterprise and make sure no one upset the scheme to defraud. Because Ortiz would not go along with the scheme, he was upsetting the Fuel Oil Cartel Enterprise. Pursuant to established procedures, Ortiz documented this incident, and complained to Rodriguez's supervisor, Defendant Clark. When Clark did nothing, Ortiz submitted a complaint under oath to the Government Ethics Office regarding Clark and Rodriguez.

205.    In 2014, with Ortiz retired, PREPA's Fuel Oil Office certified Inspectorate as a laboratory that could do Sample Analyses and issue Certificates of Analysis. In October 2014, an audit team from PREPA, which included Defendant Torres, purported to conduct an audit, but did not require Inspectorate to correct any of the deficiencies previously documented by PREPA. Torres notified Inspectorate of the certification on November 10, 2014, which certification would not expire until October 3, 2019. PREPA's 2014 certification of Inspectorate was part of its agreement with Petrobras in 2014 to permit Petrobras to hire one laboratory on both Petrobras' and PREPA's behalf to provide the results showing fuel oil was compliant even when it was not.

### (3)    PREPA and Alchem

206.    Until 2010, Alchem tried to avoid participating in the Fuel Oil Cartel Enterprise. While Alchem wanted to provide testing services for PREPA, PREPA gave Alchem very little work because Alchem's tests would show that the fuel oil delivered by the Fuel Oil Suppliers was non-compliant. Moreover, testing is done in stages. As soon as Alchem sent test results to

- 53 -

PREPA in the preliminary stage showing that the fuel oil was out of specifications, PREPA would move the remainder of the testing to Laboratory Participant or Saybolt.

207.    For example, over a period of three to four months in 2010, every single shipment from both STUSCO and Petrobras tested by Alchem was out of compliance on sulfur. Each time, PREPA told Alchem to stop testing and the testing was given to Defendant Saybolt to complete. PREPA never stopped delivery of the Non-Compliant Fuel Oil shipments pursuant to its conspiracy with STUSCO and Petrobras.

208.    By mid- to late-2010 however, Alchem's fuel oil laboratory needed PREPA's work to stay in business. Alchem's management felt it was being penalized for delivering accurate and truthful testing results.

209.    Thus, at the same time PREPA's audit team was lauding Alchem for being the only laboratory in Puerto Rico following approved methodologies for fuel oil testing in the 2010 audit report to PREPA's Governing Board, PREPA's Fuel Oil Office and the Fuel Oil Suppliers were telling Alchem that they were not using Alchem because Alchem's testing results were supposedly taking too long.

210.    PREPA's Fuel Oil Office told Alchem to report the results of the tests of the fuel oil after 30 seconds when in fact the tests should take five minutes if done properly.  Alchem understood that PREPA's Fuel Oil Office wanted consistent Compliant Fuel Oil test results, even for Non-Compliant Fuel Oil.

211.    Because Alchem needed the business, Alchem decided that if PREPA was not interested in accurate results, but instead would pay for false results showing that the fuel oil was compliant, Alchem would participate in the Fuel Oil Cartel Enterprise.

- 54 -

212.     In mid to late 2010, Altol and Alchem hired AmSpec Services, LLC ("AmSpec"), a New Jersey-based inspection and testing company for the petroleum industry, to change the calibration procedures for Alchem's sulphur testing instrument. Altol and Alchem hired AmSpec to develop a calibration curve for Alchem that deviated from accepted methodologies but that would ensure Alchem's test results reflected Compliant Fuel Oil even when it was not.

213.     On December 7, 2010 at about 7:41 p.m., AmSpec's Director of Laboratory Operations, Matthew Reilly, communicated via email with Altol's management, including Carlos Negron, Juan Colon, and Limarie Cintron. Mr. Reilly communicated that AmSpec's goal was to "identify[] a timely resolution for the mutual benefit of everyone involved" concerning the calibration of fuel oil. In his email, Mr. Reilly confirmed the purchase of new calibration instruments and quality control standards that would be used by AmSpec to recalibrate Alchem's fuel oil testing methods.

214.     Mr. Reilly also confirmed that AmSpec's Director of Instrumentation would travel from New Jersey "to the Altol laboratory in Ponce, PR next Tuesday 12/14 for the purposes of assisting with the calibration and verification of Altol's" instruments and to establish a chart for tracking test results. He stated that Altol would then keep those charts "current on a daily basis and email to Ampec'[sic] Director of Laboratory Operations (Matthew Reilly) on a weekly basis for review and action if necessary[.]"

215.     On December 14, 2010 at 5:24 p.m., Alex Leon Olivera, Altol Petroleum Products Director, sent an email to Altol and Alchem employees, including Limarie Cintron, Francis Martinez, Luis Morales, Saris Aponte, Jose Ruiz, Carlos Negron, Alving Tollinchi, and Juan Colon, informing them that AmSpec would be at Altol the next morning for a meeting concerning the fuel oil testing equipment for sulfur.

- 55 -

216.     On December 15, 2010, PREPA's audit team received a phone call from an Alchem employee, asking the team to come to Alchem first thing the next morning.

217.     Also, on December 15, 2010, Francis Martinez, the Director of Operations for Alchem Laboratory, sent an email to Maridaly Tollinchi of Altol to schedule training for the new sulfur testing methods on December 16, 2010, for certain Altol and Alchem employees by AmSpec's Technical Director, Bob Powell.

218.     On December 16, 2010, PREPA's audit team visited Alchem. When they arrived, the audit team was met by an Alchem laboratory employee, who explained that Alchem intended to change the calibration procedure for the sulfur testing instrument. As the audit team observed, they realized that the change would result in Alchem conducting sulfur testing for fuel oil in the same way as Laboratory Participant Saybolt.

219.     PREPA's audit team then visited Alchem's management, who denied that it intended to change the calibration methods for sulfur testing. Alchem's management claimed that the change in calibration was for a different client, not for PREPA.

220.     PREPA's auditors initially accepted management's explanation. In order to document their findings, PREPA's auditors walked through the Alchem fuel oil laboratory towards a small office where they could work.

221.     While walking through the laboratory, PREPA's auditors were stopped by Pedro Fernandez, who was working with PREPA's fuel oil samples. Mr. Fernandez explained to the auditors that AmSpec had helped Alchem to make modifications and "upgrade" the calibration curve used to test the sulfur in the fuel oil. In fact, the "upgrade" to the calibration curve was to change the range of the curve by three percent (3%) to ensure that sulfur results for fuel oil would fall within the limit of .50% to be deemed Compliant Fuel Oil.

- 56 -

222.    Mr. Fernandez told the auditors that he had used the new calibration curve to reanalyze certain of PREPA's fuel oil samples which Alchem had previously found to be out of specification, or Non-Compliant. Mr. Fernandez told the auditors that, with the new calibration curve, the results were now "good." PREPA's auditors requested a print-out of the results from the reanalysis.

223.    Mr. Fernandez told the auditors that Alchem would be using the new calibration curve for all PREPA fuel oil samples going forward. He explained that he had certificates of analysis using the new calibration curve that would be used for training purposes with the Alchem employees on the new procedures.

224.    After observing the new calibration procedure, PREPA's auditors tried to speak again with Alchem's management. Upon learning they were not available, PREPA's auditors advised Alchem that they would return the following day.

225.    PREPA's audit team returned to Alchem on December 17, 2010. At that time, Alchem management, Carlos Negron, advised the auditors that they were not allowed to interview any more employees. Mr. Negron also advised the auditors that Mr. Fernandez was an employee of AmSpec, who was not authorized to speak on behalf of Alchem. Mr. Negron stated that Mr. Fernandez's claims were false and that Alchem was not changing its calibration procedures for PREPA's fuel oil samples.

226.    PREPA's auditors told Mr. Negron that they would confirm Alchem's agreement not to change the calibration procedures in writing. Mr. Negron agreed that this was acceptable.

227.    On December 17, 2010 at 11:42 a.m., Mr. Negron sent an email to Altol and Alchem employees, including Alchem's laboratory directors and supervisors, reminding them that they had signed confidentiality agreements as employees and could be sanctioned for

- 57 -

divulging confidential information. Mr. Negron wrote that, specifically, no employee should divulge the sulfur testing process developed by AmSpec for Alchem's use.

228.    On or about December 22, 2010, PREPA's audit team delivered a letter to Alchem. Because Mr. Negron was not available, they delivered the letter to Alchem's President, Alving Tollinchi Delgado. The letter confirmed the agreement between Mr. Negron and PREPA's auditors that Alchem would not change its calibration procedures. Upon reading the letter, Mr. Tollinchi refused to accept it.

229.    While he was on vacation, the PREPA Office Administrator, Gilberto Rivera, heard about the audit team's letter to Alchem's President within 24 hours. Rivera immediately sent an email to Alicea's supervisor, Luis Romano, instructing him to stop the audit. Romano called Alicea, and insisted that the audit team meet on December 23, 2010. Romano told the audit team that they were not authorized to write to a supplier, accused the audit team of deviating from internal audit rules, and advised them that he had no option but to stop the audit.

230.    Ortiz then reported in writing to PREPA's Governing Board President, Luis Garcia Passalacqua, that, if PREPA permitted Alchem to change its calibration methodology, no laboratory in Puerto Rico would be reporting accurate results for the fuel oil delivered by Fuel Oil Suppliers to PREPA. Passalacqua did not respond to Ortiz.

231.    Accordingly, Ortiz wrote to Passalacqua a second time, requesting that he be released from a confidentiality agreement he had signed so that he could complain about the problems and irregularities he had observed with the Fuel Oil Cartel Enterprise. This time, Passalacqua responded, threatening Ortiz with disciplinary action. When Ortiz did not confirm his acquiescence to remain silent, Passalacqua wrote to Ortiz again, but Ortiz refused to accept the second letter. Ortiz then filed a formal complaint with the Comptroller's Office.

232.    During this time, the auditors continued to inspect Alchem to determine whether in fact it had changed its calibration procedures.

233.    On January 25, 2011, an Alchem employee gave PREPA's auditors a copy of Alchem's fuel oil laboratory log book. The log book contains a daily handwritten record of the tests conducted by the laboratory's chemists of PREPA's fuel oil. It reflects the name of the barge from which the fuel oil was taken, the calibration curve, and the test results.

234.    A sample page from Alchem's log book from December 14, 2010 – prior to the change in calibration procedure – follows:



235.     On December 31, 2010, a telling change occurs in the log book. Alchem's chemist documents that Alchem changed its calibration procedure to the one developed by AmSpec for the purposes of covering up Non-Complaint Fuel Oil. In fact, knowing that the change in calibration procedure deviated from the scientific standards, Alchem's chemist wrote in the log book that the procedure was ordered by management and that the lab supervisors, Luis

Morales and Nelson Rivera, were present for the change. The entry on page 84 of Alchem's log

book from December 31, 2010 follows:



A certified translation of page 84 of Alchem's log book is attached to the Complaint as Exhibit

A.

236.    The daily entries in Alchem's fuel oil laboratory log book after December 31,

2010, reflect that Alchem thereafter implemented the new calibration curve developed by

AmSpec to ensure that Non-Compliant Fuel Oil would test as compliant. In addition to the name

of the test at the top of each page, the chemists began including a note at the bottom of every

daily entry stating that a manager or supervisor ordered the use of calibration curve #3 from

AmSpec. An example follows:



A certified translation of page 88 of Alchem's log book is attached as Exhibit B.

237.     Thus, contrary to management's assurances to the PREPA auditors in December

2010 that they would not implement any changes to their calibration procedures, Alchem did

adopt the new calibration curve developed by AmSpec to falsify test results on December 31,

2010, and used it for all testing of PREPA's fuel oil samples thereafter.

- 62 -

238.   For every log book entry like the example on page 88 of the log book above, Alchem reported compliant test results for Non-Compliant Fuel Oil to PREPA via telephone, email or text, and documented the results in Certificates of Analysis which were transmitted to PREPA via email.

239.   By way of example only, on January 21, 2011 at 1:06 p.m., Alchem faxed compliant test results resulting from the use of the AmSpec calibration method to Defendants Cesar Torres and William Clark at PREPA. The test results were for a delivery of fuel oil by Defendant STUSCO on the Barge Tennessee. The test results reflected Compliant Fuel Oil:

| Tests | Method | Minimum | Maximum | Result |
|---|---|---|---|---|
| Gravity API @ 60°F | D-287-02-06 | 18.5 | 18.0 | 16.0 |
| Visc. Furol SSF @ 122°F | D-445-09 | 150 | 350 | 272 |
| Sulfur, wt % | D-4294-03 A | | 0.50 | 0.50 |
| Vanadium content PPM | D-5863 B 00a-05 | | 150 | 14 |
| Asphaltenes, wt % | D-3279-97 | | 8.0 | 2.1 |

However, had the correct calibration methods been used rather than the AmSpec calibration method, the fuel oil delivered by STUSCO would have been reported as Non-Compliant.

240.   In another example, on January 22, 2011, Alchem faxed or emailed compliant test results resulting from the use of the AmSpec calibration method to PREPA's fuel oil office. The test results were for a delivery of fuel oil by Defendant Trafigura AG on the vessel named "MT Asphalt Star." The test results reflected Compliant Fuel Oil:

- 63 -

| Tests | Method | Minimum | Maximum | Result |
|---|---|---|---|---|
| Gravity API @ 60°F | D-287-92-06 | 10.5 | 18.0 | 14.8 |
| Visc. Furol SSF @ 122°F | D-445-09 | 150 | 350 | 114 |
| Water and Sediment, vol% | D-1796-04 | | 1.0 | 0.4 |
| Flash Point, F, PMCT | D-93-06 | 150 | | 175 |
| Sulfur, wt % | D-4294-08 A | | 0.50 | 0.48 |
| Ash, wt% | D-482-03 | | 0.1 | 0.02 |
| Vanadium content, ppm | D-5863 B 00a-05 | | 150 | 16 |
| Asphaltenes, wt, % | D-3279-97 | | 8.0 | 4.1 |
| Pour Point, °F | D-97-06 | | 75 | 56 |
| Sodium + Potassium, ppm | D-5863 A 00a-05 | | 35 | 16 |
| Calcium, ppm | D-5863 A 00a-05 | | 75 | 87 |
| Heating Value, BTU/Gal (Gross) 60°F | D-240-02 | 150,000 | | 150,806 |
| Heating Value, BTU/Lb (Net) | | | | 18,722 |

However, had the correct calibration methods been used rather than the AmSpec calibration method, the fuel oil delivered by Trafigura AG would have been reported as Non-Compliant.

241.   Accordingly, Alchem changed its calibration methods in ways that did not comply with approved methodologies in order to produce test results that would always show fuel oil was compliant even when it was not. While certain Alchem employees refused to use the irregular testing methods, Alchem was insistent, pursuant to its agreement with PREPA and the Fuel Oil Supplier Participants, that the irregular testing methods be used in order to achieve Compliant Fuel Oil test results for Non-Compliant Fuel Oil.

242.   The audit team did understand the pressure on Alchem. During the audit in 2010, Alchem told the audit team that the team should track the payments by PREPA to the Laboratory Participants to demonstrate that Saybolt and Inspectorate received most of PREPA's business because they had been participating in the Fuel Oil Cartel Enterprise for many years.

243.   A member of the audit team went to PREPA's accounting office and asked for evidence of all payments to Saybolt, Inspectorate and Alchem for the past 12 months to verify

- 64 -

Alchem's claim that it was well behind in income from PREPA compared to the other two laboratories. The audit team obtained approximately 12 months of payments, which showed PREPA paid Alchem just $80,000, while Inspectorate received $200,000 (for inspection services only), and Saybolt received $2,300,000 million.[50]

244.     According to Alchem, Saybolt received the majority of the testing work from PREPA because Saybolt ensured that all tests for the fuel oil delivered by the Fuel Oil Suppliers reflected that the fuel oil was compliant despite the fact that the fuel oil was non-compliant. Alchem's President Alving Tollinchi Delgado told the audit team that his decision to require Alchem to change its calibration methods was a "business decision," not a technical decision.

**D.     The Fuel Oil Supplier Participants Thank Clark a/k/a "The Emperor" for His Participation in the Fuel Oil Cartel Enterprise**

245.     By 2014, PREPA was financially strapped, and creditors were worried that PREPA would eventually default on part of its $8.3 billion in outstanding bonds. Thus, as part of a forbearance agreement with its creditors allowing PREPA to extend its line of credit, PREPA was required to agree to restructure.

246.     Defendant Clark knew with the oversight of the creditors that his time at PREPA was coming to an end. In fact, an August 14, 2014, agreement with its creditors required PREPA to appoint a Chief Restructuring Officer by September 8, 2014.[51]

247.     Thus, in advance in July 2014, Defendant Clark retired after more than 25 years of working in the Fuel Oil Office and using PREPA to control the Fuel Oil Cartel Enterprise. The Fuel Oil Supplier Participants, among others, threw a lavish retirement party for Clark to, on information and belief, thank him for his decades of ensuring that the Fuel Oil Cartel Enterprise

---

[50] These numbers are approximate, and demonstrate the relative disparity.

[51] http://blogs.barrons.com/incomeinvesting/2014/09/04/puerto-rico-prepa-utility-names-chief-restructuring-officer/.

was both successful and undetected. However, for a Commonwealth in deep recession, the party was the tip that the ever-increasing and alarmingly high electricity costs were not the result of natural market conditions, but instead the result of the Fuel Oil Cartel Enterprise. [52]

**E.  PREPA Cedes Control of the Fuel Oil Cartel Enterprise to Petrobras in September 2014**

248.    The scheme is still going on today. For example, on August 14, 2014, a controversy erupted regarding a fuel oil delivery by Petrobras at the Aguierre plant on the Energy 8001 barge, because Alchem reported to PREPA that the BTUs were noncompliant.[53] As a result of Alchem's report, PREPA should have rejected the fuel oil; instead PREPA told Alchem to stop testing.

249.    On information and belief, in 2014, PREPA agreed to let Petrobras control all aspects of the Fuel Oil Enterprise. Petrobras was able to gain control as a result of the severe financial restraints under which PREPA is currently operating. While Petrobras cut off PREPA's fuel oil credit line in May 2014 unless PREPA became current, Petrobras "relented" so long as future contracts were entered on its terms. One such term required that PREPA allow Petrobras to select the laboratories to be used by both the supplier and PREPA to verify fuel oil content, rather than to have competing or conflicting Certificates of Analysis from Sample Analyses.

250.    On September 30, 2014, PREPA and Petrobras signed a contract for the delivery of  Compliant Fuel Oil in exchange for the payment of $680,000,000 through August 15, 2015. The contract solidified Petrobras' control of the Fuel Oil Cartel Enterprise and the choice of Laboratory Participants. Section VI.C provides in pertinent part:

---

[52] Video of "¿Por qué pagamos tanto? En su totalidad," at 42:11-42:57, available at http://video.univision.mobi/shows-de-tv/video/2014-05-13/por-que-pagamos-tanto-totalidad?id=436583.

[53] The heating or combustion value of a fuel can be expressed as the quantity of heat (BTU per gallon) released during the combustion process where oxygen from the air reacts with the hydrogen and carbon in the fuel. The BTU measurement reflects the grade of fuel oil.

- 66 -

> To assure fuel compliance with Specifications, before discharge of
> each delivery, the Parties will contract a mutually agreed
> independent inspection company to perform laboratory analyses as
> per specified methods of the fuel actually being supplied. A
> laboratory certificate including all the parameters contained in
> Exhibit A and signed by an authorized chemist in Puerto Rico will
> be produced and its results shall be considered final and binding
> for both parties. Acceptance criteria will be based on these
> laboratory results.

251.    For each delivery of fuel oil, PREPA had previously used a laboratory separate from the Fuel Oil Supplier Participant to verify test results. Petrobras' requirement that it would choose the Laboratory Participant for both PREPA and Petrobras formally removed what was supposed to be an independent check.

252.    On or about November 5, 2014, PREPA announced it was going to do an audit of water quality and fuel oil testing for the Laboratory Participants.

253.    On or about November 12, 2014, PREPA audited Alchem. The PREPA auditors found Alchem's procedures and protocols to be acceptable, and stated that they would recommend that PREPA keep Alchem qualified as one of the laboratories to provide fuel oil testing.

254.    However, Petrobras had previously only qualified Laboratory Participants Saybolt and Inspectorate, but not Alchem, as laboratories qualified to test fuel oil.

255.    Once Alchem learned of the new control ceded to Petrobras, an Alchem Vice President asked Petrobras to visit Alchem's facilities and do an inspection to qualify Alchem.

256.    Petrobras decided to do inspections of all three laboratories. Accordingly, during December 2014, Petrobras auditors, Anibal Raas and Alain Olivieri, visited Saybolt and Inspectorate on a Monday, and Alchem on a Wednesday. Petrobras prepared a standard or composite sample of fuel oil for all three laboratories to test, so that Petrobras could compare the

- 67 -

certified values of the standard to the results reached by each laboratory. A Petrobras auditor witnessed the analysis in each of the laboratories.

257.    Specifically, at Alchem, the Petrobras auditors required the testing of BTUs, sulfur, flash point, pour point, viscosity and API gravity.

258.    Luis Morales, who was then an Alchem employee, was assigned to oversee the sulfur testing for Alchem.  Alchem's President was also present for the testing. As the Petrobras auditor was watching the sulfur testing, the auditor told Morales (and the Alchem President) that Alchem was the only one of the three laboratories he visited that was calibrating the instrument; neither Inspectorate nor Saybolt calibrated the instrument. Thus, Petrobras' admission demonstrated that Laboratory Participants Saybolt and Inspectorate were submitting falsified test results.

259.    In fact, Defendant Petrobras admitted to Alchem that the Laboratory Participants purposefully did not follow approved methodologies. For example, when Alchem started doing the sulfur analysis with the calibrated instrument, the Petrobras auditor commented that one of the Laboratory Participants had attempted to analyze the fuel oil sample without a standard. The Petrobras auditor explained that he asked the Laboratory Participant to use standards, but there were no standards in the laboratory. Thus, even though the Laboratory Participant regularly submitted test results to PREPA showing fuel oil was compliant, it would be impossible for the Laboratory Participant to properly conduct the tests without a standard. Thus, the Laboratory Participant was submitting falsified results to fulfill its role in the scheme.

260.    The auditor explained to Alchem that he then provided the Laboratory Participant with the standards he had with him. The Laboratory Participant should have calibrated the instrument with the control fuel oil, which was certified to be the same as compliant fuel oil.

- 68 -

Then, any future tests with those standards would show whether the fuel oil being tested was compliant.

261.    However, the Laboratory Participant calibrated the instrument with a diesel oil. By calibrating the standards with diesel oil, the Laboratory Participant was ensuring that tests of Non-Compliant Fuel Oil delivered by the Fuel Oil Supplier Participants would reflect that the fuel oil was compliant. The Petrobras auditor told Morales and the Alchem President that, for fuel oil which the Petrobras auditor knew was .50 sulfur content (to be compliant, the sulfur level in the fuel oil cannot exceed .50); this other Laboratory Participant reported .30 sulfur content; similarly, the Petrobras auditor told Alchem that the other Laboratory Participant, for fuel oil with .70 sulfur content, reported .50. The Petrobras auditor concluded that this Laboratory Participant's tests would always report .20 under the actual sulfur content, thus ensuring that test results of Non-Compliant Fuel Oil would be falsified to reflect compliant results.

262.    The other analysis overseen by Morales (with Alchem's President present) was flash point; again the Petrobras auditor said Alchem was the only one of the three laboratories to calibrate its instrument. Thus, Petrobras' admission again demonstrated that Laboratory Participants Saybolt and Inspectorate were submitting falsified test results.[54]

263.    With respect to BTUs, the certified value of the standard was 11,373 BTUs per pound. Using its calibrated instrument to test the standard, Alchem's test results reflected 11,373 BTUs per pound, exactly the certified value.

264.    Alchem's BTU measurements had traditionally tested low for Petrobras shipments; Alchem understood that the non-compliant test results were the reasons why

---

[54] The auditor told Alchem that he was frustrated because of the number of irregularities he has seen in most of the analyses by Laboratory Participants Saybolt and Inspectorate; in fact, test results from Saybolt and Inspectorate for BTUs were 300 BTUs higher than the certified value. This reflects that Saybolt and Inspectorate were submitting test results certifying that fuel oil was compliant when it was not.

Petrobras had previously refused to use Alchem. When the Petrobras auditor saw that Alchem got the exact result as Petrobras, the Petrobras auditor acted surprised and called his colleague to tell him that Alchem was correctly conducting the tests. Subsequently, Alchem internally celebrated that they were finally recognized by Petrobras for following approved methodologies and they expected to be certified by Petrobras to do future work.

265.   Despite the fact that Alchem was the only laboratory audited that conducted the tests during the audit that would correctly reflect whether fuel oil was compliant or not, Petrobras headquarters in Brazil, sent an email to Alchem one week later, declining to certify it. While Petrobras headquarters complained about Alchem's testing methods as a pretext, it was clear to Morales that Petrobras had no intention of letting Alchem test its fuel oil because the tests would show the fuel oil was non-compliant. Petrobras' intention was reflected by the fact that Petrobras certified Laboratory Participants Inspectorate and Saybolt, because their tests would always give a passing grade to non-compliant fuel oil.

266.   As a result, Alchem fired Morales, because he was one of the employees within Alchem that insisted that Alchem do the tests the right way. However, prior to his termination, Alchem Vice President Juan Colon told Morales that he should talk to the Senate investigator who was investigating the Fuel Oil Cartel. The Alchem Vice President said it was important that the Senate investigator know what PREPA and Petrobras were doing to ensure the purchase of Non-Compliant Fuel Oil by accepting the "irregularities" with Laboratory Participants Saybolt and Inspectorate.

**F.   Plaintiffs and the Class Were Damaged**

267.   PREPA pays over $3 billion per year for fuel oil used in the combustion of electricity. 100% of these costs are passed on to Plaintiffs and the Class.

- 70 -

268.     Compliant Fuel Oil is more expensive than Non-Compliant Fuel Oil. Thus, PREPA's acceptance of Non-Compliant Fuel Oil, while charging Plaintiffs and the Class for Compliant Fuel Oil, caused Plaintiffs and the Class to suffer significant out-of-pocket losses.

269.     Thus, Defendants' scheme to defraud has damaged Plaintiffs and the Class, who have borne the entire cost of the scheme.

**G.     Use of Mails and Wires**

270.     Defendants used thousands of mail and interstate wire communications to create and manage the fraudulent scheme and RICO enterprise.  Defendants' scheme involved national and multi-national companies' contracting for and procurement of fuel oil from states and nations outside Puerto Rico, marketing and sales plans and programs, and encompassed governmental agents and employees, laboratories, and Fuel Oil Suppliers across and outside the country.

271.     Defendants' use of the mails and wires to perpetrate the fraud involved thousands of communications, including:

a.     Fuel orders, contracts and related negotiation communications exchanged via the mail, facsimile and electronic mail;

b.     Requests for laboratory testing and falsified laboratory results exchanged via mail, facsimile and electronic mail;

c.     Communications, including financial payments sent via mail and wire, for the sale and procurement of fuel oil;

d.     Monthly bills to Plaintiffs and the Class on which 100% of the costs of Non-Compliant Fuel Oil at Compliant Fuel Oil prices was passed through from PREPA to Plaintiffs and the Class throughout the Class Period; and

e.     Receiving the proceeds of the Defendants' improper scheme.

- 71 -

272.     In addition, Defendants' corporate headquarters have communicated by United States mail, telephone and facsimile with various local and regional district managers and employees in furtherance of Defendants' scheme.

## VI.    CLASS ACTION ALLEGATIONS

273.     Plaintiffs bring this action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and a Class defined as follows:

> All persons or entities that paid the Puerto Rico Electric Power Authority, a/k/a Autoridad de Energía Eléctrica, for electricity during the period January 1, 2002 to the present.

274.     Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' legal representatives, predecessors, successors, assigns, and employees.

275.     The definition of the Class is unambiguous.  Plaintiffs are members of the Class that they seek to represent.  Members of the Class can be identified using PREPA's billing databases that track sales of electricity to Plaintiffs and the Class, as well as the charges for fuel oil to Plaintiffs and the Class. Class members can be notified of the class action through publication and direct mailings to address lists maintained in the usual course of business by PREPA.

276.     Class members are so numerous that their individual joinder is impracticable. The precise number of Class members is unknown to Plaintiffs, but it is clear that the number greatly exceeds the number to make joinder impossible. According to PREPA, it currently serves 1.5 million customers.

277.     Common questions of law and fact predominate over the questions affecting only individual Class members.  Some of the common legal and factual questions include:

- 72 -

a.      Whether Defendants engaged in a scheme to provide and pay for Non-Compliant Fuel Oil;

b.      Whether Defendants engaged in a scheme to pay undisclosed commissions or kickbacks to cause PREPA to accept Non-Compliant Fuel Oil while paying for Compliant Fuel Oil;

c.      Whether Defendants engaged in a scheme to falsify laboratory reports reporting Non-Compliant Fuel as compliant;

d.      Whether Defendants violated RICO, 18 U.S.C. § 1962;

e.      Whether Defendants used the mails and wires to create and manage their unlawful scheme to defraud;

f.      Whether Defendants violated the common law of unjust enrichment; and

g.      The nature and extent of damages and other remedies to which the conduct of Defendants entitles the Class members.

278.   Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by the Class members. Similar or identical statutory and common law violations and deceptive business practices are involved. Individual questions, if any, pale by comparison to the numerous common questions that predominate.

279.   The injuries sustained by the Class members flow, in each instance, from a common nucleus of operative facts – Defendants' misconduct.  In each case Defendants engaged in a scheme to enter contracts for the supply and purchase of Compliant Fuel Oil at more expensive prices while secretly agreeing to supply and accept Non-Compliant Fuel Oil, and covering up the fact that non-compliant fuel oil was supplied through falsified lab reports.

280.   The Class members have been damaged by Defendants' misconduct.  The Class members have paid the costs of Compliant Fuel Oil, as well as borne the costs of the undisclosed commissions paid to the PREPA Participants by the Fuel Oil Supplier Participants, which costs would have been far lower had Defendants' fraud been disclosed.

- 73 -

281.    Plaintiffs' claims are typical of the claims of the other Class members.  Plaintiffs paid for the fuel oil reflected on their monthly bills.

282.    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are familiar with the basic facts that form the bases of the Class members' claims. Plaintiffs' interests do not conflict with the interests of the other Class members that it seeks to represent. Plaintiffs have retained counsel competent and experienced in Class action litigation and intend to prosecute this action vigorously. Plaintiffs' counsel has successfully prosecuted complex Class actions, including RICO class actions. Plaintiffs and Plaintiffs' counsel will fairly and adequately protect the interests of the Class members.

283.    The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the Class members. The relief sought per individual member of the Class is small given the burden and expense of individual prosecution of the potentially extensive litigation necessitated by the conduct of Defendants. Furthermore, it would be virtually impossible for the Class members to seek redress on an individual basis. Even if the Class members themselves could afford such individual litigation, the court system could not.

284.    Individual litigation of the legal and factual issues raised by the conduct of Defendants would increase delay and expense to all parties and to the court system. The Class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court. Given the similar nature of the Class members' claims and the absence of material differences in the state statutes and common laws upon which the Class members' claims are based, a nationwide Class will be easily managed by the Court and the parties.

## VII.   FRAUDULENT CONCEALMENT AND TOLLING OF STATUTES OF LIMITATIONS

285.   Defendants' fraudulent scheme depended on concealing their involvement in the Fuel Oil Cartel Enterprise. Indeed, the Fuel Oil Cartel Enterprise was created precisely to make it appear to the public that Defendants did not have a hand in any scheme to accept Non-Compliant Fuel in exchange for undisclosed commissions or kickbacks while paying for Compliant Fuel Oil and overcharging Plaintiffs and the Class. Additionally, as described above, Defendants had the Fuel Oil Cartel Enterprise perform the procurement, supply and testing of Non-Compliant Fuel Oil in the semblance of legitimate meetings, testing, and other actions for the procurement and supply of Compliant Fuel Oil. Also as described above, Defendants' involvement was hidden because Defendants hid their financial connections between the PREPA Participants and Fuel Oil Supplier Participants and used the Laboratory Participants to cover up the fraud with falsified lab reports. These activities and others described above concealed Defendants' fraudulent promotional activities and Plaintiffs could not have discovered the scheme alleged herein earlier in the exercise of reasonable diligence. Indeed, much of the scheme to this day remains concealed by Defendants.

286.   Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. By way of example, Defendants falsified lab testing reports, and did not disclose the kickbacks paid and received in connection with fuel oil contracts and purchases.  Moreover, PREPA prevented its internal auditors from conducting audits that would have discovered the fraud, discontinued the Preventative Program for Environmental Audits in the Power Generating Plants, and buried auditors' reports of fraudulent activity, including decisions to knowingly accept Non-Compliant Fuel and pay compliant fuel prices. PREPA also paid a purported independent auditor to cover up the scheme

- 75 -

and report material compliance with the EPA Consent Decree. Plaintiffs have been kept in ignorance of vital information essential to the pursuit of these clams, without any fault or lack of diligence on their part.  Plaintiffs could not reasonably have discovered the fraudulent nature of Defendants' conduct.

287.    Plaintiffs were not and could not have been on notice of Defendants' scheme until at least on or about May 12, 2014, when the television program entitled "¿Por qué pagamos tanto? En su totalidad," aired in Puerto Rico.[55] At that time, a former internal auditor who has since retired from PREPA decided that PREPA's participation in the scheme to defraud should be reported. Without the disclosures from the internal auditor, Plaintiffs could not have known about the internal cover-up of the scheme to defraud at PREPA.

288.    After the airing of the television program, the Puerto Rico Justice Department launched a probe into PREPA's fuel purchasing practices. On May 23, 2014, agents from the Justice Department's Special Investigations Bureau seized documents and computers from PREPA's fuel purchasing department.[56]

289.    Accordingly, Defendants are estopped from relying on any statute of limitations to defeat any of Plaintiffs' claims.

## VIII.   CAUSES OF ACTION

### COUNT I

### Violation of 18 U.S.C. § 1962(c)
### (The Fuel Oil Cartel Enterprise)

290.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.

---

[55] Video of "¿Por qué pagamos tanto? En su totalidad," at 42:11-42:57, available at http://video.univision.mobi/shows-de-tv/video/2014-05-13/por-que-pagamos-tanto-totalidad?id=436583.

[56] http://caribbeanbusinesspr.com/prnt_ed/more-than-1.1-million-tv-viewers-tuned-in-to-energy-crisis-special-9993.html.

291.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

292.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendants, including their employees and agents; (ii) the PREPA Participants; (iii) the Fuel Oil Supplier Participants; and (iv) the Laboratory Participants as set forth *supra* ("Fuel Oil Cartel Enterprise"). The Fuel Oil Cartel Enterprise is an ongoing organization that functions as a continuing unit. The Fuel Oil Cartel Enterprise was created and used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the Fuel Oil Cartel Enterprise.

293.    The Fuel Oil Cartel Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of accepting Non-Compliant Fuel in exchange for undisclosed commissions or kickbacks while paying for Compliant Fuel Oil, overcharging Plaintiffs and the Class and earning profits therefrom.

294.    Defendants have conducted and participated in the affairs of the Fuel Oil Cartel Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

295.    The Fuel Oil Cartel Enterprise engaged in and affected interstate commerce, because, *inter alia*, PREPA contracted with multi-national corporations for the procurement, supply and delivery of millions of barrels of fuel oil, at costs exceeding $10 billion, to be shipped via barge from all over the world to Puerto Rico.

296.    Defendants exerted control over the Fuel Oil Cartel Enterprise, and Defendants

participated in the operation or management of the affairs of the Fuel Oil Cartel Enterprise,

through a variety of actions including the following:

a.    Defendants controlled the stream of information disseminated by the Fuel Oil Cartel Enterprise ensuring that only favorable laboratory results were published and disclosed and unfavorable results were suppressed or changed.

b.    The PREPA Participants and Fuel Oil Supplier Participants selected and approved which laboratory would test the non-compliant oil, and selected and approved each laboratory based on the falsified test results necessary for the continuation of the Fuel Oil Cartel Enterprise.

c.    The PREPA Defendants selected who received requests for bid for the supply of fuel oil, the bid results, and who received bid awards for the supply of fuel oil in exchange for providing kickbacks to perpetuate the Fuel Oil Cartel Enterprise.

d.    Defendant PREPA paid the Laboratory Participants and the Fuel Oil Supplier Participants for their participation in the Fuel Oil Cartel Enterprise, and the Fuel Oil Supplier Participants paid the Laboratory Participants for their participation in the Fuel Oil Cartel Enterprise.

e.    Defendants placed their own employees and agents in positions of authority and control in the Fuel Oil Cartel Enterprise.

297.    As detailed above, Defendants' fraudulent scheme consisted of, *inter alia*:

(a) deliberately misrepresenting, and causing others to misrepresent, the supply of Non-

Compliant Fuel Oil so that Plaintiffs and the Class paid for Compliant Fuel Oil that was not

delivered as well as the kickbacks associated with the deliveries; (b) publishing or causing to

have published materials containing false information upon the public, auditors, and

governmental agencies, such as the EPA, relied in believing that compliant fuel oil was delivered

and the charges for compliant fuel oil were legitimate; and (c) actively concealing, and causing

others to conceal, information about the true nature of the fuel oil delivered, as well as the

payments of kickbacks or undisclosed commissions.

- 78 -

298.    Defendants' scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiff and others to pay for excessive overcharges for fuel oil on their electricity bills.  Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs.  Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiffs' property.

299.    The pattern of racketeering activity alleged herein and the Fuel Oil Cartel Enterprise are separate and distinct from each other.  Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Fuel Oil Cartel Enterprise.

300.    The causal chain in this case is anything but attenuated. Defendants have always known that, because of the structure of the Puerto Rico electrical system, PREPA would not bear the costs of the fuel oil. Defendants' fraudulent scheme, meant to increase their revenues and profits, only became successful once Defendants received payments for the fuel oil and related services. Those payments came from Plaintiffs and the Class.

301.    Plaintiffs have been injured in their property by reason of these violations in that Plaintiffs have made thousands of dollars in payments for fuel oil that they would not have made had Defendants not engaged in their pattern of racketeering activity.

302.    Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity, as described above.

303.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT II

**Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate 18 U.S.C. § 1962(c)**

304.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.

305.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

306.    Defendants have violated section 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the section 1962(c) Enterprise described previously through a pattern of racketeering activity.

307.    As demonstrated in detail above, Defendants' co-conspirators, including but not limited to the PREPA Participants, Fuel Oil Supplier Participants, and Laboratory Participants have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff of money.

308.    The nature of the above-described Defendants' co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

309.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs have been and are continuing to be injured in its business or property, as set forth more fully above.

- 80 -

310.    Defendants have sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

      a.    Multiple instances of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1342;

      b.    Multiple instances of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346; and

      c.    Multiple instances of wire fraud in violation of 18 U.S.C. §§ 1343 and 1346.

311.    Defendants have sought to and have engaged in the violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting Defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

## COUNT III

### Violation of Common Law of Unjust Enrichment

312.    The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by Plaintiff on behalf of itself and members of the Class. To the detriment of Plaintiffs and members of the Class, Defendants have been, and continue to be, unjustly enriched as a result of the unlawful and/or wrongful collection of, *inter alia*, payments for Non-Compliant Fuel Oil and associated kickbacks.

313.    Defendants have unjustly benefited through the unlawful and/or wrongful collection of, *inter alia*, payments for Non-Compliant Fuel Oil and kickbacks and continue to benefit to the detriment and at the expense of Plaintiffs and members of the Class.

314.    Accordingly, Plaintiffs and members of the Class seek full restitution of Defendants' enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class members request that the Court enter an order or judgment against Defendants including the following:

A.      Certification of the action as a Class Action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to Plaintiffs' claims for injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages, and appointment of Plaintiff as Class Representative and its counsel of record as Class Counsel;

B.      Damages in the amount of out-of-pocket losses for Non-Compliant Fuel Oil and associated kickbacks;

C.      Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

D.      Pre-judgment and post-judgment interest on such monetary relief;

E.      Equitable relief in the form of restitution, including restitutionary disgorgement into a fluid recovery fund, to restore monies received by Defendants as a result of the unfair, unlawful and/or deceptive conduct alleged in herein;

F.      Other appropriate injunctive or declaratory relief;

G.      The costs of bringing this suit, including reasonable attorneys' fees; and

H.      All other relief to which Plaintiffs and members of the Class may be entitled at law or in equity.

- 82 -

DATED:  April 18, 2016

ISMAEL MARRERO ROLÓN, ANNE
CATESBY JONES, JORGE VALDES
LLAUGER, PUERTO RICO BATHROOM
REMODELING, INC.,

By: */s/Elizabeth A. Fegan*
Elizabeth A. Fegan
Mark Vazquez
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone:  (708) 628-4949
Facsimile:  (708) 628-4950
E-mail:  beth@hbsslaw.com

Jane A. Becker Whitaker
USDC NUMBER 205110
P.O. Box 9023914
San Juan, Puerto Rico 00902
Telephone: (787) 754-9191
Facsimile: (787) 764-3101
E-Mail: janebeckerwhitaker.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
E-mail:  steve@hbsslaw.com

J. Barton Goplerud
Andrew Howie
HUDSON, MALLANEY, SHINDLER &
ANDERSON, P.C.
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA  50265
Telephone:  (515) 223-4567
E-mail:  jbgoplerud@hudsonlaw.net

Daniel R. Karon
KARON LLC
700 W. St. Clair Ave., Suite 200
Cleveland, OH 44113
Direct: (216) 622-1851
Fax: (216) 241-8175
Cell: (216) 390-2594
E-mail: dkaron@karonllc.com

010476-11  760966 V1

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, of all issues so triable.


DATED:  April 18, 2016

By: */s/Elizabeth A. Fegan*
Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone:  (708) 628-4949
Facsimile:  (708) 628-4950
E-mail:  beth@hbsslaw.com

- 85 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 18, 2016 a copy of the foregoing was filed electronically.

Notice of this filing will be sent to the attorneys of record by operation of the Court's electronic

filing system. Parties may access this filing through the Court's system.

                                                                 */s/Elizabeth A. Fegan*
                                                                 Elizabeth A. Fegan

010476-11  760966 V1